**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, et al., | |
| Plaintiffs, | Case No. 1:13-cv-01236 (CKK) |
| v. | |
| US AIRWAYS GROUP, INC. | |
| and | Initial Scheduling Conference: |
| AMR CORPORATION, | Friday, August 30, 2013 |
| | 9:30 a.m. |
| Defendants. | |

**REPLY IN SUPPORT OF DEFENDANTS' MOTION TO SET TRIAL DATE**

I.       **Introduction**

Plaintiffs seem surprised that there is no automatic entitlement or acquiescence by defendants in what would effectively equate to some 9 months of injunctive relief. Plaintiffs should not be surprised. Defendants' proposal of a November 12 trial date is reasonable and consistent with the District Court's well-established practice of expeditiously adjudicating merger challenges.

In answer to defendants' request for a trial date 90 days from the filing of the complaint, plaintiffs mischaracterize precedents, disregard the significant harm to both Airlines as they operate in an extended period of uncertainty, discount the seriousness of bankruptcy, grossly underestimate the difficulty of putting together a successful reorganization plan, and summarily dismiss the loss to others, including employees and customers, while exaggerating their own difficulties. After having had more than 16 months to conduct their investigation with the benefit of compulsory process, plaintiffs presume a right to the equivalent of a preliminary

injunction absent any showing, much less a court finding, in their favor.  Indeed, plaintiffs seek a

schedule that would place the merger at risk regardless of its competitive benefits.  Thus,

plaintiffs incorrectly contend that:

- ***"Six months to a full trial on the merits is in keeping with timetables in comparable merger cases."*** (Opp'n at 8.)  As the table below demonstrates, of the 23 cases cited by the parties, only 3 had trial schedules as long as plaintiffs' request, whereas 14 had schedules that were actually *shorter* than what defendants propose.  Moreover, not a single case cited by plaintiffs or defendants in which the schedule went longer than 110 days actually made it to a final adjudication after *a trial on the merits*.  That is exactly what drives the Airlines' concern here: that a trial delayed according to the plaintiffs' schedule would knock the bottom out of this merger.

- ***"[I]nterested parties knew what should have been clear: that a merger of two large firms competing in already highly concentrated markets might draw an antitrust challenge."*** (Opp'n at 3.)  In fact, the DOJ approved three large airline mergers in the last five years using criteria that, if applied here, would demonstrate that US Airways/American Airlines is even more pro-competitive than the others.

- "***American reported record profits in the second quarter of this year.***" (Opp'n at 3.)  In fact, prior to its restructuring, American lost $10 billion in the last decade.

- "***American's restructuring efforts have been extraordinarily successful and have positioned the company to compete as a strong and vibrant standalone firm.***" (Opp'n at 3.)  Although American has made progress in restructuring, it has not yet presented an alternative plan to the bankruptcy court.

- ***The harm of delay is merely costs that American "may incur" and "some uncertainty" that "employees will face."*** (Opp'n at 5.)  This is a significant understatement of the harm attendant to a delayed trial. The Airlines conservatively estimate that this merger will result in net direct consumer benefits of conservatively $500 million annually.  The pay raises and benefits improvements that have been promised to both airlines' employees are put on hold—amounting to $400 million annually.  That translates to nearly $2.5 million permanently lost for every day of delay.  And American's employees, entitled to an equity stake worth about $2 billion (at today's valuations) when the merger is closed, would have to stand by and watch as the value of that equity is buffeted by the market.

Further, as plaintiffs are well aware, their proposal presents a significant risk that the

schedule rather than the merits will determine the future of the planned transaction.  The delay

proposed by plaintiffs inherently puts the transaction at risk because two independent companies can be asked to stay in limbo for only so long before they need to make independent plans.  To avoid a schedule that could itself be outcome determinative, this trial should be set for November 12, 2013 (or as soon thereafter as the Court's schedule will accommodate).

Defendants are prepared to try this case starting November 12, 2013.  Instead, plaintiffs seek a March trial date that will push a decision at least into April and very possibly May.  This despite a 16-month or more head start both in party and third-party discovery, together with access to multiple detailed reports by defendants' expert consultants, as well as access to defendants' key witnesses.  If defendants can be ready on November 12, so can plaintiffs.

