**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____ )
)
UNITED STATES OF AMERICA, et. al.,          )
)
     *Plaintiffs*,          )
)
  v.          )
)  Civil Action No. 1:13-cv-01236 (CKK)
US AIRWAYS GROUP, INC.          )  Judge Colleen Kollar-Kotelly
)
and          )
)
AMR CORPORATION,          )
)
     *Defendants*.          )
_____ )

**MEMORANDUM OF LAW OF *AMICUS CURIAE***
**OFFICIAL COMMITTEE OF UNSECURED CREDITORS**
**IN SUPPORT OF DEFENDANTS' MOTION TO SET TRIAL DATE**

# I.
## PRELIMINARY STATEMENT

The Official Committee of Unsecured Creditors (the "Statutory Committee") of AMR Corporation ("AMR") submits this Memorandum of Law in support of Defendants' Motion to Set Trial Date, ECF No. 11 (the "Motion").  As statutory representatives of the stakeholders that will own a majority equity interest in the airline formed as a result of the proposed merger between AMR and US Airways Group, Inc. ("US Airways"), the Statutory Committee has a unique fiduciary interest in ensuring that the uncertainty surrounding the government's challenge to the merger—which *is* particularly disruptive and harmful to AMR and its stakeholders in the bankruptcy setting—is resolved as quickly as possible.  Contrary to the government's blithe assertions in its opposition brief ("Pls.' Opp."), the delicate balance of diverse stakeholders in bankruptcy that support this merger necessarily would be jeopardized by the extraordinary pretrial delay the government now seeks.  Indeed, under the government's proposal, trial would begin more than twenty-two months after the Department of Justice ("DOJ") initiated its investigation of the proposed transaction and ten months after the merging parties substantially complied with the DOJ's Request for Additional Information ("Second Request").

Further, and again contrary to the government's assertion, the bankruptcy setting here *is* distinct from the merger challenges the government highlights, which did not involve transactions that brought together diverse stakeholders with potentially divergent interests, in support of creating a new competitor.  In addition, the value created by this merger largely is the result of combining complementary networks much like those the DOJ approved previously in the context of the mergers of Delta Airlines and Northwest Airlines in 2008, United Airlines and Continental Airlines in 2010 and Southwest Airlines and AirTran in 2011.

Finally, the government is completely wrong to suggest that exacerbating the uncertainty regarding AMR's future is of no moment because AMR has a standalone plan of reorganization. On the contrary, AMR's current plan of reorganization, which is based on the Merger Agreement, is the only plan proposed to and voted on by creditors and stakeholders that is before the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") presiding over AMR's pending chapter 11 cases; there is no "Plan B" with regard to reorganization.  Instead, as the Statutory Committee—which was actively involved throughout the DOJ's investigation and attended and participated in all meetings between the DOJ and Defendants—has informed the government in several submissions and communications directly solicited by the DOJ, any injunction here would return the AMR bankruptcy to square one with likely disruption and relative disarray among numerous, financially unaligned stakeholders.  It frankly is shocking that the government would knowingly suggest otherwise.  In practical terms, the "sooner the better" is an apt approach for resolving this case in order to minimize the harm that the uncertainty inherent in the government's action already is causing and which only would be compounded by the delay the government contemplates.

## II.
## THE INTEREST OF THE STATUTORY COMMITTEE

The Statutory Committee is a statutory fiduciary created by Congress to represent the stakeholders that will own the majority interest of the airline that will exist following the proposed merger of AMR and US Airways.[1]  *See* 11 U.S.C. § 1102(a)(1) (requiring appointment

---

[1] The Statutory Committee consists of nine members:  three indenture trustees (the Bank of New York Mellon, Manufacturers and Traders Trust Company and Wilmington Trust Company); three labor organizations (the Allied Pilots Association, the Association of Professional Flight Attendants and the Transport Workers Union of America); two trade creditors (Boeing Capital Corporation and Hewlett-Packard Enterprise Services, LLC) and the Pension Benefit Guaranty Corporation.  The three labor organizations have filed a proposed *amicus* brief supporting

*(cont'd)*

of a general unsecured creditors' committee "as soon as practicable" after the commencement of a chapter 11 case).