## II.     Long-standing Precedent Supports Defendants' Proposed Schedule

The chart below includes all of the cases put forward by both plaintiffs and defendants.[1] It demonstrates that merger cases get to trial within 90 days as a matter of course.  It also shows that the likelihood of a merger being abandoned steadily grows as trial dates get further and further out.  Under the Clayton Act, plaintiffs have a right to seek an injunction, but not a schedule by which they can "win" through delay and trial avoidance.

---

[1] As plaintiffs concede, plaintiffs' cases were not included in defendants' brief because they were ultimately settled or abandoned.  (Opp'n at 7.)

## TABLE 1
### Merger Challenge Cases Cited in Defendants' and Plaintiffs' Memoranda

| Case Name | Filing of Complaint | Trial (First Day) | Days to Trial | No. of Trial Days | Opinion / Order |
|---|---|---|---|---|---|
| Sungard Data Sys. (DOJ) | Oct. 22, 2001 | Nov. 8, 2001 | 17 | 2 days | Nov. 14, 2001 |
| Foster (FTC) | Apr. 12, 2007 | May 7, 2007 | 25 | 5 days | May 29, 2007 |
| ProMedica Health (FTC) | Jan. 7, 2011 | Feb. 10, 2011 | 34 | 2 days | Mar, 29, 2011 |
| Libbey (FTC) | Jan. 14, 2002 | Feb. 25, 2002 | 42 | 1 day | Apr. 22, 2002 |
| CCC Holdings (FTC) | Nov. 26, 2008 | Jan. 8, 2009 | 43 | 7 days | Mar. 18, 2009 |
| H.J. Heinz (FTC) | Jul. 14, 2000 | Aug. 30, 2000 | 47 | 6 days | Oct. 18, 200 |
| Phoebe Putney (FTC) | Apr. 20, 2011 | Jun. 13, 2011 | 54 | 1 day | Jun. 27, 2011 |
| UPM-Kymmene Oyj (DOJ) | Apr. 15, 2003 | Jun. 9, 2003 | 55 | 10 days | Jul. 25, 2003 |
| Whole Foods (FTC) | Jun. 6, 2007 | Jul. 31, 2007 | 55 | 2 days | Aug. 16, 2007 |
| Franklin Electric (DOJ) | May 31, 2000 | Aug. 1, 2000 | 62 | 5 days | Aug. 30, 2000 |
| Lab. Corp. (FTC) | Dec. 1, 2010 | Feb. 3, 2011 | 64 | 1 day | Mar. 11, 2011 |
| Swedish Match (FTC) | June 23, 2000 | Sept. 5, 2000 | 74 | 4 days | Dec. 14, 2000 |
| OSF Healthcare (FTC) | Nov. 18, 2011 | Feb. 1, 2012 | 75 | 3 days | Apr. 5, 2012 |
| Arch Coal (FTC) | Apr. 1, 2004 | Jun. 21, 2004 | 81 | 10 days | Aug. 16, 2004 |
| **Defendants' Proposed Schedule** | Aug. 13, 2013 | Nov. 12, 2013 | 91 | 10 days | |
| Oracle (DOJ) | Feb. 26, 2004 | Jun. 7, 2004 | 102 | 18 days | Sep. 9, 2004 |
| H & R Block (DOJ) | May 23, 2011 | Sept. 6, 2011 | 106 | 9 days | Oct. 31, 2011 |
| Compuware (DOJ) | Oct. 29, 1999 | NA | 157 | NA: Merger Abandoned | |
| AT&T (DOJ) | Aug. 31, 2011 | NA | 166 | NA: Merger Abandoned | |
| Lockheed Martin (DOJ) | Mar. 23, 1998 | NA | 168 | NA: Merger Abandoned | |
| JBS (DOJ) | Oct. 20, 2008 | NA | 200 | NA: Merger Abandoned | |
| **Plaintiffs' Proposed Schedule** | Aug. 13, 2013 | Mar. 3, 2013 (or later) | 202 | | |
| Primestar (DOJ) | May 12, 1998 | NA | 263 | NA: Merger Abandoned | |
| Dean Foods (DOJ) | Jan. 22, 2010 | NA | 545 | NA: Consummated merger; Settlement | |
| Northwest Airlines (DOJ) | Oct. 23, 1998 | Nov. 1, 2000 | 740 | NA: Settlement | |

Plaintiffs have gone to great lengths, but without success, in seeking to distinguish some of the cases in which mergers have promptly gone to trial. But they cannot overcome the fact

that DOJ cases that actually made it to a trial decision took, on average, only 70 days to trial commencement.  Plaintiffs make no effort to explain this long and consistent history.  As to their efforts to distinguish other cases, only a few salient points need be made.