The Statutory Committee exercises a "wide and important array of authority and responsibility . . . [and] the Bankruptcy Code contemplates a significant and central role for committees in the scheme of a business reorganization." *In re Penn-Dixie Indus., Inc.*, 9 B.R. 941, 944 (Bankr. S.D.N.Y. 1981). The Bankruptcy Code invests the Statutory Committee with oversight responsibilities, and the Statutory Committee is afforded investigatory authority consistent with its mandate to "provide supervision of the debtor in possession and of the trustee." H.R. Rep. No. 95-595, at 401 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6357; *see also* 11 U.S.C. § 1103 (defining the powers and responsibilities of creditors' committees and other statutory committees).

Consistent with its statutory mandate, at the outset of AMR's chapter 11 case, the Statutory Committee announced that its principal objective was "to work with the Debtors to achieve a feasible and expeditious transformation of American Airlines and its related businesses that preserves, and hopefully enhances, business enterprise value." *See In re AMR Corp.*, Case No. 11-15463 (SHL), ¶ 6 (Bankr. S.D.N.Y. Dec. 20, 2011), ECF No. 403. To advance this objective, the Statutory Committee and AMR worked collaboratively to fairly and systematically evaluate restructuring alternatives.[2] On May 1, 2012, the Statutory Committee and AMR agreed

_____

*(cont'd from previous page)*
Defendants' Motion. *See* Motion of Allied Pilots Association, Association of Professional Flight Attendants, Association of Flight Attendants-CWA and Transport Workers Union of America to File *Amicus Curiae* Brief In Support of Defendant's Motion To Set Trial Date [ECF No. 11], *United States v. US Airways Group, Inc.*, No. 1:13-cv-01236-CKK (D.D.C.. Aug. 23, 2013), ECF No. 21, Ex. A.

[2] The aim of the strategic alternatives exploration process was to compare the AMR's stand-alone business plan against a transaction with another airline. During this process, AMR, the

*(cont'd)*

to a formal written protocol to guide their assessment of strategic alternatives.  The announcement of a definitive merger agreement (the "Merger Agreement") between AMR and US Airways on February 14, 2013, marked the culmination of that strategic alternatives process. Pursuant to the Merger Agreement, approximately 72% of the equity of the merged entity, New AAG, will be distributed to the AMR's economic stakeholders.

In addition, the Statutory Committee serves as a "primary negotiating bod[y] for the formulation of the plan of reorganization."  H.R. Rep. No. 95-959, at 401 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6357; *see also In re Johns-Manville Corp.*, 801 F.2d 60, 62 (2d Cir. 1986).  The Statutory Committee was therefore intimately involved in the negotiation of the AMR's plan of reorganization (the "Plan").  In turn, that Plan—the *only* plan of reorganization before the Bankruptcy Court—is the product of an enormously complex set of related agreements.  Specifically, the Plan contemplates the settlement of numerous complicated and contested intercreditor issues; the negotiation of memoranda of understanding between AMR, US Airways and their respective labor organizations concerning the integration of the two companies' unionized workforces; and other settlements and compromises that are embodied in the Plan, all of which are predicated on the consummation of the merger.

---

*(cont'd from previous page)*
Statutory Committee and their respective advisors assessed a number of potential transactions and concluded that a combination with US Airways could create significant incremental value for AMR's estates by generating incremental traffic and cost synergies that could not be achieved through other means.  Thus, in August 2012, AMR, the Statutory Committee and US Airways commenced formal negotiations and information sharing toward a potential merger. The Statutory Committee provided extensive input to both parties throughout their negotiations.

### III.
### THE GOVERNMENT'S PROPOSED SCHEDULE
### WOULD EXACERBATE HARMFUL UNCERTAINTY

The Statutory Committee believes that prompt adjudication of this action according to the schedule Defendants have proposed is in the best interests of AMR's unsecured creditors and other stakeholders.  AMR's chapter 11 cases involve over 430,000 parties in interest, including investors, current and retired employees, suppliers and other business partners, airport authorities, stockholders and many others.  Despite the sheer number of stakeholders and the diversity of interests they hold, all classes of creditors and equity interest holders entitled to vote on the Plan have accepted the Plan by margins that are virtually unprecedented in large chapter 11 cases.[3]