First, the FTC cases included in the above chart, although decided on preliminary injunction motions, are directly relevant.  Because the grant of a preliminary injunction effectively ends a planned merger, preliminary injunction hearings as a practical matter constitute trials on the merits:  They are routinely treated as such by the judges in this District[2] who typically hold multi-day evidentiary hearings.[3]

Second, the *AT&T/T-Mobile* case relied on by the plaintiffs concerned the special circumstances of a telecommunications merger where a parallel Federal Communications Commission ("FCC") competition review was the gating item.  Going into the merger, the parties expected a long period of FCC review. The FCC independently reviews

---

[2] *See, e.g., FTC v. Arch Coal, Inc.*, 329 F. Supp. 109, 116, 158 (D.D.C. 2004) (performing detailed inquiry into "likelihood of success on the merits" and denying injunction after finding, inter alia, that "plaintiffs' statistical case of increased market concentration is… much weaker than other FTC antitrust challenges" and that past price spikes and mine closures did not "constitute evidence of anticompetitive coordination among SPRB coal producers"); *FTC v. Cardinal Health*, 12 F. Supp. 2d 34, 44 (D.D.C. 1998) (holding that "the FTC must demonstrate… a likelihood of success on the merits" to get a preliminary injunction, and performing in-depth analysis that included, inter alia, market definition, effect of merger on market concentration, evaluation of possibility of entry, and discussion of buyer power in deciding to grant preliminary injunction).

[3] *See, e.g., FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1069 (D.D.C. 1997) (five days); *FTC v. Swedish Match*, 131 F. Supp. 2d 151, 155 (D.D.C. 2000)(five-days); *FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 44 (D.D.C. 1998); *FTC v. H.J. Heinz, Co.*, 116 F. Supp. 2d 190, 192 (D.D.C. 2000) (five days); *FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109, 114 (D.D.C. 2004) (two-week evidentiary trial); *FTC v. CCC Holdings, Inc.*, 605 F. Supp. 2d 26, 31 (D.D.C. 2009) (a nine-day evidentiary hearing); *see also FTC v. Butterworth Health Corp.*, 946 F. Supp. 1285, 1288 (W.D. Mich. 1996) (five-day evidentiary hearing and touring of hospitals at issue), *aff'd mem.*, 121 F. 3d 708 (6th Cir. 1997); *FTC v. Tenet Health Care Corp.*, 186 F.3d 1045, 1048 (8th Cir. 1999)(noting the E.D. Mo. held a five-day evidentiary hearing); *FTC v. Foster*, No. CIV 07-325 JBACT, 2007 WL 1793441 (D.N.M. May 29, 2007) (five day evidentiary hearing).

telecommunications mergers under the Communications Act of 1934.  That review includes competition issues.  In the AT&T/T-Mobile merger, the parties anticipated that the DOJ case would be heard prior to resolution of the FCC action, which would proceed on its own schedule. By contrast, the Clayton Act claim here is the key gating item.  In an airline merger, the Department of Transportation ("DOT"), unlike the FCC, has no independent statutory authority to undertake a domestic competition review.[4]

Finally, this case involves a bankruptcy; a unique circumstance.  To the best of defendants' information, only two merger-challenge cases in the chart involved companies in ongoing bankruptcy proceedings: *Sungard Data Systems* (DOJ permanent injunction case) and *Laboratory Corporation* (FTC preliminary injunction case).  Both had expedited schedules: 17 and 64 days, respectively, between the filing of the complaint and the start of trial.  Defendants are here proposing 90 days.