There is no guarantee, however, that the remarkable consensus the parties have achieved to date would endure over the elongated schedule the government proposes.  The Statutory Committee believes that protracted litigation would engender greater uncertainty and could encourage opportunistic and destabilizing behavior.  In particular, significant delay in resolving this litigation could lead individual stakeholders to attempt to extract as much value as possible for particular constituencies without maximizing the value of AMR's estates as a whole.  This concern is particularly acute because, as noted above, the Plan is predicated on a global settlement of enormously complex intercreditor issues.  The prolonged uncertainty associated with the government's proposed schedule could undermine these compromises and instead

---

[3] On August 23, 2013, the Statutory Committee submitted a memorandum at the direction of the Bankruptcy Court addressing what impact, if any, the government's action has on AMR's outstanding request for entry of an order confirming the Plan.  The Statutory Committee's view, reflected in its submission to the Bankruptcy Court, is that the litigation pending before this Court, and the Plan confirmation proceedings in the Bankruptcy Court, are separate processes that can and should proceed independently.  *See In re AMR Corp.*, Case No. 11-15463 (SHL) (Bankr. S.D.N.Y. Aug. 23, 2013), ECF No. 9927.

precipitate factiousness and in-fighting among various constituencies.  That AMR and US

Airways understood and accounted for the possibility that the DOJ might seek to enjoin the

merger in no way negates the risk that protracted litigation could upset the dynamics of AMR's

reorganization.  In short, the government should not be permitted to rely on scheduling to block

the proposed merger, without even having to prove its entitlement to relief on the merits.

**IV.**
**THE BANKRUPTCY CONTEXT DISTINGUISHES**
**THIS LITIGATION FROM THE CASES THE GOVERNMENT CITES**

The Statutory Committee was quite surprised to see the government argue that because

there is "some uncertainty" in "every merger challenged by the government" (Pls.' Opp. at 5),

the bankruptcy context here is in no way unique.  Nothing could be further from the truth.

First and foremost, none of the prior challenges the government references (*id.* at 9)

involved a merger agreement incorporated into a plan of reorganization accepted by creditors

and shareholders following a bankruptcy court-approved solicitation process, let alone one that is

the result of bringing together numerous and diverse stakeholders in support of creating a new

competitor.  As noted above, that support has the real potential to erode with the passage of time

because stakeholders will respond differently to event risk—i.e., the risk of intervening

exogenous events that would disrupt the proposed transaction.  As the delay in consummating

the proposed merger becomes more protracted, so too does event risk.  Because stakeholders

respond differently to event risk depending on the certainty of their recovery (e.g., stakeholders

that are more certain to recover regardless of whether the proposed merger is consummated are

less tolerant of event risk, and *vice versa*), the divergence of interest among stakeholders

increases as the expected delay in merger consummation increases.

Second and equally telling, none of the merger challenges identified by the government

involved industries in which the DOJ itself was an active participant—through the approval of

6

three prior mergers—that created competitors capable of offering far more expansive service than AMR and US Airways could provide on their own.  This is not to say that the government is legally estopped from abandoning its prior endorsement of merging complementary airline networks, but it is quite another thing for the government to act as if AMR and its creditors anticipated the government's proposed schedule—under which trial would commence in March 2014, more than twenty-two months after the DOJ initiated its investigation by issuing Civil Investigative Demands in April 2012 and ten months after the parties substantially complied with a Second Request in May 2013—because, as the government now claims, this is a "highly problematic merger" in "highly concentrated markets."  (Pls.' Opp. at 3.)  That proposition is, of course, fanciful in light of the DOJ's own airline merger precedents.  With only *seventeen* direct flight overlaps (without accounting for the significance of other competitors on those routes), few conceivable slot issues beyond those alleged to exist at Ronald Reagan Washington National Airport and net direct consumer benefits of more than $500 million per year, Defendants and the Statutory Committee had every reason to believe that the December 17, 2013 outside termination date provided more than ample time to resolve any concerns that the DOJ could reasonably raise.[4]  Indeed, if anything, it was the DOJ that hid the ball from all interested parties and stakeholders during its nearly sixteen-month-long, intensive investigation of the potential (and, later, announced) merger, which in the Statutory Committee's view leaves the government's demand for additional massive and lengthy discovery quite hollow.