## III.     Plaintiffs' Proposal Ignores the Fragility of the Airline Industry

The airline industry is incredibly fragile.  Of the airline mergers proposed since 1998, DOJ allowed all but two to proceed without challenge, and the two that were challenged were abandoned short of any final judgment.  The four carriers involved in the abandoned transactions—Northwest, Continental, United, and US Airways—were left poorly positioned to weather the next exogenous industry shock, and three of them subsequently entered bankruptcy—US Airways twice.  While each ultimately recovered, it was able to do so only by becoming a party to a subsequent merger, which was cleared by the DOJ.

---

[4] Instead, the DOT exercises "jurisdiction over the transfer of international operating authority in conjunction with airline acquisitions."  *See* Department of Transportation web site, Mergers and Acquisitions Overview, http://www.dot.gov/policy/aviation-policy/competition-data-analysis/mergers-acquisitions (last visited August 27, 2013).

Plaintiffs point to American's June quarter earnings announcement which, they say, "demonstrates[ ] there is no evidence [it's growth] will slow during the pendency of this litigation."  (Opp'n at 5.)  But plaintiffs' assertion is made without foundation and does not tell the whole story.  In the last decade prior to its restructuring, American lost more than $10 billion.

The reality is that the health of airlines is inherently fragile, subject to well-known (and repeated) exogenous shocks.  Since 2000, US Airways and American have lost a cumulative $13.7 billion (American $10.3, US Airways $3.4) and filed for bankruptcy three times.[5]  Oil price spikes present a particular risk.  In 2008, driven by a skyrocketing in the price of crude oil, the  average price of jet fuel rose from $1.26 to $4.26 per gallon.[6]  For every $1 increase in the price of a barrel of crude oil, American's annual costs increase by more than $60 million and US Airways' costs by $35 million.  Just yesterday, the price of crude oil jumped $3.63 per barrel, implying an annualized cost increase for American of about $242 million.  Such an increase would in itself erase almost the entirety of the monthly profit American announced this week, after deductions for reorganizational costs are made.

Out-of-control costs, like these, can quickly reverse the fortunes of the airlines.  For example, US Airways earned $135 million in the second quarter of 2000, but lost $37 million in the very next quarter.  It thereupon lost approximately $4.5 billion, through 2005, while twice filing for bankruptcy from which it was able to emerge via a merger with America West.  The new US Airways earned $185 million in the third quarter of 2007, but lost $46 million in the very next quarter.  That proved to be the first of 10 consecutive unprofitable quarters that

---

[5]The industry as a whole has lost 160,000 jobs and incurred $55 billion in losses in that time.  Joe Sharkey, *Since Sept. 11, Years of Change for Airlines,* N.Y. Times, Sept. 5, 2011 at B6.

[6] *See 2009 Econ. Report* (Air Transp. Ass'n, Washington, D.C.), 2009, at 9. *available at* http://www.airlines.org/Documents/economicreports/2009.pdf.

cumulatively amounted to a $1.4 billion loss.  And that loss would have led to a third, and likely, final bankruptcy absent the financial support of a number of industry suppliers.

## IV.  Plaintiffs Offer No Persuasive Response to the Airlines' Showing That This Case Presents an Urgent Need for Prompt Resolution

The Airlines would face large and unusual burdens that would increase over time if resolution of this lawsuit were delayed and the implementation of this merger were needlessly forestalled.  Motion at 2, 6-8.  Both American and US Airways have been diligently planning to implement the merger.  Medium-term decisions about schedules, aircraft financing, plane configuration, and facility leases and relocation are all being made in expectation that the merger would close within the next few weeks.  Many of those plans are now on hold as a result of the uncertainty engendered by this lawsuit.[7]

Moreover, the vast array of the stakeholders of defendants, who have joined to support the merger, face ongoing uncertainty over their jobs and futures that could lead to the loss of employees if the plaintiffs' lawsuit were to proceed according to its proposed trial schedule. This risk of adverse effects to US Airways and American stakeholders is illustrated by the amicus submission of the Allied Pilots Association, Association of Professional Flight Attendants, Association of Flight Attendants-CWA, and Transport Workers Union of America. These organizations document "the uncertainty cast upon the airline industry" as a whole in light of the pendency of this case and the urgent need of these stakeholders to have the plaintiffs' claims resolved "in an expedited manner."  Amicus Br. at 3.  The plaintiffs offer no substantive response to any of the foregoing points, which by itself suffices to establish the need for the

---

[7]The Airlines had previously agreed not to consummate the merger for thirty days following the filing of a complaint seeking to enjoin the merger.  The Airlines have agreed to a fourteen day extension of that date and have committed not to consummate the deal before 11:59 p.m. on Thursday September 26, 2013.