---

[4] The Merger Agreement accounts for a delay in obtaining antitrust clearance by permitting either party to extend the "Termination Date" (as defined in the Merger Agreement) by up to two months, from October 14, 2013 to December 17, 2013.  *See In re AMR Corp.*, Case No. 11-15463 (SHL) (Bankr. S.D.N.Y. June 5, 2013), ECF No. 8590, Ex. A § 6.2 (authorizing an extension to December 13, 2013, plus a forward adjustment to reflect time that elapsed during the Second Request process, resulting in a December 17, 2013 Termination Date).

**V.**
**THE GOVERNMENT CANNOT JUSTIFY A**
**LENGTHY PRETRIAL SCHEDULE BASED ON A FICTIONAL PLAN "B"**

Finally, particularly from the Statutory Committee's perspective, it is ironic that the government takes the position that significant delay and uncertainty cannot harm AMR (and presumably, its creditors) because AMR is, in the government's view, positioned to "compete as a strong and vibrant standalone firm."  (Pls.' Opp. at 3.)  This presumptuous assertion is both factually unsubstantiated and, more importantly, misunderstands the procedural context of the AMR bankruptcy.

Factually, as the Statutory Committee and its advisors analyzed in exhaustive detail and explained to DOJ throughout its lengthy investigation, AMR simply cannot compete as effectively long term against Delta, United, Southwest and others without the scope and breadth of connecting traffic that the DOJ allowed Delta, United and Southwest to attain through their recent mergers.  Indeed, the Statutory Committee finds it particularly troubling that the government's claim under Section 7 of the Clayton Act, 15 U.S.C. § 18, appears to be centered more around the government's wishful or naive belief that AMR can compete effectively on its own (notwithstanding its current bankruptcy) than on proving that the combination of AMR's and US Airways' complementary networks may substantially lessen competition (rather than enhance it) in any economically meaningful market.

Procedurally, as the Statutory Committee informed the government in response to one of the DOJ's several requests for information directly from the Statutory Committee, there is no Plan B before the Bankruptcy Court that AMR, the Statutory Committee and other stakeholders could readily revert to if the present Plan, which is predicated on the Merger Agreement, cannot be consummated.  The Statutory Committee conveyed to the government that any injunctive relief would take the bankruptcy back to square one because any confirmation order entered by

the Bankruptcy Court would be vacated, the Plan would be rendered null and void, and AMR would continue in chapter 11 administration.  This scenario likely would result in the unwinding of numerous complex, multilateral settlements and contractual arrangements that are dependent on the Merger Agreement (including new union collective bargaining agreements) and a general balkanization of stakeholders that inevitably would impose relative disarray on AMR as a company and as a competitor.

Again, presumably some of these issues will be the subject of trial, but the point for this Motion is that the government has no basis to assert, or even suggest, that AMR is a stable, long-term competitor that would be unaffected by the lengthy delay and uncertainty that the government's schedule so myopically envisions.  To the contrary, the government's schedule only will exacerbate the harm that uncertainty itself creates in relation to the unique and complex balance of interests that culminated in the all but uniform support for this highly procompetitive merger.

## VI.
## CONCLUSION

For the foregoing reasons, the Statutory Committee respectfully requests that this Court grant the Motion.

Dated:  August 28, 2013                                     Respectfully submitted,

John Wm. Butler, Jr. (*pro hac vice* forthcoming)        /s/ *Gregory B. Craig*
Albert L. Hogan, III (*pro hac vice* forthcoming)         Gregory B. Craig (D.C. Bar No. 164640)
SKADDEN, ARPS, SLATE,                                      SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP                                      MEAGHER & FLOM LLP
155 North Wacker Drive                                     1440 New York Avenue, N.W.
Chicago, IL 60606                                          Washington, DC 20005-2111
Tel:  (312) 407-0700                                       Tel: (202) 371-7000
Jack.Butler@skadden.com                                    Gregory.Craig@skadden.com
Al.Hogan@skadden.com

Jay M. Goffman (*pro hac vice* forthcoming)
James A. Keyte (*pro hac vice* forthcoming)
Kenneth B. Schwartz (*pro hac vice* forthcoming)
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
4 Times Square
New York, NY 10036-6522
Tel: (212) 735-3000
Jay.Goffman@skadden.com                                    *Counsel for Official Committee of Unsecured*
James.Keyte@skadden.com                                    *Creditors*
Ken.Schwartz@skadden.com