Airlines' proposed schedule.

American's bankruptcy only exacerbates these largely undisputed harms.  An injunction would set back American's reorganization efforts by many months, requiring it to create the necessary agreements and consents of all of the stakeholders involved in the bankruptcy proceedings.  Absent the merger, there will be prolonged disruption to those same stakeholders, employees and the flying public.  Plaintiffs not only seek to impose those burdens, but by its proposed schedule it seeks to prolong them unnecessarily.  How American is structured when it emerges from bankruptcy — whether merged with US Airways or standing independently — cannot be resolved by intellectual debate.  Rather, it will necessarily be the result of the considerable hammering, pushing, and pulling that characterizes a reorganization process.  The merger solution, with virtually all of the restructuring pieces in place, is ready to be implemented upon this Court's concurrence that the combined New American is not anticompetitive.  It is not possible to predict how American would look after a prolonged bankruptcy process in which any stakeholder can make its own demands for satisfying creditors, and where the merger solution that drew unanimous support would not be available.  In either case, however, delay exacerbates the current uncertainties and related harm.

Most fundamentally, of course, the uncertainty regarding the outcome of this lawsuit is impeding the ability of both American and US Airways to compete effectively today. Corporations that are soliciting proposals for multi-year contracts have done so with the expectation that American and US Airways would be selling them a combined network.  How does an airline sell its network to corporate customers, if it not only cannot describe that network, but cannot even say when it will know?  How do customers make informed decisions about staking their allegiances to a particular airline, when the only certainty is that it will be

different in the next year, but in some unknown way?  The loss of any corporate customers, the customers that are the most valuable to the Airlines, for a one to three year contract period, is harm to the Airlines that can never be recouped.

If this case were not tried until April or May of next year, an already bankrupt company will have incurred an additional $65,000,000 to $75,000,000 in bankruptcy-related fees. Plaintiffs  cavalierly dismiss these fees as too high, and snidely suggests without any basis at all that these costs are unjustified, Opp'n at 5 n.11, but it offers no justification in law or logic for ignoring these large expenses when considering the harms associated with delaying the trial. Plaintiffs also ignore that these costs would substantially increase if, as a result of additional months of delay, the deal fell apart and American was left to hammer out an independent plan with the relevant stakeholders and then seek bankruptcy-court confirmation.  Plaintiffs quibble that the Airlines do not unequivocally "claim that the transaction will be abandoned after December 13," Opp'n at 6, but there is no question that a delay of the magnitude contemplated by plaintiffs' proposed schedule would cast grave doubt on the parties' ability to hold everything together and complete the transaction notwithstanding the wholesale absence of any meritorious basis for this lawsuit.

The prolongation of the bankruptcy would also give rise to a variety of other needless expenses, such as additional financing costs and heightened aircraft-acquisition expenses.  As a company operating in Chapter 11, American faces additional hurdles in obtaining financing. Much of American's current financing was negotiated under the assumption that American would be emerging from bankruptcy and merging in the third quarter of 2013.

American expects to acquire a large number of aircraft over the next several years.  Prior to this lawsuit, American had completed much of the negotiations on business terms for the

acquisition of a substantial number of new regional jets to replace smaller regional jets or to replace older, inefficient larger jets with large, modern, regional aircraft.  Deliveries of those aircraft were expected to start as early as June 2014.  American intended to finance the purchases of these new aircraft with favorable export credit financing.  However, this type of financing will only be available to American after it emerges from bankruptcy.  American's backstop financing agreements with the manufacturers are also conditioned on American's emergence from bankruptcy.  Any alternative financing for a company still in bankruptcy would almost certainly be under considerably less favorable terms, and would result in additional costs to American.

Consumers, of course, would also be harmed as the pro-competitive benefits of the merger would be withheld from them.  Defendants conservatively estimate net direct customer benefits of $500 million per year from the merger, meaning that the five months of additional time sought by plaintiffs would result in a loss of more than $200 million in consumer benefit that cannot be recaptured after the Airlines prevail on the merits.

The merger agreement itself reinforces the Airlines' contemporaneous recognition of these points.  When the parties agreed to the transaction, they expressed a clear recognition of the dangers associated with delaying implementation by including a bilateral termination right starting December 13, 2013.  See Motion at 7.  Plaintiffs' contention that the inclusion of this provision does not matter because the parties can agree to change it, Opp'n at 6, misses the point entirely.  The parties certainly have the power to alter the agreement, but the question is whether they would be in a position to make the decision to do so in the face of unexpected delay.  The provision underscores that the circumstances surrounding such a decision would be very different depending on whether the transaction would be expected to be completed in December 2013 or January 2014, or whether the delay would last until May or later.

In the face of these strong demonstrations of harm that would result from its proposed schedule, plaintiffs offer nothing but fragmentary quotations from American's CEO in an effort to suggest that the merger is unnecessary to American's success.  But it is hardly surprising that a CEO would present favorable results to thank hard-working employees for their efforts and build morale following the turmoil and dire news from the previous months and years.  Plaintiffs are merely trying to divert focus from the real issue in this case, which is whether the merger is anti-competitive, not whether either American or US Airways is capable of standing on its own.

Plaintiffs also attempt to dismiss the steep costs associated with delay by offering a misleading characterization of the state of American's business.  Plaintiffs point to American's most recent financial results and imply that they are indicative of America's future performance.  Opp'n at 3-4.  In the first place, that presumes that American can continue to operate as it has most recently, which assumes the management continuity that delay erodes.  American is confident that, in light of its incentive plan, it will retain critical management if the Airlines' proposed trial schedule is adopted.  But if plaintiffs were permitted to impose their proposed trial schedule, it would create a real risk over time that American could lose key employees who have been told that they will not have a position at the New American if the merger goes forward.  In short, plaintiffs' proposed delay could adversely affect American's ability to retain mission-critical personnel as time passes.

Placing the second-quarter results within the broader context of American's net earnings since 2005 illustrates the longer-term variance in American's earnings and the impossibility of projecting long-term results from the earnings of a single quarter.  For instance, plaintiffs ignore that in the quarter preceding the most recent quarter,  American had minimal net earnings.



Source:  American Airlines Quarterly Earnings Releases (net earnings excluding special items), *available at* http://phx.corporate-ir.net/phoenix.zhtml?c=117098&p=quarterlyearnings.

Plaintiffs' emphasis on earnings from the second quarter of 2013, and particularly the favorable results in the single month of July 2013, Opp'n at 3-4, is particularly misleading because it reflects results from the summer season, frequently a season of increased travel and particularly strong results for airlines, in a year in which demand is finally returning following a recession.  So whether plaintiffs just don't understand the industry or choose to misleadingly focus on the trees instead of the forest, the fact is that American today continues to be fully subject to the ebbs and flows of the airline industry, and is even more vulnerable until it can emerge from bankruptcy.

In short, plaintiffs have not begun to undermine the Airlines' showing that they will incur serious harm if the trial is delayed from November to March or April of next year.  Plaintiffs entirely ignore or concede much of this showing, and the arguments they do make are either wrong or reinforce the need for a November trial.

**V.    Defendants' Proposed Schedule Offers Plaintiffs a Full and Fair Opportunity to Present Their Case**

The government has been investigating this proposed merger for over 16 months.  By any measure, plaintiffs have an enormous head start.  The DOJ began investigating the merger in April 2012, issuing a Civil Investigative Demand ("CID") to US Airways seeking documents and information related to a potential merger with American Airlines.  DOJ demanded the production of documents and responses to interrogatories, which they explained, were "part of an Antitrust Division investigation into the possible merger of US Airways and American Airlines."[8]US Airways produced thousands of documents in response to the CID, including documents from its key executives.

Thereafter, before publicly announcing the merger, the parties in January 2013, submitted Hart-Scott-Rodino ("HSR") pre-merger notifications, including hundreds more documents.  Indeed, they did so on the basis of a letter of intent (rather than a definitive agreement) so as to provide the government with even more time to conduct its investigation.  Moreover, under the DOJ's second request pursuant to the HSR Act, the parties provided additional information on a rolling basis beginning April 4, 2013.  By May 7, 2013, when the parties certified compliance, they had produced millions of pages of documents, data, and analyses, including answers to voluminous interrogatories.  Between April and July, defendants provided numerous expert economic analyses and underlying data.  These included estimates of direct consumer benefits resulting from the merger both generally and for passengers at Reagan National Airport (DCA), as well as a detailed econometric analysis of the advantage pricing program under a wide variety

---

[8]See Letter from Michael D. Billiel, U.S. Dep't of Justice, to Howard Kass, Vice President of Legal and Gov't Affairs, US Airways, Inc., at 1 (Apr. 20, 2012) (attached as Exhibit A).

of specifications.  In June and July, defendants made seven witnesses available for depositions. During that period, defendants met with the Department of Justice on multiple occasions to answer questions.

And even before investigating the merger as such, the DOJ had already long been investigating some of the very issues that underlie the allegations in its complaint.  For example, certain of the documents cited in the complaint were produced by US Airways' in response to DOJ's investigation of the proposed exchange of take-off and landing slots with Delta Air Lines at Reagan National and LaGuardia Airports.  All told, since 2009, US Airways has delivered to the DOJ around 1.2 terabytes of documents (around 825,000 documents or, conservatively, over 4,000,000 pages of documents) and data spanning three HSR filings, three Second Request responses, and at least five other formal document and/or data demands.

Defendants' proposed schedule is not only reasonable in circumstances, it is consistent with past practice.  It allows for substantial further discovery by all parties.  Plaintiffs will be given until October 24, 2013—more than nineteen months after DOJ first demanded information and documents—to complete fact discovery and until November 4, 2013—seven months after they received the economists' first report—to complete expert discovery.

## VI.    <u>Conclusion</u>

Timing of the trial should never be outcome determinative; a March trial risks that.  For all these reasons, defendants' request for a November 12 trial date should be granted.

Dated: August 28, 2013                    Respectfully submitted,

                                              /s/ Richard G. Parker
                                              Richard G. Parker (DC Bar #327544)
Henry Thumann (DC Bar #474499)
Courtney Dyer (DC Bar #490805)
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
(202) 383-5300 (Phone)
(202) 383-5414 (Facsimile)
rparker@omm.com
hthumann@omm.com
cdyer@omm.com

Kenneth R. O'Rourke (Admitted Pro Hac Vice)
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
(213) 430-6000 (Phone)
(213) 430-6407 (Facsimile)
korourke@omm.com

Paul T. Denis (DC Bar #437040)
Steven G. Bradbury (DC Bar #416430)
DECHERT LLP
1900 K Street, N.W.
Washington, DC 20006
(202) 261-3300 (Phone)
(202) 261-3333 (Facsimile)
paul.denis@dechert.com
steven.bradbury@dechert.com

Charles F. Rule (DC Bar #370818)
CADWALADER, WICKERSHAM
& TAFT LLP
700 Sixth Street, N.W.
Washington, DC 20001
(202) 862-2200 (Phone)
(202) 862-2400 (Facsimile)
rick.rule@cwt.com

***Attorneys for Defendant***
***US Airways Group, Inc.***

/s/ John M. Majoras
John M. Majoras (DC Bar #474267)
Michael S. Fried (DC Bar #458357)
Rosanna K. McCalips (DC Bar #482859)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
(202) 879-3939 (Phone)
(202) 626-1700 (Facsimile)
jmmajoras@jonesday.com
msfried@jonesday.com
rkmccalips@jonesday.com

Mary Jean Moltenbrey (DC Bar #481127)
PAUL HASTINGS LLP
875 15th Street, NW
Washington, DC 20005
(202) 551-1725 (Phone)
(202) 551- 0225 (Facsimile)
mjmoltenbrey@paulhastings.com

***Attorneys for Defendant***
***AMR Corporation***