# Exhibit 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, *et al.*, <br><br> *Plaintiffs,* <br><br> *v.* <br><br> US AIRWAYS GROUP, INC. and AMR CORPORATION, <br><br> *Defendants,* | Case No. 1:13-cv-01236-CKK <br> (Before Special Master Levie) |

<u>**DECLARATION OF STEVEN G. BRADBURY**</u>

I, Steven G. Bradbury, being over the age of 18, do hereby declare as follows:

1.      I am a partner at Dechert LLP and a counsel of record to Defendant US Airways Group, Inc. in this action.  I submit this Declaration in support of Defendants' Motion to Compel Production of Factual Materials and Information Regarding DOJ's Approvals of Four Prior Airline Mergers (the "Motion to Compel").

2.      Attached to this Declaration as Exhibit A is a true and correct copy of Plaintiffs' Objections and Responses to Defendants' First Set of Requests for Production of Documents, dated September 13, 2013.

3.      Attached as Exhibit B is a redacted copy of Plaintiffs' Objections and Responses to Defendants' First Set of Interrogatories Directed to All Plaintiffs, dated September 19, 2013. The non-redacted portion of the document contains Plaintiffs' objections and responses to Plaintiffs' Interrogatories 1 and 2.  The portion of the document that is redacted (addressing Interrogatory no. 3) is not at issue on this motion.

4.      Attached as Exhibit C are true and correct copies of closing statements publicly released by the United States Department of Justice ("DOJ") announcing and explaining DOJ's decisions not to challenge four prior airline mergers under section 7 of the Clayton Act:  (a) the April 26, 2011 statement approving the merger of Southwest Airlines and AirTran Airways; (b) the August 27, 2010 statement approving the merger of United Airlines and Continental Airlines, subject to the transfer of certain assets; (c) the October 29, 2008 statement approving the merger of Delta Airlines and Northwest Airlines; and (d) the June 23, 2005 statement approving the merger of US Airways and America West.

5.      Attached as Exhibit D is a true and correct copy of an article entitled "The Year in Review:  Economics at the Antitrust Division, 2008-2009," authored by three senior DOJ economists (Ken Heyer, Carl Shapiro, and Jeffrey Wilder) and published by the Review of Industrial Organization on November 12, 2009.

6.      Attached as Exhibit E is a true and correct copy of a subpoena to produce documents served by the DOJ on United Airlines, Inc.

7.      At issue in Defendants' Motion to Compel are Plaintiffs' objections and responses to Defendants' Requests for Production ("RFP") 15 through 20, set forth in Exhibit A, and their objections and responses to Interrogatory 2, set forth in Exhibit B.  RFPs 15 through 19 seek documents that reflect the facts, factual assumptions, and forecasts on which DOJ based its decisions not to challenge the four prior airline mergers announced in the closing statements set forth in Exhibit C.  RFP 20 seeks the documents that reflect the underlying studies, analyses, and forecasts described in section 2.3 of the article attached hereto as Exhibit D (key language highlighted) concerning DOJ's approval of the merger of Delta Airlines and Northwest Airlines.

Interrogatory 2 requests the same factual information encompassed by RFPs 15 through 20, but asks for the information directly in the form of an interrogatory.

8.      Plaintiffs have refused to produce any of the documents or information requested in RFPs 15 through 20 and Interrogatory 2 on the ground that the factual record on which DOJ approved the prior airline mergers is not relevant to any issue in this case.  Plaintiffs have also asserted that all of the requested documents and information are categorically protected from discovery in this litigation by various privileges and discovery protections, including the deliberative process privilege, work-product protection, and other privileges.  (*See* Exhibit A at 20-30; Exhibit B at 5-6.)

9.      As required by Local Civil Rule 7(m), the parties met and conferred on the substance of Plaintiffs' objections and the subject of this Motion to Compel, but were unable to resolve this discovery dispute.  In an effort to sharpen the issues for resolution by the Special Master, Defendants asked Plaintiffs to itemize the categories of materials at issue and to identify what privileges they are claiming as to each category, but Plaintiffs have refused to do so.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 19, 2013, in Washington, D.C.

_____
Steven G. Bradbury

# Exhibit A

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.* <br><br> *Plaintiffs,* <br><br> v. <br><br> US AIRWAYS GROUP, INC. <br> and <br> AMR CORPORATION <br><br> *Defendants*. | Case No. 1:13-cv-01236 (CKK) |

**PLAINTIFFS' OBJECTIONS AND RESPONSES TO DEFENDANTS' FIRST SET OF
REQUESTS FOR PRODUCTION OF DOCUMENTS**

Plaintiff United States of America ("United States") and the Plaintiff States (collectively, "Plaintiffs"), by their undersigned counsel, and pursuant to the Federal Rules of Civil Procedure, respond to Defendants' First Set of Requests for Production of Documents ("First Set of Requests") as follows:

## GENERAL OBJECTIONS

1.   Plaintiffs' investigation and development of facts and circumstances relating to this action are ongoing.  Therefore, Plaintiffs reserve the right to supplement, clarify, revise, or correct any or all of these responses and objections, and to assert additional objections or privileges, in one or more supplemental responses.

2.   Plaintiffs object generally that because it contains no time limitation, Defendants' First Set of Requests is overbroad, unduly burdensome, and seeks documents that are neither relevant

1

nor reasonably calculated to lead to the discovery of admissible evidence.  Subject to and without waiving the General Objections or the Specific Objections, Plaintiffs respond that they will produce documents through August 13, 2013.

3.   Plaintiffs object generally to Defendants' First Set of Requests to the extent that the "General Instructions" attempt to impose any obligation on Plaintiffs greater than those imposed or authorized by the Federal Rules of Civil Procedure, the Local Civil Rules of the United States District Court for the District of Columbia, or any applicable order of the Court.

4.   Plaintiffs object generally to Defendants' First Set of Requests to the extent that they request premature production of expert materials, or production of expert materials not subject to discovery under Paragraph 10 of the Case-Management Order ("CMO") or FRCP 26.

5.   Plaintiffs object generally to Defendants' First Set of Requests to the extent that it is vague, ambiguous, overbroad, or incomprehensible.

6.   Plaintiffs object generally to Defendants' First Set of Requests to the extent that it requests documents that are unduly burdensome to produce, irrelevant, or not reasonably calculated to lead to the discovery of admissible evidence.

7.   Plaintiffs object generally to Defendants' First Set of Requests to the extent that it requests production of documents that are protected from disclosure by the attorney-client privilege, deliberative-process privilege, attorney work-product doctrine, the law enforcement investigatory files privilege, common interest privilege, or any other applicable privilege or statute governing confidentiality of information.  Should any such disclosure by Plaintiffs occur, it is inadvertent and shall not constitute a waiver of any privilege.

8.   Plaintiffs object generally to Defendants' First Set of Requests to the extent it requests Plaintiffs' production of documents in Defendants' possession, custody, or control.

9.    Plaintiffs object generally to Defendants' First Set of Requests to the extent it seeks production of materials produced by Plaintiffs in compliance with their Initial Disclosure obligations pursuant to Paragraph 5 of the CMO.  Plaintiffs will not reproduce documents already being produced in connection with their Initial Disclosures.

10.    Plaintiffs object generally to Defendants' First Set of Requests to the extent it requests production of documents that are subject to the terms of confidentiality or non-disclosure agreements with non-parties or would violate privacy interests of others.  Plaintiffs' production of such documents will be made after non-parties have had an opportunity to designate their documents in a manner consistent with the provisions of the Protective Order governing this case, and subject to that Protective Order.

11. Plaintiffs expressly incorporate their General Objections into each specific response below.  A specific response may repeat a General Objection for emphasis or some other reason. The failure to include any General Objection in any specific response does not waive any General Objection applicable to that Request.  Moreover, Plaintiffs do not waive their right to amend their responses.

## SPECIFIC OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

12.    Plaintiff United States objects to Defendants' Definition 14 to the extent that it includes the Department of Transportation or other agencies of the executive branch of the United States government in its definition of "third parties."

13.    Plaintiff United States objects to Defendants' Instruction 1 as overbroad and unduly burdensome to the extent it requires production of documents from divisions of the Department of Justice other than the Antitrust Division and therefore not in the Antitrust Division's possession, custody, or control.  Subject to and without waiving the following Specific

3

Objections or the General Objections, Plaintiff United States will produce responsive, non-privileged documents in the possession, custody, or control of the Antitrust Division of the Department of Justice.

14. Plaintiffs Arizona, District of Columbia, Michigan, Pennsylvania, Tennessee, Texas, and Virginia object to Defendants' Instruction 1 as overbroad and unduly burdensome to the extent it requires production of documents from units, departments, divisions, or sections of the offices of their Attorneys General other than those with antitrust enforcement responsibilities.

15. Plaintiffs object to Defendants' Instruction 4 to the extent it requires individualized logging in a privilege log of voluminous privileged documents that can be described categorically, such as the Antitrust Division's internal privileged documents that have not been disclosed to persons outside the Antitrust Division of the Department of Justice. Individual logging of such documents in a privilege log is unduly burdensome and exceeds the obligation imposed by the Federal Rules of Civil Procedure, including Fed. R. Civ. P. 26(b)(5)(ii).

**SPECIFIC OBJECTIONS AND RESPONSES TO DOCUMENT REQUESTS**

**REQUEST FOR PRODUCTION NO. 1:  All documents, communications, data, or other information that have been provided to, made available to, or obtained by the DOJ or any State from third parties pursuant to or in connection with the Merger Review or this litigation.**
**Response to Request No. 1:**

Subject to and without waiving the following Specific Objections or the General Objections, and consistent with Plaintiff United States' obligation to provide non-parties an opportunity to designate their documents in accordance with the provisions of the Protective Order governing this case, Plaintiff United States responds that it has produced or will produce all responsive, non-privileged documents related to its investigation of the proposed Transaction (DOJ File No.

4

60-481111-0048).  Specifically, Plaintiff United States will produce all non-privileged

documents, data, oral examination transcripts, depositions, statements, declarations, and

affidavits, whether in hard-copy or electronic form, exchanged between Plaintiff United States

and a non-party in the course of Plaintiff United States' investigation of the Transaction.

Plaintiff United States will also produce all responsive, non-privileged, relevant documents

relating to the following investigations:

- (DOJ File No. 60-481111-0045) ("slots babysitting"),

- (DOJ File No. 60-481111-0038) (the proposed acquisition of US Airways' slots by
  Delta Airlines),

- (DOJ File No. 60-481111-0039) (the slots swap between Continental Airlines and
  AirTran Airways), and

- (DOJ File No. 60-481111-0034) (airline baggage fees).

Plaintiff United States will also produce a submission made by US Airways' predecessor,

America West Airlines, to the Department of Justice on July 26, 2002 and a submission made by

America West Airlines to the U.S. Department of Transportation on May 15, 2012.  Further,

Plaintiff United States will produce six depositions of American Airlines personnel conducted in

2004.  Lastly, Plaintiff United States will produce four boxes of documents submitted by

American Airlines to the Department of Justice on or around July 2000 that consist of records of

*AMR Corp. v. UAL Corp.*, No. 91-civ-7773 (JSM) (S.D.N.Y.), a case filed by American Airlines

against United Airlines and Air Wisconsin.

Subject to and without waiving the following Specific Objections and the General

Objections, Plaintiff States respond that they have produced all responsive, non-privileged

documents related to their investigation of the proposed Transaction in their disclosures pursuant to FRCP 26(a)(1)(A)(ii).

**Specific Objections to Request No. 1:**

1. Plaintiff United States objects to this Request as unduly burdensome and overbroad to the extent it seeks documents not in the Antitrust Division's custody, possession, or control. Plaintiffs Arizona, District of Columbia, Michigan, Pennsylvania, Tennessee, Texas, and Virginia object to this Request as unduly burdensome and overbroad to the extent it seeks documents from units, departments, divisions, or sections of the offices of their Attorneys General other than those with antitrust enforcement responsibilities.

2. Plaintiffs object to the phrase "made available to" as overbroad, vague, and ambiguous. Plaintiffs will limit their response to this Request to documents, communications, data, or other information that was provided to or obtained by the Antitrust Division of the U.S. Department of Justice or the units, departments, divisions, or sections of the offices of the Attorneys General of the Plaintiff States.

3. Plaintiffs object to this Request to the extent that it requires the production of materials that are protected by the attorney work-product doctrine, attorney-client privilege, law enforcement investigatory files privilege, or the deliberative process privilege, in conjunction with the joint prosecution privilege.

6

**REQUEST FOR PRODUCTION NO. 2:  All transcripts of investigatory hearings, depositions, factual witness statements or factual interviews (ex parte or otherwise) of third parties concerning the Merger.**

**Response to Request No. 2:**

Subject to and without waiving the following Specific Objections or the General Objections, Plaintiff United States responds that it has produced or will produce all responsive, non-privileged transcripts of investigatory hearings, depositions, declarations, and affidavits.

Subject to and without waiving the following Specific Objections or the General Objections, Plaintiff States respond to Request No. 2 as follows:  Plaintiff States adopt and specifically incorporate by reference their response to Request No. 1 as their response to Request No. 2.

**Specific Objections to Request No. 2:**

1.  Plaintiffs object to the phrase "factual witness statements" as vague and ambiguous.

2.  Plaintiffs object to this Request to the extent that it requires the production of materials that are protected by the attorney work-product doctrine, attorney-client privilege, the law enforcement investigatory files privilege, or the deliberative process privilege, in conjunction with the joint prosecution privilege.  Plaintiffs object to the extent that the request for copies of "factual witness statements" or "factual interviews" could be interpreted to seek production of attorney notes, memoranda, or other confidential documents reflecting the mental impressions of counsel.

**REQUEST FOR PRODUCTION NO. 3:  To the extent not produced in response to the preceding requests, all statements, transcripts, reports, notes, or other documents constituting or memorializing factual testimony, interviews, hearings, meetings, witness recollections, witness declarations, or conversations concerning the facts relevant to the Merger or to the factual allegations made in the Complaint, including but not limited to drafts of such documents.**

<u>**Response to Request No. 3:**</u>

Subject to and without waiving the following Specific Objections or the General Objections, Plaintiff United States responds to Request No. 3 as follows:  Plaintiff United States adopts and specifically incorporates by reference its responses and productions in response to Requests 1 and 2 as its response to Request No. 3.

Subject to and without waiving the following Specific Objections or the General Objections, Plaintiff States respond to Request No. 3 as follows:  Plaintiff States adopt and specifically incorporate by reference their response to Request No. 1 as their response to Request No. 3.

<u>**Specific Objections to Request No. 3:**</u>

1. Plaintiffs object to this Request to the extent that it requires the production of materials that are protected by the attorney work-product doctrine, attorney-client privilege, the law enforcement investigatory files privilege, or the deliberative process privilege, in conjunction with the joint prosecution privilege.

**REQUEST FOR PRODUCTION NO. 4:  All exhibits, presentations, or other documents used or disclosed during any testimony, interview, hearing, deposition, meeting, or conversation with a third-party witness or potential witness concerning the Merger or the allegations made in the Complaint.**

<u>**Response to Request No. 4:**</u>

Subject to and without waiving the following Specific Objections or the General Objections, Plaintiff United States responds to Request No. 4 as follows:  Plaintiff United States adopts and specifically incorporates by reference its response and production for Request No. 1 as its response to Request No. 4.

Subject to and without waiving the following Specific Objections or the General Objections, Plaintiff States respond to Request No. 4 as follows:  Plaintiff States adopt and specifically incorporate by reference their response to Request No. 1 as their response to Request No. 4.

<u>**Specific Objections to Request No. 4:**</u>

1.  Plaintiffs object to this Request on the grounds that the phrase "third-party witness" is vague and ambiguous.

2.  Plaintiffs object to this Request on the grounds that the phrase "potential witness" is vague and ambiguous.

3.  Plaintiffs object to this Request on the grounds that the selection of "exhibits, presentations, or other documents used or disclosed" by employees or agents of the Plaintiffs reflects the mental impression of counsel and is protected by the attorney work-product doctrine.

4.  Plaintiffs object to this Request to the extent that it requires the production of materials that are protected by the attorney work-product doctrine, attorney-client privilege, the law enforcement investigatory files privilege, or the deliberative process privilege, in conjunction with the joint prosecution privilege.

9

**REQUEST FOR PRODUCTION NO. 5:  All non-privileged documents discussing or analyzing the Merger, including but not limited to all documents discussing or analyzing geographic market definition, product market definition, market participants, market shares, market concentration, competition, coordination, entry, expansion, capacity, efficiencies, supply, demand, or any other market conditions related to domestic scheduled air passenger service.**

**<u>Response to Request No. 5:</u>**

Subject to and without waiving the following Specific Objections or the General Objections, Plaintiff United States responds to Request No. 5 as follows:  Plaintiff adopts and specifically incorporates by reference its response and production for Request No. 1 as its response to Request No. 5.

Subject to and without waiving the following Specific Objections or the General Objections, Plaintiff States respond to Request No. 5 as follows:  Plaintiff States adopt and specifically incorporate by reference their response to Request No. 1 as their response to Request No. 5.

**<u>Specific Objections to Request No. 5:</u>**

1.  Plaintiffs object to this Request as duplicative or cumulative of Requests No. 1 & 2.

2.  Plaintiffs object to this Request to the extent that it requires the production of materials that are protected by the attorney work-product doctrine.

**REQUEST FOR PRODUCTION NO. 6:  All documents supportive of the Merger, including but not limited to communications that express support for the merger.**

**<u>Response to Request No. 6:</u>**

Subject to and without waiving the following Specific Objections or the General Objections, Plaintiff United States responds to Request No. 6 as follows:  Plaintiff adopts and specifically incorporates by reference its response and production for Request No. 1 as its response to Request No. 6.

10

Subject to and without waiving the following Specific Objections or the General Objections, Plaintiff States respond to Request No. 6 as follows:  Plaintiff States adopt and specifically incorporate by reference their response to Request No. 1 as their response to Request No. 6.

**Specific Objections to Request No. 6:**

1.  Plaintiffs object to this Request as duplicative or cumulative of Requests No. 1 & 2.

2.  Plaintiffs object to this Request to the extent that it requires the production of materials that are protected by the attorney work-product doctrine, attorney-client privilege, the law enforcement investigatory files privilege, or deliberative process privilege, in conjunction with the joint prosecution privilege.

**REQUEST FOR PRODUCTION NO. 7:  All documents supportive of DOJ's or any State's opposition to the Merger.**

**Response to Request No. 7:**

Subject to and without waiving the following Specific Objections or the General Objections, Plaintiff United States responds to Request No. 7 as follows:  Plaintiff adopts and specifically incorporates by reference its response and production for Request No. 1 as its response to Request No. 7.

Subject to and without waiving the following Specific Objections or the General Objections, Plaintiff States respond to Request No. 7 as follows:  Plaintiff States adopt and specifically incorporate by reference their response to Request No. 1 as their response to Request No. 7.

**Specific Objections to Request No. 7:**

1.  Plaintiffs object to this Request as duplicative or cumulative of Requests No. 1 & 2.

2.  Plaintiffs object to this Request on the grounds that the phrase "opposition to the Merger" is vague, ambiguous, and overbroad.

11

3.  Plaintiffs object to this Request to the extent that it requires the production of materials that are protected by the attorney work-product doctrine, attorney-client privilege, the law enforcement investigatory files privilege, law enforcement investigatory files privilege, or deliberative process privilege, in conjunction with the joint prosecution privilege.

**REQUEST FOR PRODUCTION NO. 8:  All subpoenas, civil investigative demands, or other formal or informal requests for documents, testimony, declarations, or other information sent by the DOJ to any third party concerning the Merger or the allegations made in the Complaint; all documents, testimony, declarations, or other information provided in response to such requests; all communications and correspondence concerning the scope of the requests or any limitation to them; and all communications, notes memorializing communications, and correspondence, including draft declarations and comments on such draft declarations, related to such requests.**

<u>Response to Request No. 8:</u>

Subject to and without waiving the following Specific Objections or the General Objections, Plaintiff United States responds to Request No. 8 as follows:  Plaintiff adopts and specifically incorporates by reference its response and production for Request No. 1 as its response to Request No. 8.

Subject to and without waiving the following Specific Objections or the General Objections, Plaintiff States respond to Request No. 8 as follows:  Plaintiff States adopt and specifically incorporate by reference their response to Request No. 1 as their response to Request No. 8.

<u>Specific Objections to Request No. 8:</u>

1.  Plaintiffs object to this Request as duplicative or cumulative of Requests No. 1, 4 & 5.

2.  Plaintiffs object to this Request to the extent that it requires the production of materials that are protected by the attorney work-product doctrine.  In particular, Plaintiffs object to the extent that the request for copies of "notes memorializing communications" and "draft declarations and comments on such draft declarations" could be interpreted to seek production of

12

attorney notes, memoranda, or other confidential documents reflecting the mental impressions of

counsel.


**REQUEST FOR PRODUCTION NO. 9:  All communications with any third party regarding any aspect of the Merger, including, but not limited to:**
**(a) e-mails and other correspondence, presentations, sworn statements, declarations, or affidavits related in any way to the merger, and any drafts of such documents that were given to or received from a third party;**
**(b) all documents and information received by or submitted to the DOJ or any State from any third party or obtained from any third party in connection with the Merger Review; and**
**(c) documents sufficient to identify all third parties with whom the DOJ or any State has communicated regarding the Merger Review, including but not limited to phone logs, interview notes, draft witness statements, and declarations or affidavits.**

<u>**Response to Request No. 9:**</u>

Subject to and without waiving the following Specific Objections or the General Objections,

Plaintiff United States responds to Request No. 9 as follows:  Plaintiff adopts and specifically

incorporates by reference its response and production for Request No. 1 as its response to

Request No. 9.

Subject to and without waiving the following Specific Objections or the General Objections,

Plaintiff States respond to Request No. 9 as follows:  Plaintiff States adopt and specifically

incorporate by reference their response to Request No. 1 as their response to Request No. 9.

<u>**Specific Objections to Request No. 9:**</u>

1.  Plaintiffs object to this Request as duplicative or cumulative of Requests No. 1 & 4.

2.  Plaintiffs object to this Request to the extent that it requires the production of materials

that are protected by the attorney work-product doctrine, attorney-client privilege, the law

enforcement investigatory files privilege, or the deliberative process privilege, in conjunction

with the joint prosecution privilege.

Ex. A 00016
U.S. v. US Airways et al.
No. 1:13-cv-01236 (CKK)

**REQUEST FOR PRODUCTION NO. 10:  All documents, declarations, analyses, calculations, or other information supporting (or contradicting) any allegation in the Complaint, including but not limited to:**

(a) that the Merger "threatens substantial harm to consumers" (Compl. ¶ 1; *see also* Compl. ¶ 8, 10);

(b) that the Merger "would likely substantially lessen competition, and tend to create a monopoly" (Compl. ¶ 13; *see also* Compl. ¶ 95);

(c) that the Merger "would likely result in the elimination of US Airways' Advantage Fares" (Compl. at 18; *see also* Compl. ¶ 7);

(d) that "Washington, D.C. area passengers would likely see higher prices and fewer choices if the merger were approved" (Compl. ¶ 10);

(e) that AMR is "fully capable of emerging from bankruptcy proceedings on its own with a competitive cost structure, profitable existing business, and plans for growth" (Compl. ¶ 12; *see also* Compl. ¶ 68);

(f) that "each city pair is a relevant geographic market and section of the country under Section 7 of the Clayton Act" (Compl. ¶ 28);

(g) that "airlines can predictably raise prices for some . . . passengers without raising prices for others" (Compl. ¶ 29);

(h) that "the competitive effects of the proposed merger may vary among passengers" (Compl. ¶ 29);

(i) that "[a]irlines do not view service at other airports as adequate substitutes for service offered at Reagan National for certain passengers" (Compl. ¶ 31);

(j) that "slots at Reagan National Airport constitute a line of commerce, section of the country and relevant market within the meaning of Section 7 of the Clayton Act" (Compl. ¶ 31);

(k) that "[i]ncreasing consolidation among large airlines has hurt passengers" (Compl. ¶ 35);

(l) that "many relevant markets are highly concentrated" (Compl. at 14);

(m) that the Merger "would likely substantially enhance the ability of the industry to coordinate on fares, ancillary fees, and service reductions" (Compl. ¶ 46);

(n) that "the benefits from Advantage Fares extend to hundreds of other routes" (Compl. ¶ 51);

(o) that "[o]ther airlines have chosen to respond to Advantage Fares with their own low connecting fares in markets where US Airways has nonstop service" (Compl. ¶ 52);

(p) that "Advantage Fares have proven highly disruptive to the industry's overall coordinated pricing dynamic" (Compl. ¶ 54);

(q) that the Merger would likely lead to increased "capacity discipline" (Compl. ¶ 59);

(r) that "recent experience has shown that capacity discipline has resulted in fewer flights and higher fares" (Compl. ¶ 59);

(s) that "each significant legacy airline merger in recent years has been followed by substantial reductions in service and capacity" (Compl. ¶ 60);

(t) that "the merger would likely result in higher fees" (Compl. at 27);

(u) that "increased consolidation likely has aided the implementation of these [ancillary] fees" (Compl. ¶ 72);

Ex. A 00017
U.S. v. US Airways et al.
No. 1:13-cv-01236 (CKK)

**(v)** that "[t]he levels of the ancillary fees charged by the legacy carriers have been largely set in lockstep" (Compl. ¶ 72);

**(w)** that the Merger "would also likely reduce the quality and variety of ancillary services offered by the legacy airlines" (Compl. ¶ 80);

**(x)** that the Merger would have the likely effect of lessening service (Compl. ¶ 96 (e); *see also* Compl. ¶ 81 (absent the merger, US Airways and AMR "will have greater incentives to grow and compete aggressively through lower ancillary fees, new services, and lower fares"));

**(y)** that the Merger would likely result in reduced industry capacity (Compl. ¶ 96 (d); *see also* Compl. ¶ 82 (the merger would likely "create strong incentives for the merged airline to reduce capacity and raise fares"));

**(z)** that the Merger would "effectively foreclose entry or expansion by other airlines that might increase competition at Reagan National" (Compl. ¶ 83; *see also* Compl. ¶ 96(f));

**(aa)** that "[n]ew entry, or expansion by existing competitors, is unlikely to prevent or remedy the merger's likely anticompetitive effects" (Compl. ¶ 91);

**(bb)** that "[t]he remaining airlines in the United States, including Southwest and JetBlue, have networks and business models that are significantly different from the legacy airlines" and that in certain markets "many passengers view them as a less preferred alternative to the legacy carriers" (Compl. ¶ 93);

**(cc)** that "competition from Southwest, JetBlue, or other airlines would not be sufficient to prevent the anticompetitive consequences of the merger" (Compl. ¶93);

**(dd)** that "[t]here are not sufficient acquisition-specific and cognizable efficiencies that would be passed through to U.S. consumers to rebut the presumption that competition and consumers would likely be harmed by this merger" (Compl. ¶ 94);

**(ee)** that, unless enjoined, the Merger would likely eliminate actual and potential competition between US Airways and American Airlines (Compl. ¶ 96(a)); and

**(ff)** that, unless enjoined, the Merger would likely lessen substantially the "competition in general among network airlines" (Compl. ¶ 96(b)).

## Response to Request No. 10:

Subject to and without waiving the following Specific Objections or the General Objections,

Plaintiff United States responds to Request No. 10 as follows:  Plaintiff United States adopts and

specifically incorporates by reference its response and production for Request No. 1 as its

response to Request No. 10.

Subject to and without waiving the following Specific Objections or the General Objections,

Plaintiff States respond to Request No. 10 as follows:  Plaintiff States adopt and specifically

incorporate by reference their response to Request No. 1 as their response to Request No. 10.

15

**Specific Objections to Request No. 10:**

1.  Plaintiffs object to this Request as duplicative or cumulative of Requests No. 1, 5, 8 & 9.

2.  Plaintiffs also object to this Request as overbroad and unduly burdensome.

3.  Plaintiffs object to this Request to the extent that it requires the production of documents in the possession of Defendants, including the large volume of documents relating to the transaction that were submitted by Defendants to Plaintiffs in the course of Plaintiffs' investigation of the proposed transaction.

4.  Plaintiffs object to this Request to the extent that it requires the production of materials that are protected by the attorney work-product doctrine, attorney-client privilege, the law enforcement investigatory files privilege, or the deliberative process privilege, in conjunction with the joint prosecution privilege.

**REQUEST FOR PRODUCTION NO. 11:  All documents, declarations, or transcripts that are quoted or referenced in the Complaint. (*See, e.g.*, Compl. ¶¶ 1, 4, 6, 9, 11, 19-22, 34-35, 43-48, 54-57, 61-67, 69-70, 72-80, 89.)**

**Response to Request No. 11:**

Subject to and without waiving the General Objections, Plaintiff United States will produce responsive documents, declarations, and transcripts that are quoted or referenced in the Complaint.

Subject to and without waiving the General Objections, Plaintiff States respond to Request No. 11 as follows:  Plaintiff States have no responsive, non-privileged documents that are not identical copies of documents produced by the United States in their custody or control.

16

**REQUEST FOR PRODUCTION NO. 12:  All documents, data and calculations used to create Appendix A to the Complaint, including the basis for determining the HHI numbers shown therein.**

**Response to Request No. 12:**

Subject to and without waiving the General Objections, Plaintiff United States will produce responsive, non-privileged documents, data, and calculations used to create Appendix A of the Complaint.

Subject to and without waiving the General Objections, Plaintiff States respond to Request No. 12 as follows:  Plaintiff States have no responsive, non-privileged documents that are not identical copies of documents produced by the United States in their custody or control.


**REQUEST FOR PRODUCTION NO. 13:  All documents that discuss, describe, or relate to the alleged market shares of US Airways, AMR, or any other airline that provides domestic scheduled air passenger service.**

**Response to Request No. 13:**

Subject to and without waiving the following Specific Objections or the General Objections, Plaintiff United States responds to Request No. 13 as follows:  Plaintiff United States adopts and specifically incorporates by reference its response to and production for Requests Nos. 1 and 12 as its response to Request No. 13.

Subject to and without waiving the following Specific Objections or the General Objections, Plaintiff States respond to Request No. 13 as follows:  Plaintiff States adopt and specifically incorporate by reference their response to Request No. 1 as their response to Request No. 13.

17

**Specific Objections to Request No. 13:**

1.  Plaintiffs object to this Request as unduly burdensome to the extent it seeks documents that discuss, describe, or relate to Defendants' market share that are in the possession of Defendants.

2.  Plaintiffs object to this Request on the grounds that it is overbroad, unduly burdensome, and seeks documents that are not relevant nor reasonably calculated to lead to the discovery of admissible evidence, in that it calls for the production of "all documents that discuss, describe, or relate to alleged market shares," without any limitation on the date the document was dated, created, or updated.

3.  Plaintiffs object to this Request to the extent that it requires the production of materials that are protected by the attorney work-product doctrine, attorney-client privilege, the law enforcement investigatory files privilege, or the deliberative process privilege, in conjunction with the joint prosecution privilege.


**REQUEST FOR PRODUCTION NO. 14:  All documents that discuss or describe the impact of low-cost carriers on the competition for domestic air passenger travel.**

**Response to Request No. 14:**

Subject to and without waiving the following Specific Objections or the General Objections, Plaintiff United States responds to Request No. 14 as follows:  Plaintiff United States adopts and specifically incorporates by reference its response and production for Request No. 1 as its response to Request No. 14.

Subject to and without waiving the following Specific Objections or the General Objections, Plaintiff States respond to Request No. 14 as follows:  Plaintiff States adopt and specifically incorporate by reference their response to Request No. 1 as their response to Request No. 14.

Ex. A 00021
U.S. v. US Airways et al.
No. 1:13-cv-01236 (CKK)

**Specific Objections to Request No. 14:**

1. Plaintiffs object to this Request to the extent that it requests the production of documents in the possession of Defendants, including the large volume of documents relating to the transaction that were submitted by Defendants to Plaintiff in the course of Plaintiff's investigation of the proposed transaction.

2. Plaintiffs object to the phrase "impact of low-cost carriers on the competition" as vague and ambiguous.

3. Plaintiffs object to this Request on the grounds that it is overbroad, unduly burdensome, and seeks documents that are not relevant nor reasonably calculated to lead to the discovery of admissible evidence, in that it calls for the production of "all documents" that discuss or describe "low-cost carriers," without any limitation on the date the document was dated, created or updated.

4. Plaintiffs object to this Request to the extent that it requires the production of materials that are protected by the attorney work-product doctrine, attorney-client privilege, the law enforcement investigatory files privilege, or the deliberative process privilege, in conjunction with the joint prosecution privilege.

**REQUEST FOR PRODUCTION NO. 15:  All documents that constitute, reflect, or contain the facts or forecasts upon which the DOJ based its clearance of the 2005 merger between US Airways and America West (Compl. ¶ 34), including but not limited to factual information, assumptions, and forecasts concerning geographic market definition, product market definition, market participants, market shares, market concentration, capacity, competitive effects, entry, expansion, efficiencies, supply, demand, and other market conditions related to domestic scheduled air passenger service.**

**Response to Request No. 15:**

Subject to and without waiving the following Specific Objections or the General Objections, Plaintiff United States will produce all public statements made in connection with the closing of the investigation.

**Specific Objections to Request No. 15:**

1.  Plaintiff United States objects to the Request as overbroad on the grounds that it seeks "all documents" related to the clearance of the merger.  The parties agreed, as reflected in a September 5, 2013, email from Ryan Danks to Defendants' counsel, that Defendants seek only documents sufficient to show the facts the Division believed were relevant to its enforcement decision with respect to the merger.

2.  Notwithstanding the limitation to this Request in Specific Objection No. 1, Plaintiff United States objects to the Request unduly burdensome, in that it seeks documents that are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.  The United States' exercise of prosecutorial discretion in a different merger bears no relevance to the question of whether the merger between US Airways and American substantially lessens competition.

3.  Plaintiff United States objects to this Request to the extent that it requires the production of materials that are protected by the attorney work-product doctrine, attorney-client privilege,

20

the law enforcement investigatory files privilege, or the deliberative process privilege, in conjunction with the joint prosecution privilege.

4.  Plaintiff United States objects to the Request to the extent it requires the production of confidential material produced to the Antitrust Division in connection with prior investigations in response to a Civil Investigative Demand or pursuant to the Hart-Scott-Rodino Act.  Except in limited circumstances not applicable here, such information is absolutely protected from disclosure by statute, unless the Antitrust Division intends to make direct use of such materials in the present action.  *See* 15 U.S.C. § 1313(c); 15 U.S.C. § 18a(h); *United States v. Am. Tel. & Tel. Co.*, 86 F.R.D. 603, 647-48 (D.D.C. 1979).

5.  Plaintiff United States objects to the Request to the extent it requires the production of expert materials that would not be subject to discovery under Paragraph 10 of the CMO or Fed. R. Civ. P.  26.


**REQUEST FOR PRODUCTION NO. 16:  All documents that constitute, reflect, or contain the facts or forecasts upon which the DOJ based its clearance of the 2008 merger between Delta and Northwest Airlines (Compl. ¶ 34), including but not limited to factual information, assumptions, and forecasts concerning geographic market definition, product market definition, market participants, market shares, market concentration, capacity, competitive effects, entry, expansion, efficiencies, supply, demand, and other market conditions related to domestic scheduled air passenger service.**

<u>**Response to Request No. 16:**</u>

Subject to and without waiving the following Specific Objections or the General Objections, Plaintiff United States will produce all public statements made in connection with the closing of the investigation.

21

**Specific Objections to Request No. 16:**

1. Plaintiff United States objects to the Request as overbroad on the grounds that it seeks "all documents" related to the clearance of the merger.  The parties agreed, as reflected in a September 5, 2013, email from Ryan Danks to Defendants' counsel, that Defendants seek only documents sufficient to show the facts the Division believed were relevant to its enforcement decision with respect to the merger.

2. Notwithstanding the limitation to this Request in Specific Objection No. 1, Plaintiff United States objects to the Request unduly burdensome, in that it seeks documents that are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.  The United States' exercise of prosecutorial discretion in a different merger bears no relevance to the question of whether the merger between US Airways and American substantially lessens competition.

3. Plaintiff United States objects to this Request to the extent that it requires the production of materials that are protected by the attorney work-product doctrine, attorney-client privilege, the law enforcement investigatory files privilege, or the deliberative process privilege, in conjunction with the joint prosecution privilege.

4. Plaintiff United States objects to the Request to the extent it requires the production of confidential material produced to the Antitrust Division in connection with prior investigations in response to a Civil Investigative Demand or pursuant to the Hart-Scott-Rodino Act.  Except in limited circumstances not applicable here, such information is absolutely protected from disclosure by statute, unless the Antitrust Division intends to make direct use of such materials in the present action.  *See* 15 U.S.C. § 1313(c); 15 U.S.C. § 18a(h); *United States v. Am. Tel. & Tel. Co.*, 86 F.R.D. 603, 647-48 (D.D.C. 1979).

22

5.  Plaintiff United States objects to the Request to the extent it requires the production of expert materials that would not be subject to discovery under Paragraph 10 of the CMO or Fed. R. Civ. P.  26.

**REQUEST FOR PRODUCTION NO. 17:  All documents that constitute, reflect, or contain the facts or forecasts upon which the DOJ based its clearance of the 2010 merger between United and Continental (Compl. ¶ 34), including but not limited to factual information, assumptions, and forecasts concerning geographic market definition, product market definition, market participants, market shares, market concentration, capacity, competitive effects, entry, expansion, efficiencies, supply, demand, and other market conditions related to domestic scheduled air passenger service.**

## Response to Request No. 17:

Subject to and without waiving the following Specific Objections or the General Objections, Plaintiff United States will produce all public statements made in connection with the closing of the investigation.

## Specific Objections to Request No. 17:

1.  Plaintiff United States objects to the Request as overbroad on the grounds that it seeks "all documents" related to the clearance of the merger.  The parties agreed, as reflected in a September 5, 2013, email from Ryan Danks to Defendants' counsel, that Defendants seek only documents sufficient to show the facts the Division believed were relevant to its enforcement decision with respect to the merger.

2.  Notwithstanding the limitation to this Request in Specific Objection No. 1, Plaintiff United States objects to the Request unduly burdensome, in that it seeks documents that are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.  The United States' exercise of prosecutorial discretion in a different merger bears no relevance to the

Ex. A 00026
U.S. v. US Airways et al.
No. 1:13-cv-01236 (CKK)

question of whether the merger between US Airways and American substantially lessens competition.

3.   Plaintiff United States objects to this Request to the extent that it requires the production of materials that are protected by the attorney work-product doctrine, attorney-client privilege, the law enforcement investigatory files privilege, or the deliberative process privilege, in conjunction with the joint prosecution privilege.

4.   Plaintiff United States objects to the Request to the extent it requires the production of confidential material produced to the Antitrust Division in connection with prior investigations in response to a Civil Investigative Demand or pursuant to the Hart-Scott-Rodino Act.   Except in limited circumstances not applicable here, such information is absolutely protected from disclosure by statute, unless the Antitrust Division intends to make direct use of such materials in the present action.  *See* 15 U.S.C. § 1313(c); 15 U.S.C. § 18a(h); *United States v. Am. Tel. & Tel. Co.*, 86 F.R.D. 603, 647-48 (D.D.C. 1979).

5.   Plaintiff United States objects to the Request to the extent it requires the production of expert materials that would not be subject to discovery under Paragraph 10 of the CMO or Fed. R. Civ. P.  26.

24

**REQUEST FOR PRODUCTION NO. 18:  All documents that constitute, reflect, or contain the facts or forecasts upon which the DOJ based its decision not to seek to block or obtain a consent decree concerning the sale of slots at Newark related to the 2010 merger between United and Continental, including but not limited to factual information, assumptions, and forecasts concerning geographic market definition, product market definition, market participants, market shares, market concentration, capacity, competitive effects, entry, expansion, efficiencies, supply, demand, and other market conditions related to domestic scheduled air passenger service.**

**Response to Request No. 18:**

Subject to and without waiving the following Specific Objections or the General Objections, Plaintiff United States will produce all public statements made in connection with the closing of the investigation.

**Specific Objections to Request No. 18:**

1.  Plaintiff United States objects to the Request as overbroad on the grounds that it seeks "all documents" related to the clearance of the merger.  The parties agreed, as reflected in a September 5, 2013, email from Ryan Danks to Defendants' counsel, that Defendants seek only documents sufficient to show the facts the Division believed were relevant to its enforcement decision with respect to the merger.

2.  Notwithstanding the limitation to this Request in Specific Objection No. 1, Plaintiff United States objects to the Request unduly burdensome, in that it seeks documents that are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.  The United States' exercise of prosecutorial discretion in a different merger bears no relevance to the question of whether the merger between US Airways and American substantially lessens competition.

3.  Plaintiff United States objects to this Request to the extent that it requires the production of materials that are protected by the attorney work-product doctrine, attorney-client privilege,

25

the law enforcement investigatory files privilege, or the deliberative process privilege, in conjunction with the joint prosecution privilege.

4.   Plaintiff United States objects to the Request to the extent it requires the production of confidential material produced to the Antitrust Division in connection with prior investigations in response to a Civil Investigative Demand or pursuant to the Hart-Scott-Rodino Act.   Except in limited circumstances not applicable here, such information is absolutely protected from disclosure by statute, unless the Antitrust Division intends to make direct use of such materials in the present action.   *See* 15 U.S.C. § 1313(c); 15 U.S.C. § 18a(h); *United States v. Am. Tel. & Tel. Co.*, 86 F.R.D. 603, 647-48 (D.D.C. 1979).

5.   Plaintiff United States objects to the Request to the extent it requires the production of expert materials that would not be subject to discovery under Paragraph 10 of the CMO or Fed. R. Civ. P.  26.

**REQUEST FOR PRODUCTION NO. 19:** **All documents that constitute, reflect, or contain the facts or forecasts upon which the DOJ based its clearance of the 2011 merger between Southwest Airlines and AirTran (Compl. ¶ 34), including but not limited to factual information, assumptions, and forecasts concerning geographic market definition, product market definition, market participants, market shares, market concentration, capacity, competitive effects, entry, expansion, efficiencies, supply, demand, and other market conditions related to domestic scheduled air passenger service.**

**<u>Response to Request No. 19:</u>**

Subject to and without waiving the following Specific Objections or the General Objections, Plaintiff United States will produce all public statements made in connection with the closing of the investigation.

**<u>Specific Objections to Request No. 19:</u>**

1. Plaintiff United States objects to the Request as overbroad on the grounds that it seeks "all documents" related to the clearance of the merger. The parties agreed, as reflected in a September 5, 2013, email from Ryan Danks to Defendants' counsel, that Defendants seek only documents sufficient to show the facts the Division believed were relevant to its enforcement decision with respect to the merger.

2. Notwithstanding the limitation to this Request in Specific Objection No. 1, Plaintiff United States objects to the Request unduly burdensome, in that it seeks documents that are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. The United States' exercise of prosecutorial discretion in a different merger bears no relevance to the question of whether the merger between US Airways and American substantially lessens competition.

3. Plaintiff United States objects to this Request to the extent that it requires the production of materials that are protected by the attorney work-product doctrine, attorney-client privilege,

27

the law enforcement investigatory files privilege, or the deliberative process privilege, in

conjunction with the joint prosecution privilege.

4.  Plaintiff United States objects to the Request to the extent it requires the production of

confidential material produced to the Antitrust Division in connection with prior investigations in

response to a Civil Investigative Demand or pursuant to the Hart-Scott-Rodino Act.  Except in

limited circumstances not applicable here, such information is absolutely protected from

disclosure by statute, unless the Antitrust Division intends to make direct use of such materials in

the present action.  *See* 15 U.S.C. § 1313(c); 15 U.S.C. § 18a(h); *United States v. Am. Tel. & Tel.*

*Co.*, 86 F.R.D. 603, 647-48 (D.D.C. 1979).

5.  Plaintiff United States objects to the Request to the extent it requires the production of

expert materials that would not be subject to discovery under Paragraph 10 of the CMO or

Fed. R. Civ. P.  26.

28

**REQUEST FOR PRODUCTION NO. 20:  All documents related to the airline merger analysis outlined in The Year in Review: Economics at the Antitrust Division, 2008-2009, Review of Industrial Organization, 2009, vol. 35, issue 4, pages 349-367, including all documents constituting, setting forth, or relating to the facts, studies, analyses, methods, and estimates that were the "basis" for "conclud[ing] that the merger was likely procompetitive and ought not be challenged," and all documents referring to this publication that post-date the publication.**

<u>**Response to Request No. 20:**</u>

Subject to and without waiving the following Specific Objections or the General Objections, Plaintiff United States responds to Request No. 20 as follows:  Plaintiff United States adopts and specifically incorporates by reference its response and production for Request No. 16 as its response to Request No. 20.

<u>**Specific Objections to Request No. 20:**</u>

1.  Plaintiff United States objects this Request as overbroad and unduly burdensome on the grounds it seeks documents that are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence, and notes that the article contains the disclaimer, "The views in this paper are those of the authors and do not necessarily reflect those of the Antitrust Division."

2.  Plaintiff United States objects to the Request as vague and overbroad on the grounds that it seeks "all documents" related to the airline merger analysis described, and "all documents" referring to the article that are dated after its publication.

3.  Plaintiff United States objects to this Request to the extent that it requires the production of materials protected by the attorney work product doctrine, attorney-client privilege, the law enforcement investigatory files privilege, or deliberative process privilege.

4.  Plaintiff United States objects to the Request to the extent it requires the production of confidential material produced to the Antitrust Division in connection with prior investigations in

response to a Civil Investigative Demand or pursuant to the Hart-Scott-Rodino Act.  Except in

limited circumstances not applicable here, such information is absolutely protected from

disclosure by statute, unless the Antitrust Division intends to make direct use of such materials in

the present action.  *See* 15 U.S.C. § 1313(c); 15 U.S.C. § 18a(h); *United States v. Am. Tel. & Tel.*

*Co.*, 86 F.R.D. 603, 647-48 (D.D.C. 1979).

5.  Plaintiff United States objects to the Request to the extent it requires the production of

expert materials that would not be subject to discovery under Paragraph 10 of the CMO or

Fed. R. Civ. P.  26.


**REQUEST FOR PRODUCTION NO. 21:  All documents that discuss, describe, or relate to
any actual or contemplated transaction involving slots between US Airways and Delta.**

**Response to Request No. 21:**

Subject to and without waiving the following Specific Objections or the General Objections,

Plaintiff United States responds to Request No. 21 as follows:  Plaintiff United States adopts and

specifically incorporates by reference its response and production for Request No. 1 as its

response to Request No. 21.

Subject to and without waiving the following Specific Objections or the General Objections,

Plaintiff States respond to Request No. 21 as follows:  Plaintiff States adopt and specifically

incorporate by reference their response to Request No. 1 as their response to Request No. 21.

**Specific Objection to Request No. 21:**

Plaintiffs object to this Request to the extent that it requires the production of materials that

are protected by the attorney work-product doctrine, attorney-client privilege, law enforcement

investigatory files privilege, or the deliberative process privilege, in conjunction with the joint

prosecution privilege.

**REQUEST FOR PRODUCTION NO. 22: All non-privileged documents that describe, discuss, measure, estimate, or relate to (a) any actual or potential pro-competitive effects, including but not limited to efficiencies or synergies from the Merger; or (b) any potential or alleged anticompetitive effects from the Merger.**

<u>**Response to Request No. 22:**</u>

Subject to and without waiving the following Specific Objections or the General Objections, Plaintiff United States responds to Request No. 22 as follows: Plaintiff United States adopts and specifically incorporates by reference its response and production for Request No. 1 as its response to Request No. 22.

Subject to and without waiving the following Specific Objections or the General Objections, Plaintiff States respond to Request No. 22 as follows: Plaintiff States adopt and specifically incorporate by reference their response to Request No. 1 as their response to Request No. 22.

<u>**Specific Objections to Request No. 22:**</u>

1. Plaintiffs object to this Request as duplicative or cumulative of Requests No. 1, 8 & 9.

2. Plaintiffs object to this Request to the extent that it requires the production of materials that are protected by the attorney work-product doctrine.

**REQUEST FOR PRODUCTION NO. 23: For every witness retained to provide testimony at a deposition, hearing or trial in connection with this litigation:**
**(a) documents sufficient to identify all of the witness's publications and research, written reports, prior testimony and depositions, and all curriculum vitae;**
**(b) copies of all of the witness's publications, research, reports or prior testimony in any matter that relates to (i) market definition, coordinated effects, or unilateral effects; (ii) competition in domestic scheduled air passenger service; or (iii) prior mergers between companies competing for domestic scheduled air passenger service;**
**(c) all documents, communications, data or other information (other than draft reports or parts thereof) relied upon by any witness retained to provide testimony at trial including, without limitation, all final reports, calculations and computations, as well as computer files of source data, and all original source documents from which computer files and**

31

**source data were constructed; the complete chain of computer programs, computer spreadsheets, source and intermediate data files, and, in hard copy, computer printouts that connect source data to any calculated result; all documents and computer files relating to any editing, corrections, manipulations, or additions to original source data used or referred to in *any* calculation; all documents and computer files relating to the sequence of computer processing steps for any calculation; all documents and computer files relating to or identifying input and output data sets for each computer program or spreadsheet utilized for any calculation; and all execution logs, source codes and printed output from any computer program utilized for any calculation.**

**<u>Specific Objections to Request No. 23:</u>**

1.  Plaintiffs object to this Request on the grounds that it constitutes premature expert discovery to the extent that it seeks the disclosure of what information was considered or relied upon by a testifying expert.  Expert-related discovery in this action is governed by Fed. R. Civ. P. 26, as modified by Paragraph 10 of the CMO.  Plaintiffs will fully comply with the expert discovery requirements of Fed. R. Civ. P. 26, as modified by the CMO, which sets the timing for the disclosure of expert reports, including related facts and data.

2.  Plaintiffs object to this Request as overbroad and unduly burdensome in that it requests production of documents that can be obtained more readily, conveniently, or in a less burdensome fashion from others, including documents that are readily available from public sources.

Ex. A 00035
U.S. v. US Airways et al.
No. 1:13-cv-01236 (CKK)

**REQUEST FOR PRODUCTION NO. 24:  All documents that DOJ or any State intends to use to support its Request for a permanent injunction.**

**Response to Request No. 24:**

Subject to and without waiving the following Specific Objections or the General Objections, Plaintiff responds to Request No. 24 as follows:  Plaintiff adopts and specifically incorporates by reference its response and production for Request No. 1 as its response to Request No. 24.

Subject to and without waiving the following Specific Objections or the General Objections, Plaintiff States respond to Request No. 24 as follows:  Plaintiff States adopt and specifically incorporate by reference their response to Request No. 1 as their response to Request No. 24.

**Specific Objections to Request No. 24:**

1.  Plaintiffs object to this Request as duplicative or cumulative of Request No. 1, 2, 5 & 8.

2.  Plaintiffs object to this Request as premature and inconsistent with paragraph 12 of the CMO, which sets a deadline of October 25, 2013, for the parties to negotiate the timing, method, and manner of the exchange of exhibit lists.  Moreover, discovery is ongoing, including discovery from Defendants and non-parties.  Plaintiffs may hereafter obtain additional documents that it may use in deposition or trial, and expressly reserve the right to do so.

**REQUEST FOR PRODUCTION NO. 25:  All non-privileged communications between DOJ and one or more of the other Plaintiffs, including Arizona, District of Columbia, Florida, Pennsylvania, Tennessee, Texas, and Virginia, or any other state, federal, or non-U.S. regulatory agency, related to this Merger, or the Merger Review.**

**Specific Objections to Request No. 25:**

1.  Plaintiffs object to the term "state regulatory agency" as vague and ambiguous.  Plaintiffs interpret this term to not include quasi-state entities such as the Allegheny County Airport Authority or other quasi-state entities that oversee airports.

2.  Plaintiffs object to this Request to the extent that it requires the production of materials that are protected by the attorney work-product doctrine in conjunction with the joint prosecution privilege.


**REQUEST FOR PRODUCTION NO. 26:  All non-privileged communications between DOJ and one or more of the other Plaintiffs, including but not limited to Arizona, District of Columbia, Florida, Pennsylvania, Tennessee, Texas, and Virginia, or any other state, federal, or non-U.S. regulatory agency, related to the mergers or DOJ review of the mergers of US Airways and America West (2005), Delta and Northwest Airlines (2008), United and Continental (2010) and Southwest Airlines and AirTran (2011).**

<u>**Specific Objections to Request No. 26:**</u>

1.  Plaintiffs object to the term "state regulatory agency" as vague and ambiguous.  Plaintiffs interpret this term to not include quasi-state entities such as the Allegheny County Airport Authority or other quasi-state entities that oversee airports.

2.  Plaintiffs object to this Request to the extent that it requires the production of materials that are protected by the attorney work-product doctrine in conjunction with the joint prosecution privilege.

Dated: September 13, 2013


FOR PLAINTIFFS

/s/ _____
Ryan J. Danks
Attorney
U.S. Department of Justice, Antitrust Division
450 Fifth Street, N.W., Suite 8000
Washington, DC 20530
(202) 305-0128
Ryan.Danks@usdoj.gov


34

## CERTIFICATE OF SERVICE

I hereby certify that I caused a true and correct copy of Plaintiffs' Objections and Responses to Defendants' First Set of Requests for Production of Documents to be served via electronic mail to all parties to this litigation.

Dated:  September 13, 2013

/s/_____
Ryan J. Danks

35

# Exhibit B

CONFIDENTIAL (PURSUANT TO PROTECTIVE ORDER)

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.* <br><br>                      *Plaintiffs*, <br><br>           v. <br><br> US AIRWAYS GROUP, INC. <br><br> and <br><br> AMR CORPORATION <br><br>                     *Defendants*. | Case No. 1:13-cv-01236 (CKK) |

## PLAINTIFFS' OBJECTIONS AND RESPONSES TO DEFENDANTS'
## FIRST SET OF INTERROGATORIES DIRECTED TO ALL PLAINTIFFS

Pursuant to Fed. R. Civ. P. 33 and the Local Rules of the United States District Court for the District of Columbia, Plaintiffs object and respond to Defendants' First Set of Interrogatories Directed to All Plaintiffs.

## PRELIMINARY STATEMENT

The responses to these interrogatories include information that Plaintiffs obtained from Defendants that is subject to the Protective Order and that is designated Confidential. Therefore, Plaintiffs designate their response to Interrogatory 3 below as Confidential, in accordance with the Protective Order.

## GENERAL OBJECTIONS

Plaintiffs object generally to Defendants' First Set of Interrogatories to the extent that they attempt to impose any obligation on Plaintiffs greater than those imposed or authorized by

the Federal Rules of Civil Procedure, the Local Civil Rules of the District of Columbia, or any applicable order of the Court.

Plaintiffs object generally to Defendants' First Set of Interrogatories to the extent they seek information protected from discovery and disclosure by the attorney-client privilege, deliberative-process privilege, work-product doctrine, law-enforcement investigative privilege, common-interest privilege, or any other applicable privilege or doctrine.  Should any disclosure by Plaintiffs of information protected from discovery occur, it shall not constitute a waiver of any privilege applicable to any other information.

Plaintiffs object generally to Defendants' First Set of Interrogatories to the extent they prematurely seek production of information relating to the anticipated testimony of any of Plaintiffs' potential expert witnesses. Plaintiffs will produce such information in accordance with the Case Management Order.

Plaintiffs' object generally to Defendants' First Set of Interrogatories to the extent that they call for Plaintiffs to specify each document, deposition, or other fact or piece of evidence that supports particular contentions that Plaintiffs intend to prove at trial. Such a requirement is overly broad, unduly burdensome, and premature.  In that regard, Plaintiffs note that, to the extent a reference is made to documents, depositions, or other evidence in its responses, such reference is made without waiver of this general objection and is not intended to provide an exhaustive list of all evidence that Plaintiffs may ultimately introduce at trial.  Plaintiffs will serve their witness and exhibit lists within the time prescribed by the Scheduling Order or other time prescribed by the Court.

Plaintiffs object generally to Defendants First Set of Interrogatories to the extent that they request information that is not in the possession, custody, or control of the Antitrust Division of

REDACTED

the Department of Justice, or information from units, departments, divisions, or sections of the

offices of the Plaintiff State Attorneys General other than those with antitrust enforcement

responsibilities.  Plaintiffs have no reason to believe that relevant responsive information is

likely found outside these offices and believe that a search for such information would be unduly

burdensome.

Plaintiffs object generally to the Instructions included in Defendants' First Set of

Interrogatories to the extent they impose burdens beyond those required by the Federal Rules of

Civil Procedure or applicable court order.  In particular, Plaintiffs object to the Instructions to the

extent that they attempt to impose obligations for claiming a privilege or protecting trial-

preparation materials that are greater than those set forth in Federal Rule of Civil Procedure

26(b)(5), or purport to require individualized logging in a privilege log of voluminous privileged

documents that can be described categorically, such as the Antitrust Division's internal

privileged documents that have not been disclosed to persons outside the Antitrust Division of

the Department of Justice. Individual logging of such documents in a privilege log is unduly

burdensome and exceeds the obligation imposed by the Federal Rules of Civil Procedure,

including Fed. R. Civ. P. 26(b)(5)(ii).

Plaintiffs object generally to the term "Previously Cleared Mergers" to the extent it

assumes that any of the Plaintiffs "cleared" the four consummated mergers listed.

Plaintiffs object generally to Instruction No. 5 to the extent that it attempts to impose

obligations beyond those imposed or authorized by Federal Rules of Civil Procedure 26 and 33.

REDACTED

## SPECIFIC OBJECTIONS AND RESPONSES TO INTERROGATORIES

**1. Identify each Person interviewed by the Plaintiffs (either together or independently) pursuant to the Investigation of the challenged Transaction and provide all factual information obtained from these individuals and entities through such interviews that is relevant to Plaintiffs' claims in this case.**

### Specific Objections

Plaintiffs object to this interrogatory to the extent that it attempts to impose obligations for supplementing an interrogatory response that are greater than those set forth in Federal Rule of Civil Procedure 26(e)(1).

Plaintiffs further object to this interrogatory because it requests protected attorney work product prepared in anticipation of litigation, and production of protected attorney work product that conveys attorneys' mental impressions, conclusions, opinions, and legal theories concerning this litigation.

Plaintiffs further object to this interrogatory because it requires Plaintiffs to identify those individuals and entities that it selected to interview during the course of its investigation and in preparation for this litigation, and the topics of interest to Plaintiffs.  This information is itself protected attorney work product.

Plaintiffs further object to this interrogatory because it requests information protected by the law enforcement investigatory privilege.

### Response

Subject to and without waiving the foregoing objections, Plaintiffs respond that they have produced to Defendants all documents and information relevant to their Investigation into the challenged Transaction in the Antitrust Division's and State Attorney Generals' possession, custody, and control that is not subject to an applicable privilege or doctrine, or otherwise exempt from production, including extensive Initial Disclosures pursuant to Fed. R. Civ. P. 26(a)

REDACTED

that identify persons likely to have discoverable information that Plaintiffs' may use to support

their claims.

**2.   Provide all of the factual information that each of the Plaintiffs relied upon in making a decision not to challenge under the antitrust laws each of the Previously Cleared Mergers.**

<u>**Specific Objections**</u>

Plaintiffs object to this interrogatory as containing discrete subparts constituting four

separate interrogatories because the interrogatory seeks separate answers for "each of the

Previously Cleared Mergers," which is defined by the Interrogatory to include the 2005 merger

of US Airways and America West, the 2008 merger of Delta and Northwest Airlines, the 2010

merger of United and Continental, and the 2011 merger of Southwest Airlines and AirTran.

Plaintiffs object to this interrogatory because it purports to seek information that is

neither relevant to the subject matter of the lawsuit nor reasonably calculated to lead to the

discovery of admissible evidence.  Plaintiffs' exercise of prosecutorial discretion in prior

investigations—including, in several instances, Plaintiff States' lack of any investigation—bears

no relevance to the question of whether the merger between US Airways and American

substantially lessens competition.

Plaintiffs also object to this interrogatory because it purports to seek information that is

protected by the attorney work-product doctrine, attorney-client privilege, the law enforcement

investigatory files privilege, or the deliberative process privilege, in conjunction with the joint

prosecution privilege.

Plaintiffs also object to this interrogatory because it purports to seek information that is

protected from disclosure by federal and state statutes.  *See, e.g.*, 15 U.S.C. § 1313(c); 15 U.S.C.

§ 18a(h); *United States v. Am. Tel. & Tel. Co.*, 86 F.R.D. 603, 647-48 (D.D.C. 1979).

5

Plaintiffs also object to this interrogatory to the extent it requires the production of

information that would not be subject to discovery under Paragraph 10 of the CMO or Fed. R.

Civ. P. 26.

3. **To the extent Plaintiffs are alleging relevant product and geographic markets that are adversely affected by the challenged Transaction (e.g., "the domestic passenger service market" (Complaint ¶ 36)) other than the city pairs listed in Appendix A to the Complaint, identify each such market and provide all factual information underlying each such market definition.**

**Specific Objections**

6



**<u>Response</u>**

REDACTED



8

Ex. B 0046
U.S. v. US Airways et al.
No. 1:13-cv-01236 (CKK)



9

Ex. B 0047
U.S. v. US Airways et al.
No. 1:13-cv-01236 (CKK)



10

Ex. B 0048
U.S. v. US Airways et al.
No. 1:13-cv-01236 (CKK)



REDACTED

Ex. B 0049
U.S. v. US Airways et al.
No. 1:13-cv-01236 (CKK)



12

Ex. B 0050
U.S. v. US Airways et al.
No. 1:13-cv-01236 (CKK)

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

Dated: September 19, 2013

FOR PLAINTIFFS

_____/s/_____
Ryan J. Danks
Attorney
U.S. Department of Justice, Antitrust Division
450 Fifth Street, N.W., Suite 8000
Washington, DC 20530
(202) 305-0128
Ryan.Danks@usdoj.gov

13

## CERTIFICATE OF SERVICE

I hereby certify that I caused a true and correct copy of Plaintiffs' Objections and Responses to Defendants' First Set of Interrogatories to be served via electronic mail to all parties to this litigation.

Dated:  September 19, 2013

_____/s/_____

Katharine S. Mitchell-Tombras

14

Ex. B 0052
U.S. v. US Airways et al.
No. 1:13-cv-01236 (CKK)

# Exhibit C

 **Department of Justice**

FOR IMMEDIATE RELEASE                                                           AT
TUESDAY, APRIL 26, 2011                                              (202) 514-2007
WWW.JUSTICE.GOV                                              TDD (202) 514-1888

### STATEMENT OF THE DEPARTMENT OF JUSTICE ANTITRUST DIVISION ON ITS DECISION TO CLOSE ITS INVESTIGATION OF SOUTHWEST'S ACQUISITION OF AIRTRAN

WASHINGTON – The Department of Justice's Antitrust Division issued the following statement today after announcing the closing of its investigation into the proposed acquisition of AirTran Airways by Southwest Airlines Company:

After a thorough investigation, the division determined that the merger is not likely to substantially lessen competition.  The merged firm will be able to offer new service on routes that neither serves today, including new connecting service through Atlanta's Hartfield Jackson International Airport from cities currently served by Southwest to cities currently served by AirTran.  The division said that the presence of low cost carriers like Southwest and AirTran has been shown to lower fares on routes previously served only by incumbent legacy carriers.

Although there are overlaps on certain nonstop routes, the division did not challenge the acquisition after considering the consumer benefits from the new service.  Also, the airports affected by the overlaps are not subject to restrictions on slots or gate availability.  Where such restrictions exist, entry by other airlines may be particularly difficult.

Southwest Airlines is based in Dallas.  In 2010, it had revenues of $12.1 billion carrying approximately 88 million passengers.  Southwest serves 72 cities in the United States.  AirTran is based in Orlando.  In 2010, it had revenues of $2.6 billion carrying approximately 25 million passengers.  AirTran serves 69 cities in the United States, Mexico and the Caribbean.

# # #

11-523

Ex. C 0053
U.S. v. US Airways et al.
No. 1:13-cv-01236 (CKK)



# Department of Justice

---

FOR IMMEDIATE RELEASE
FRIDAY, AUGUST 27, 2010
WWW.JUSTICE.GOV

AT
(202) 514-2007
TDD (202) 514-1888

### UNITED AIRLINES AND CONTINENTAL AIRLINES TRANSFER ASSETS TO SOUTHWEST AIRLINES IN RESPONSE TO DEPARTMENT OF JUSTICE'S ANTITRUST CONCERNS

***Department of Justice Closes Investigation, Transfer of Newark, N.J., Assets Resolves Competition Concerns***

WASHINGTON — The Department of Justice announced today that in light of the agreement by United Airlines Inc. and Continental Airlines Inc. to transfer takeoff and landing rights (slots) and other assets at Newark Liberty Airport to Southwest Airlines Co., the department has closed its investigation into the proposed merger of UAL Corporation, the parent of United, and Continental.  United and Continental entered into the arrangement with Southwest in response to the department's principal concerns regarding the competitive effects of the proposed United/Continental merger.

The department conducted a thorough investigation.  The proposed merger would combine the airlines' largely complementary networks, which would result in overlap on a limited number of routes where United and Continental offer competing nonstop service.  The largest such routes are between United's hub airports and Continental's hub at Newark airport, where Continental has a high share of service and where there is limited availability of slots, making entry by other airlines particularly difficult.  The transfer of slots and other assets at Newark to Southwest, a low cost carrier that currently has only limited service in the New York metropolitan area and no Newark service, resolves the department's principal competition concerns and will likely significantly benefit consumers on overlap routes as well as on many other routes.  The slot transfer is through a lease that permanently conveys to Southwest all of Continental's rights in the assets, in compliance with FAA rules.

Led by the office of the Ohio Attorney General, the offices of the attorneys general from California, Ohio, Texas, Virginia, Pennsylvania, North Dakota, New Jersey, Hawaii and the District of Columbia have also been investigating the proposed merger.  The department is supportive of the states' efforts to have any of their additional concerns about the proposed merger addressed.

United Airlines, based in Chicago, is the third largest carrier in the United States by revenue.  In 2009, it collected $16.3 billion in revenue carrying approximately 80 million passengers.  United and its regional affiliates offer service to more than 230 destinations in the United States and 30 other countries throughout the world.

Ex. C 0054
U.S. v. US Airways et al.
No. 1:13-cv-01236 (CKK)

- 2 -

Continental Airlines, based in Houston, is the fourth largest carrier in the United States by revenue.  In 2009, it collected $12.6 billion in revenue carrying approximately 67 million passengers.  Continental and its regional affiliates offer service to 265 destinations in the United States and over 50 other countries throughout the world.

Southwest Airlines, based in Dallas, is the sixth largest carrier in the United States by revenue.  In 2009, it collected $10.4 billion in revenue carrying approximately 86 million passengers.  Southwest serves 69 cities in the United States.

The Antitrust Division provides this information under its policy of issuing announcements related to the closing of investigations in appropriate cases.  This announcement is limited by the division's obligation to protect the confidentiality of certain information obtained in its investigations. As in most of its investigations, the division's evaluation has been highly fact-specific, and many of the relevant underlying facts are not public.  Consequently, readers should not draw overly broad conclusions regarding how the division is likely in the future to analyze other collaborations or activities, or transactions involving particular firms. Enforcement decisions are made on a case-by-case basis, and the analysis and conclusions discussed in this statement do not bind the division in any future enforcement actions.  Guidance on the division's policy regarding announcements related to the closing of investigations is available at www.usdoj.gov/atr/public/guidelines/201888.htm.

# # #

10-974



# Department of Justice

---

FOR IMMEDIATE RELEASE                                                        AT
WEDNESDAY, OCTOBER 29, 2008                                   (202) 514-2007
WWW.USDOJ.GOV                                             TDD (202) 514-1888

### STATEMENT OF THE DEPARTMENT OF JUSTICE'S ANTITRUST DIVISION
### ON ITS DECISION TO CLOSE ITS INVESTIGATION OF
### THE MERGER OF DELTA AIR LINES INC.
### AND NORTHWEST AIRLINES CORPORATION

WASHINGTON – The Department of Justice's Antitrust Division issued the following statement today after the Division announced the closing of its investigation of the proposed merger of Delta Air Lines Inc. and Northwest Airlines Corporation:

"After a thorough, six-month investigation, during which the Division obtained extensive information from a wide range of market participants–including the companies, other airlines, corporate customers and travel agents–the Division has determined that the proposed merger between Delta and Northwest is likely to produce substantial and credible efficiencies that will benefit U.S. consumers and is not likely to substantially lessen competition.

"The two airlines currently compete with a number of other legacy and low cost airlines in the provision of scheduled air passenger service on the vast majority of nonstop and connecting routes where they compete with each other.  In addition, the merger likely will result in efficiencies such as cost savings in airport operations, information technology, supply chain economics, and fleet optimization that will benefit consumers.  Consumers are also likely to benefit from improved service made possible by combining under single ownership the complementary aspects of the airlines' networks.

"The Division provides this statement under its policy of issuing statements concerning the closing of investigations in appropriate cases.  This statement is limited by the Division's obligation to protect the confidentiality of certain information obtained in its investigations.  As in most of its investigations, the Division's evaluation has been highly fact-specific, and many of the relevant underlying facts are not public.  Consequently, readers should not draw overly broad conclusions regarding how the Division is likely in the future to analyze other collaborations or activities, or transactions involving particular firms.  Enforcement decisions are made on a case-by-case basis, and the analysis and conclusions discussed in this statement do not bind the Division in any future enforcement actions.  Guidance on the Division's policy regarding closing statements is available at http://www.usdoj.gov/atr/public/guidelines/201888.htm."

Delta, based in Atlanta, is the third largest airline in the United States.  In 2007, it collected $19.1 billion in revenue for carrying 73 million passengers more than 126 billion miles.  Delta and its domestic regional affiliates offer service to more than 300 destinations in 58 countries.

- 2 -

Northwest, based in Minneapolis, is the fifth largest airline in the United States.  Last year, it carried approximately 53 million passengers 72 billion miles for total revenues of $12.5 billion.  Northwest serves 239 destinations in 21 countries in North America, Asia and Europe.

### 

08-963

Ex. C 0057
U.S. v. US Airways et al.
No. 1:13-cv-01236 (CKK)



# Department of Justice

---

FOR IMMEDIATE RELEASE                                                              AT
THURSDAY, JUNE 23, 2005                                              (202) 514-2007
WWW.USDOJ.GOV                                                  TDD (202) 514-1888

### STATEMENT BY ASSISTANT ATTORNEY GENERAL R. HEWITT PATE
### REGARDING THE CLOSING OF THE
### AMERICA WEST / US AIRWAYS INVESTIGATION

#### *End-To-End Merger Cleared*

WASHINGTON, D.C. – R. Hewitt Pate, Assistant Attorney General in charge of the Department's Antitrust Division, issued the following statement today after the Department announced the closing of its investigation of the proposed merger of America West and US Airways:

"The Antitrust Division has concluded that the proposed merger of America West and US Airways would not reduce competition, and therefore has decided to close its investigation without issuing requests for additional information. There is very little overlap between the networks of America West and US Airways. America West operates primarily in the western United States, with hubs in Phoenix and Las Vegas. In contrast, US Airways operates primarily in the eastern United States, with hubs in Philadelphia, Pittsburgh and Charlotte and substantial presences in Washington, D.C. and New York City. The Division has found that integration of airlines with complementary, end-to-end networks, like those of the merging firms, can achieve efficiencies that benefit consumers. The consolidation of America West and US Airways, which will create the fifth largest domestic carrier, will enable the merged airline to offer U.S. consumers more and better service to more destinations throughout the country."

Background

USAirways and America West are the seventh and eight largest U.S. carriers, in terms of revenue passenger miles, according to publicly available information. As a result of the planned merger with America West, which is valued above $1.5 billion, US Airways is expected to emerge from its second bankruptcy. In related transactions, four parties – ACE Aviation (parent of Air Canada), Air Wisconsin, PAR Investments, and the Wellington Group – will invest in the merged carrier. Today's announcement clears the way for the merger to proceed without antitrust challenge. The parties require a number of additional approvals, including confirmation of the reorganization plan by the bankruptcy court, and do not expect to consummate the merger until September.

###

05-338

Ex. C 0058
U.S. v. US Airways et al.
No. 1:13-cv-01236 (CKK)

Exhibit D

Rev Ind Organ
DOI 10.1007/s11151-009-9232-1

# The Year in Review: Economics at the Antitrust Division, 2008–2009

**Ken Heyer · Carl Shapiro · Jeffrey Wilder**

© Springer Science+Business Media, LLC. 2009

**Abstract**   This paper covers the activities of the Economic Analysis Group (EAG) of the Antitrust Division, U.S. Department of Justice, during 2008–2009. It describes the economic analysis undertaken by EAG in several important investigations, and in other activities as an advocate for competition.

**Keywords**   Antitrust · Competition · Mergers

## 1 Introduction

During the past year the Economic Analysis Group (EAG) of the Antitrust Division, U.S. Department of Justice, has been engaged actively in providing economic analysis on a wide range of interesting and important matters. A substantial share of its

Ken Heyer is the Economics Director for Economic Analysis at the Antitrust Division, United States Department of Justice. Carl Shapiro is the Deputy Assistant Attorney General for Economic Analysis and the chief economist at the Antitrust Division of the Antitrust Division, United States Department of Justice. Jeffrey Wilder is the Assistant Chief of the Antitrust Division's Competition Policy Section. Shapiro joined the Division in March 2009 and was not a party to any decisions made prior to that time. The views in this paper are those of the authors and do not necessarily reflect those of the Antitrust Division.

K. Heyer (✉) · C. Shapiro · J. Wilder
Antitrust Division, U.S. Department of Justice, 600 E Street, N.W. Suite 10000, Washington, DC 20530, USA
e-mail: ken.heyer@usdoj.gov

C. Shapiro
e-mail: carl.shapiro@usdoj.gov

J. Wilder
e-mail: jeffrey.wilder@usdoj.gov

Published online: 12 November 2009

≝ Springer

Ex. D 0059
U.S. v. US Airways et al.
No. 1:13-cv-01236 (CKK)

efforts was devoted to merger review; however, considerable attention was given also to other competition matters, including a review of a significant proposed joint venture between two on-line giants. Other activities included the preparation of formal comments to regulatory agencies and filings with the courts.

In addition, building on its efforts over the past few years, EAG has through the research efforts of its staff served as an advocate for competition. It has done so by publishing work intended to influence and help improve the design of rules and regulations with a potentially significant impact on competition and, more generally, the performance of the economy. The Division's economists have also continued to play an important role in the training of attorneys and other economists, both inside the Division and out, and both domestically and internationally.

In this review article we report on a number of these activities, with a particular emphasis on ones that raised interesting or complex economic issues. In the area of mergers, we discuss the economic analysis performed by the Division's economic staff in the investigation of proposed mergers between Coors and Miller (beer), JBS and National (beef packing) and Northwest and Delta (airline travel). Following that, we provide a somewhat more detailed discussion of the Division's investigation into the proposed joint venture between Yahoo! and Google.

We also report on two of the Division's important competition advocacy efforts: One of these resulted in the filing of formal comments with the Department of Transportation in which we opposed certain expanded elements of antitrust immunity sought by the Star international airline alliance. In another, drawing substantially on input from the Division's economists, the Department filed an amicus brief with the 2nd Circuit Court of Appeals articulating the Division's position with respect to so-called "reverse payment" patent settlement cases.

In our discussion of these investigations, partly due to space limitations and partly due to confidentiality considerations, we resist the temptation to present in its entirety the Division's analysis of all the important evidence, or all of the relevant economic issues and arguments. We refrain also from even attempting to provide a complete explanation for why each matter was decided the way it was. Rather, in the interests of focusing on the interesting economics at issue, we at times highlight only the main facts, omitting some details, without in our view doing injustice to the critical economic arguments in play in these cases. For the purposes of these year-in-review articles, the precise facts of a given investigation are of far less importance than is a more general description of the analytical work performed by the Division's economists.

Finally, during the past year economists at the Division continued to publish a considerable amount of original research. Much of this research was based on casework, but a significant fraction dealt with antitrust, applied microeconomics, and econometrics generally. Some of this research was published as part of our EAG Discussion Paper series and included timely papers on the banking industry (Raskovich 2008), failing firm defense in merger analysis (Heyer and Kimmel 2009), and consumer demand for fuel economy (Langer and Miller 2008).[1] Among the several publications by our staff economists in professional journals were papers on corporate leniency and

---

[1]  A complete list of recent and historical EAG Discussion Papers can be obtained at http://www.usdoj.gov/atr/public/eag/discussion_papers.htm or by emailed request to janet.ficco@usdoj.gov.


Ex. D 0060
U.S. v. US Airways et al.
No. 1:13-cv-01236 (CKK)

cartel enforcement (Miller 2009), remedies for exclusionary conduct (Werden 2009), and assessing the anticompetitive effects of multiproduct pricing (Carlton et al. 2008).

## 2 Mergers

### 2.1 Miller/Coors: Efficiencies Brewing

In late 2008, SABMiller plc (Miller) and Molson Coors Brewing Company (Coors) announced their proposal to enter into a joint venture under which the companies would combine their beer operations in the United States and Puerto Rico. The proposed joint venture was analyzed in much the same way the Division evaluates proposed mergers, and after an 8-month investigation the Division announced that the deal was not likely to lessen competition substantially.

At the same time that it announced that it had no intention of challenging the joint venture the Division stated publicly that "In one of the key parts of the investigation, the Division verified that the joint venture is likely to produce substantial and credible savings that will significantly reduce the companies' costs of producing and distributing beer." The type of efficiencies that the Division found credible in this matter, and the evidence it relied upon in reaching its decision, are worthy of some discussion. First, however, we briefly provide some background on the industry and the pre-venture competition within it.

Miller and Coors were at the time of their proposed joint venture two of the three largest beer producers in the country (the third being Anheuser–Busch [AB], whose size exceeded that of either Miller, or Coors, or a combined Miller/Coors). Although numerous domestic and imported beers competed against "the big three" in one or more regions of the country, none had a substantial share of sales. For whatever combination of historical and other reasons, sales of the most widely-known brands–products produced and sold by Miller, Coors, and A–B, greatly exceeded those of their rivals.

Concentration in relevant markets was quite high, though (as noted above) the Division found it unlikely that the proposed venture would lessen competition substantially. From the perspective of possible anticompetitive unilateral effects, our investigation determined that, by far, the greatest competition faced by both Miller and Coors came from A–B, not from one another. Relevant evidence consisted not only of documents from the parties and their large rival, but also of an empirical examination of sales data.

It was also found that the proposed venture would be unlikely to make coordination among firms in the industry significantly more likely, more complete, or more durable. Neither Coors nor Miller appeared to represent likely coordination-disrupting "mavericks," and the prospect of significant cognizable efficiencies (discussed below) made net anticompetitive coordinated effects even less likely.

Our lengthy investigation of this proposed venture confirmed the parties' assertions that combining their beer operations was likely to produce large and cognizable efficiencies. A considerable fraction of these efficiencies represented variable cost savings that directly affected the merged entity's pricing incentives, while other claimed benefits appeared likely to produce nontrivial fixed cost savings. Much of the

Ex. D 0061
U.S. v. US Airways et al.
No. 1:13-cv-01236 (CKK)

efficiencies involved freight cost savings that were based on the ability of the merged firm to redistribute production of the parties' two brand portfolios across the venture's multiple plants, which were geographically dispersed.

At the time of the transaction, Coors primary production facility was located in Golden, CO, with a secondary facility in Elkton, VA. The several Miller plants were distributed more widely throughout the country; from WI to OH to TX to CA. Customers of the two firms' products were distributed throughout the country, and by, for example, moving Coors production into some of the Miller facilities (which did not appear in most cases to be operating at or near capacity), average shipping costs across the combined firms' plants could be reduced considerably.

Significantly, in addition to these claimed efficiencies being plausible on their face, additional and non-pretextual evidence helped confirm not only that they were likely to be achieved, but also that they would be substantial in magnitude. Miller had, prior to its decision to join with Coors, commissioned a business consulting firm to analyze potential industry combinations. That firm modeled freight efficiencies as the current combined stand alone freight cost less the model-derived combined freight costs after redistributing optimally the firm's products across production facilities. We examined the firm's modeling approach and found it and its resulting estimates to be reasonable.

Finally, and as further confirmation of our analysis, the internal analyses of others in the industry-third parties not involved directly in the deal-tended at least broadly to track the claims put forward by the joint venturing firms. In evaluating the implications of the deal for their own business fortunes, these potentially affected third parties examined a potential Miller–Coors combination and reached conclusions consistent with those reached by the Division's economists.

Efficiencies analysis in merger cases is often quite difficult. Assertions can be difficult to test, and even plausible arguments may be subject to legitimate skepticism. However, in matters where we have multiple pieces of evidence that are independently developed, facially plausible, and mutually consistent and reinforcing, our confidence in our conclusions is heightened considerably.[2]

## 2.2 JBS/National/Smithfield: The Division's Beef with a Proposed Merger of Packers

In deals announced in March 2008, JBS, (the Brazilian owner of significant US beef processing operations), bid to acquire both the National Beef Packing Company (National) and the Smithfield Beef Group (Smithfield). The acquisitions would have combined the nation's third, fourth and fifth largest beef packers and created a new largest firm in the industry. In evaluating the proposed acquisitions, among the

---

[2]  It may be worth commenting briefly on the fact that the Division did recently challenge a merger of two other beer manufacturers–Anheuser–Busch and InBev. That deal was permitted to proceed only after adequate divestitures were specified in a formal Consent Decree. In the latter Anheuser–Busch/InBev matter we found the two firms to be one another's principal competitors in a relevant geographic market (upstate New York) and, unlike in the case of Miller/Coors, the evidence for merger-specific efficiencies was very weak.

 Springer

key economic issues evaluated by the Division's economists were geographic market definition and competitive effects.[3]

Beef processors compete both in procuring cattle from farmers and in selling packaged products to retailers. Transportation and other cost considerations may make relevant geographic markets for purchasing cattle much narrower than are geographic markets for selling packaged beef products. A hypothetical single purchaser of cattle within a geographic region narrower than the entire United States might well have considerable monopsony power over cattle farmers in that region even if a hypothetical single seller of the packaged beef coming from that region could not profitably raise prices to retailers.

It is, of course, entirely possible that an exercise of monopsony power in regional markets could be economically inefficient and welfare-reducing even if the prices paid by consumers of final products remains unaffected. For example, paying lower prices to suppliers whose marginal cost is upward sloping will call forth less supply from them. This may prove profitable to the purchaser even if there is a highly elastic supply forthcoming from non-victimized producers—additional sales from whom would protect final consumers from a price increase. In such cases, final consumers of the product are not harmed, however the economy is performing below its potential because it is producing an unchanged quantity of the product less efficiently.

The Division's analysis in this matter incorporated considerations of potential harms both upstream (the purchase of cattle from feedlots by regional packing facilities) and downstream (the sale of graded boxed beef by packers to retailers). We found a significant likelihood that the merger might lead not only to competitive harm from lower prices paid to regional cattle suppliers, but also harm to final consumers of beef. This latter effect, which was predicted to be quite modest in percentage terms, arose in part from the fact that although cattle breeders might, in principle, attempt to protect themselves by shipping small "feeder" cattle outside the region prior to fattening and slaughter,[4] unutilized packing capacity in the hands of independent firms located outside the region was quite limited.

The Division's upstream concerns were both that the merger might enable the merged firm unilaterally to reduce price for fed cattle in the affected region, and also that market conditions might facilitate coordinated pricing for fed cattle among the region's few remaining significant packers. One of the techniques used by the Division's economists to evaluate the likelihood of competitive harm upstream was to employ cross-section econometric analysis of how winning bids for cattle at feedlots varied as a function of the number of independently owned packing facilities located within various distance bands around the feedlot.

We found, after controlling for other relevant variables, that winning bids tended to be somewhat higher when the number of independent packing facilities located

---

[3] The Division elected not to challenge the JBS acquisition of Smithfield. Some time after the Division filed a formal Complaint challenging its proposed acquisition of National, JBS withdrew its bid for that company.

[4] Shipping costs are much lower for pre-fed cattle.

Ex. D 0063
U.S. v. US Airways et al.
No. 1:13-cv-01236 (CKK)

near a feedlot was greater.[5] From these results, along with other pieces of evidence, we concluded that eliminating one of only two or three independent packing facilities that were located relatively near feed lots would result in lower winning bid prices for cattle supplied by those feed lots.

One other issue in our decision to challenge the JBS acquisition of National is especially worth noting. The potential harm from enhanced monopsony power in this case, while it was found to be likely, was not predicted to be very large in percentage terms. Concern was heightened, however, by two additional pieces of information. The first is that the volume of commerce in the market was enormous–billions of dollars per year. Hence, even an anticompetitive effect as small as, say, 1%, could lower payments to feed lots of tens of millions of dollars per year. Second, the merger-specific efficiencies from the deal were found to be exceedingly small. In our judgment, the expected net harm from the deal was likely to be quite large.

### 2.3 Northwest/Delta: An Airline Merger Gets off the Ground

In the summer of 2008, Delta Airlines and Northwest Airlines proposed to merge their operations.[6] The networks of these two large carriers' operations overlapped quite a bit; however the vast majority of the overlaps were on routes where one or both of the carriers offered only "connect" service via their hubs and where there was substantial competition from other airlines. In a limited number of city-pairs, however, there was a nonstop horizontal overlap as well; on service between (respectively) Atlanta, Cincinnati, and Salt Lake City, where Delta operates major hubs, and the domestic hubs (Detroit, Minneapolis, and Memphis) operated by Northwest.

Key challenges in our investigation included estimating a) the potential anticompetitive effects on the overlap (nonstops and connects), and b) evaluating and estimating the size of potential merger-specific efficiencies, which the parties claimed would be in the many hundreds of millions of dollars annually.

Beginning with connecting service, there are literally thousands of domestic city-pairs where Northwest and Delta both offer connecting service, including many where both carriers have significant market shares. We were unable to find any empirical support for adverse competitive effects in markets where the two carriers' face competition from another nonstop carrier or from a Low Cost Carrier (LCC),[7] although we did find some evidence of small potential harm on other one-stop routes.

---

[5] Our economists investigated the possibility that these empirical findings might have been the result of spurious correlation—i.e., that some other variable, not included in the model, was responsible for both the lower prices and the greater number of bidders. After looking at candidate missing variables that might in theory have generated our results, we found this alternative explanation to be unsupported by available evidence.

[6] The deal was ultimately permitted to go forward without objection from the Antitrust Division.

[7] "LCCs" are non-"legacy" airlines, such as Southwest and AirTran who, due to lower labor and other expenses, commonly have lower operating costs than do the major "legacy" airlines (which have large networks and extensive union collective bargaining agreements that originated in the era before the deregulation of the U.S. airlines in the late 1970s. Numerous empirical studies have found a significant "LCC effect" on fares–i.e., controlling for the number of carriers serving a route, it makes a difference whether one or more of them happens to be an LCC.

 Springer

Of the nonstop overlap routes, there were two categories of markets potentially affected adversely by the merger. One was the five city-pairs in which only Northwest and Delta provided nonstop service. The other was the four city-pairs where Northwest, Delta, and a non-legacy LCC provided nonstop service. Our economists used both publicly available airline data and internal data provided by the carriers to examine the likely consequences of both a merger to monopoly of nonstop carriers and a merger of two legacy carriers where the remaining nonstop competitor would be an LCC.

Because the city-pairs where the only nonstop service was provided by Northwest and Delta were markets where the carriers operated hubs at different endpoints, in estimating the merger's likely competitive effects in these markets our economists compared the performance of carriers in city-pairs where nonstop service was provided by two carriers–each with a hub at only one end–with prices and output in city-pairs where nonstop service was provided between two hubs of the same carrier (e.g., by Northwest between its Minneapolis and Detroit hubs).

Consistent with prior research (and conventional wisdom), nonstop domestic service was found to be a relevant antitrust market. In other words, absent efficiencies or entry, a hypothetical monopolist would profitably raise price by at least a small, but significant and nontransitory amount. We found also that the remaining nonstop competition from an LCC on a route would lower considerably the potential anticompetitive effect in a nonstop market.

Nevertheless, because there were so few nonstop overlap markets and the volume of commerce on these routes was relatively small, potential harm in these city-pairs was predicted to be modest at most. This implied that if only a fraction of the efficiencies claimed by the parties from combining their large, and largely complementary, networks were found likely to be generated by the merger, these would easily exceed any potential for harm from the deal.

Turning then to efficiencies, we considered two potential benefits from the merger; cost savings and increased value to travelers. On the first of these, many of the claimed cost savings were merely asserted, rather than documented. This made it impossible for us to credit them in our analysis. Some of the claimed savings were credited; in particular, those relating to more efficient utilization of gate space. There was, however, an offsetting factor, including estimates from the parties themselves of significant one-time integration costs.

On the benefits side of the ledger, the proposed merger might generate consumer benefits by facilitating schedule improvements, by allowing for a more efficient allocation of aircraft across the network, and through marketing synergies that could make the merged carrier's service more attractive to consumers.

Our analysis was complicated by, among other things, the fact that following the merger the parties were planning to adjust the schedules of both carriers' flights. Generating our own independent predictions of post-merger scheduling was beyond our ability. Therefore, in conducting our analysis we worked with a number of different hypothetical post-merger schedules, including one produced by the parties as part of what appeared to be a legitimate business effort to assess post-merger opportunities, as well as on the actual "but-for" schedules for October 2008 that the two carriers had published the previous June.

Ex. D 0065
U.S. v. US Airways et al.
No. 1:13-cv-01236 (CKK)

Our methodology for calculating benefits involved comparing the forecasted demand for the merged carrier under plausible post-merger schedules with the forecasted demand for Northwest and Delta under the but-for schedules. By doing so we could determine how the post-merger schedule changes would be likely to affect the demand for the merged carrier's service. With no change in rivals' services, a change that allows the merged carrier to attract more customers implies an increase in consumer welfare.

Using demand elasticity estimates that are consistent with the empirical literature on the airline industry, along with some neutral assumptions about the nature of consumer demand, our economists were able to calculate the change in consumer welfare implied by the predicted traffic changes for each hypothetical post-merger schedule. Our best estimates of the likely increases in consumer welfare significantly exceeded the feared harm to consumers in the overlap routes served by the two carriers. On this basis we concluded that the merger was likely procompetitive and ought not be challenged.

It is worth noting that our methods for estimating merger-specific benefits produced figures that were far below those claimed by the parties. One major reason for this was that the model used by the parties' experts employed a measure of convenience (a variable that essentially measures how many flights a carrier offers on a route and how well-timed they are) that generated predictions about future traffic flows that were wildly inconsistent with the predictions made by the model that Northwest uses in the ordinary course of its business.

## 2.4 Yahoo!/Google: A Searching Analysis of a Proposed Joint Venture[8]

In June 2008, Google and Yahoo! announced an advertising agreement that would have allowed Google, at Yahoo!'s discretion, to serve ads on Yahoo! Websites.[9] In exchange, Google agreed to share a percentage of the revenue generated by these ads with Yahoo!. The deal was non-exclusive, with an initial term of 4 years and two 3-year extensions at Yahoo!'s option. Google and Yahoo! delayed implementation of the agreement to allow the Antitrust Division to review its competitive implications. On November 5, 2009, facing advertiser opposition and the specter of a lawsuit by the Antitrust Division, Google and Yahoo! abandoned the agreement.

### 2.4.1 Background on the Search Advertising Business

Today's search advertising platforms all adhere to the same core business model. In response to a user's search query, a platform serves up "algorithmic" search results accompanied by ads both immediately above and to the right of the search results. Advertisements directly above the algorithmic search results generate the most clicks,

---

[8] Carl Shapiro represented one of the parties during this investigation. He had no input into the drafting of this section.

[9] As is explained below, in essence Yahoo! would transmit a search query to Google, which would return ads for Yahoo! to display alongside its search results.

 Springer

followed by those to the right, with positions higher on the web page generating more clicks. When a user clicks on an ad, the advertiser whose ad is clicked pays the platform; ads that are not clicked generate no revenue for the platform.

Each advertiser's cost per click, as well as its advertisement's position on the page, are determined by auction. Advertisers submit bids that specify the maximum cost per click they are willing to pay. Each advertiser's bid is multiplied by its ad's quality score, a measure of the ad's expected relevance to the user derived from historical click-through rates and other factors. Ads are then ordered, with higher bids leading to ad placement in those positions that generate the most clicks. When an ad is clicked, the advertiser pays an amount determined by the bid and quality score for the next highest ad on the page.[10] At least for Google's advertising platform, in the specific case in which all ads' quality scores are equal, the advertiser pays the bid of the next-highest bidder. This has led many observers to describe the auction mechanism as a generalized second-price auction.[11]

Because advertisers could not possibly submit bids on the universe of all user queries, bidding is organized around relatively common keywords. Much of the "secret sauce" of these platforms inheres in the algorithms that they use to aggregate bids on keywords upon which advertisers bid, and their skill in populating pages with relevant ads in response to a wide variety of (at-times obscure) user queries. Importantly, platforms also employ proprietary algorithms to determine how ads are configured on the page. Many queries result in no ads being promoted to the prime real estate immediately above the algorithmic results, or even in no ads being shown at all.

Determining how and where a platform will serve up particular ads, if done well, add considerable value to searchers and advertisers by converting advertisements into final sales. However, and in contrast to claims made by the parties,[12] a concern during our investigation was that the agreement might have enabled Google more fully to exploit advertisers by manipulating auction parameters such as reserve prices, promotion thresholds, and even the quality scores themselves.

Despite the fact that Google and Yahoo! jointly represent a dominant share of the search advertising market, it is not immediately obvious that an agreement would have led to higher prices or that if prices were to increase the effect would be substantial. If Google and Yahoo! users are distinct—for example, if those who search for "tennis racket" on Google do not also search for that product on Yahoo! (and vice-versa)—and if an advertiser's margin is constant, the advertiser may not view the two platforms as substitutes. If so, even a full merger of the two platforms might have no immediate effect on price.

---

[10] http://googleblog.blogspot.com/2008/10/quality-scores-and-ad-auctions.html.

[11] See Athey and Ellison (2007), Edelman et al. (2007), and Varian (2007) for more information on these auction mechanisms.

[12] From a Google blog post: "[The agreement] does not let Google raise prices for advertisers. Google does not set the prices manually for ads; rather, advertisers themselves determine prices through an ongoing competitive auction. We have found over years of research that an auction is by far the most efficient way to price search advertising and have no intention of changing that." http://googleblog.blogspot.com/2008/06/our-agreement-to-provide-ad-technology.html.

Ex. D 0067
U.S. v. US Airways et al.
No. 1:13-cv-01236 (CKK)

To see this, consider an advertiser that runs local radio ads to reach populations in both San Francisco and Chicago. In making its purchasing decisions, this advertiser likely invests in each campaign until the benefit of an additional sale, or conversion, is exactly offset by its cost. The price of a television spot in San Francisco has no bearing on the profit-maximizing calculus for Chicago. The possibility that search behavior by internet users followed this pattern (for example, that those searching for "tennis rackets" on Google virtually never searched also for tennis rackets on Yahoo!—and vice-versa) needed to be explored.

Such arguments, it should be noted, break down if advertisers are budget constrained, which may be fairly common in the world of search advertising where many advertisers outsource their campaigns to third parties. The argument also breaks down when advertisers face increasing marginal costs or capacity constraints. In these cases, the advertiser likely will view the two media as substitutes and will shift purchases in response to changes in relative prices.

Ultimately, whether substitution is significant or not is an empirical question. Answering it proved challenging in several respects. To begin with, advertisers have a variety of ways in which they might respond to price shocks. Consider an advertiser that finds itself displaced from the top ad position on an advertising platform when a competitor suddenly begins to bid more on a keyword. The advertiser can increase its bid to regain the top position, increase its bids on related keywords on the same platform, increase its bids on the same or related keywords on other platforms, or simply do nothing. Further complicating the analysis is the question of how quickly advertisers respond to changes in relative prices. Advertisers are a heterogeneous group. Some monitor tens of thousands of keywords in-house on a daily basis, others outsource their campaigns to specialized advertising firms known as search engine marketers, or SEMs, subject to budget constraints; still others bid on a few keywords and check in every few weeks to see how their ads are performing. Not knowing how, and how quickly, advertisers respond to price shocks made reliable estimation of cross-elasticities of demand between the platforms difficult.

An additional challenge was logistical. Given the vast number of user queries that they receive each day, Google and Yahoo! generate, if anything, too much data. Even with statistical sampling, the size of the data sets produced by Google and Yahoo! made structural modeling of the underlying auctions infeasible given the need for expeditious review of the transaction.

### 2.4.2 Potential Efficiencies

Google is, by far, the largest and most successful search engine on the planet. Part of its success owes to its great skill in helping advertisers monetize their advertisements by generating clicks, and ultimately sales, in response to ads. The proposed agreement was touted for its potential to enable both consumers and advertisers on Yahoo! To benefit from its outsourcing this function to Google at least for some keywords.

Potential benefits to advertisers included the prospect of Yahoo! outsourcing unused ad space to Google. If the agreement allowed Google to fill this space with ads, resulting in additional sales of advertisers' good and services, this would surely qualify as a benefit. Beyond that, Google might also have been able to replace Yahoo ads with



more relevant ads, generating both more clicks and more conversions per click. Both would have resulted in increased advertiser surplus and consumer surplus. Some evidence developed during our investigation suggested that Google outperformed Yahoo! in both respects.

### 2.4.3 Potential Competitive Harm

When the revenue-sharing agreement between Google and Yahoo! was announced, several commenters argued that the deal would result in a price floor at the Google price. According to the argument, the agreement creates incentives for Yahoo! to outsource any query for which Google was able to extract a higher price (net of Google's revenue share) from advertisers than Yahoo!. As a result, Yahoo! could immediately increase its price on these queries.

This argument, however, fails to account for the fact that some underlying factors were responsible for the existence of a price differential in the first place. Yahoo! could, of course, decide to increase its price post-agreement; but this would drive many advertisers away from its platform and towards Google for the same reasons it drove them from its platform prior to the agreement.

Among more conventional theories of harm is the standard diversion theory that underlies most unilateral effects analysis of differentiated products mergers. Because Google would earn, post-agreement, a share of ad revenue on queries outsourced by Yahoo!, Google would have an increased incentive to raise prices on its own platform. While the theory is certainly valid, harm through this mechanism may have been fairly limited. Because Google would only recapture lost revenues on those queries outsourced by Yahoo! and because Google would keep only a fraction of ad revenue on outsourced queries, its incentive to increase price would be much weaker than would have been the case were Google and Yahoo! to merge outright.

Beyond this standard revenue recapture analysis, another consideration was the ability of Google potentially to coordinate pricing with Yahoo! by controlling the configuration of ads on Yahoo! web pages. For example, depending on the precise final terms of their agreement, Google could reduce the number of ads displayed immediately above the algorithmic results on both its own platform and Yahoo!'s. By doing so, it may have been able profitably to restrict industry output and achieve, or come close to achieving, the quantity effect we would expect to observe if Google and Yahoo! merged.[13]

Beyond the potential for harm from immediate price effects, the agreement created a risk of even greater harmful effects on innovation over the immediate to long run. In a world without the agreement, Yahoo! reaps the benefits of its innovations for all its user queries. With the agreement, Yahoo!'s return on any investments in new search advertising technologies is limited to what it earns on those queries it populates with its own ads after it has implemented its new technology. To the extent that Yahoo!

---

[13] As with any such arrangement, it would (of course) need to be the case that neither Yahoo! nor Google would find it profitable to defect by showing additional ads on its own websites. Both platforms, however, have available a number of mechanisms to monitor compliance.

Ex. D 0069
U.S. v. US Airways et al.
No. 1:13-cv-01236 (CKK)

outsourced a large fraction of its queries to Google, its incentive to innovate would undoubtedly be reduced, especially if innovations are incremental.

In addition, because scale is so important in the search advertising business, the effect of having Yahoo! outsource significant business to Google could precipitate a downward spiral, with serious consequences to Yahoo!'s future competitiveness. Search advertising platforms are successful largely to the extent that they match users with relevant ads, and "learning by doing" is a big part of what helps these platforms improve. Knowing which ads are likely to generate a user's interest is in part a numbers game: The more opportunities that the platform has to observe similar users responding to similar ads, the better is the platform's ability to match ads to any individual user. The greater the increased profits to Yahoo! from outsourcing, the more outsourcing Yahoo! would have found profitable. And to the extent Yahoo! found the outsourcing of ads to be profitable, this would undermine its future ability to provide relevant ads in response to user queries.

While any future degradation of Yahoo!'s platform would have obvious negative implications for consumers and advertisers, it would affect also the many Internet publishers who contract with Google or Yahoo! to provide search technology for their websites. Currently, Google, Yahoo!, and Microsoft compete to offer search bars at the top of partners' web sites as well as the contextual ads that are displayed alongside partners' content. Ad revenue generated under these syndication agreements is shared with publishers and is often the only way, other than display or banner ads, for publishers to generate returns on their investments in content. If Yahoo! were no longer able to compete aggressively for these syndication contracts, publisher revenues would surely decline. And, faced with lower revenues, publishers may bring less content to market on the Internet.

In the end, the Division determined that the potentially substantial harms from a combination of higher prices in the near term and, perhaps more importantly, weakened future innovation and competition by Yahoo! against Google, were sufficiently large and likely so as to exceed the admittedly nontrivial benefits potentially arising from an outsourcing agreement between the parties.

## 3 Competition Advocacy

### 3.1 Star Alliance Antitrust Immunity

Over the past 15 years, a number of international airline alliances have formed and grown. Under such alliances, carriers from different countries cooperate to handle passengers travelling internationally. For example, United Airlines is a member of the Star Alliance, which contains twenty-one carriers, including Air Canada, Lufthansa, SAS, Swiss, and TAP. Members of airline alliances agree to provide alliance customers with certain joint services such as code sharing, coordinated reservations and baggage transfer, through ticketing, frequent flyer reciprocity, and lounge sharing. International airline alliances have proven beneficial to connecting passengers who necessarily must

 Springer

travel on more than one carrier to complete their journey.[14] In some ways, these alliances are a substitute for mergers between carriers operating in different countries; such mergers are prohibited by limitations in many countries, including the U.S., on foreign ownership of airlines that operate domestically. Since these alliances involve various forms of cooperation among carriers who are actual or potential competitors, they raise significant antitrust issues.

The U.S. Department of Transportation (DOT) has the authority to approve international airline alliances and grant them antitrust immunity on international routes. Carriers have sought antitrust immunity from DOT to shield themselves from possible antitrust liability as they cooperate to carry traffic on international routes. In some cases, such cooperation involves joint setting of fares and the sharing of revenues earned from international passengers. Over the past 16 years, DOT has exercised its authority to grant antitrust immunity to more than twenty alliance agreements. During this time, most of the largest airlines in the world have become members of one of three large alliances, often with antitrust immunity. Many of the immunity grants made by DOT over the years were intended, in large part, to further the foreign policy goals of inducing the governments of the foreign alliance partners' home countries to enter into "open skies" agreements with the U.S., thus promoting international aviation competition.

Within the Star alliance, United and Lufthansa operate a joint venture that was granted antitrust immunity in 1996. These two carriers instituted revenue sharing in 2003, when they changed the name of their venture to the Atlantic Plus (A+) Alliance. Additionally, there is an immunized portion of the Star Alliance containing United, Air Canada, Lufthansa, Austrian, BMI, LOT, SAS, Swiss, and TAP. Both of these immunity grants involve "carve-outs" that exclude certain hub-to-hub routes on which the carriers compete head-to-head for non-stop traffic. Where they are workable, carve-outs offer an attractive solution: They preserve competition on the affected routes while allowing the carriers in the alliance to realize broader alliance efficiencies.

In considering an alliance application, DOT is required by statute to evaluate the impact of a proposed alliance agreement on competition. As explained by the DOT:

> "In particular, we cannot approve agreements that substantially reduce or eliminate competition unless they are necessary to meet a serious transportation need or to achieve important public benefits, when that need or those benefits cannot be met or achieved by reasonably available alternatives that are materially less anticompetitive." DOT Show Cause Order, April 2009, p. 6.

In July 2008, Continental Airlines, in conjunction with United Airlines and other members of the immunized portion of the Star Alliance, applied to the DOT for permission for Continental to be admitted to the Star Alliance, including its immunized portion.[15] These Applicants also proposed an integrated joint venture, named A++, among Continental, United, Air Canada, and Lufthansa, patterned after the immunized A+ joint venture. In April 2009, DOT issued a Show Cause Order that indicated its

---

[14] See Brueckner (2003), Brueckner and Whalen (2000), and Whalen (2007).

[15] Joint Application of Air Canada, et al. Docket OST-2008-0234.

Ex. D 0071
U.S. v. US Airways et al.
No. 1:13-cv-1236 (CKK)

intention to grant authority for Continental to join the immunized Star Alliance and further immunizing the A++ joint venture.[16] The DOT Show Cause Order (pp. 7–13) states that the DOT's competitive analysis treats immunized agreements as a merger, applying traditional Clayton Act merger standards.

The Antitrust Division has considerable experience in analyzing international airline alliances. The Division analyzes an immunity application much like a merger, since the immunized carriers will have the legal ability to cease any competition among themselves for activities within the scope of the immunity that is granted. In cases where the Division believes that the proposed alliance will substantially diminish competition, we communicate our concerns to DOT, in meetings and/or in formal comments. In response to the application for Continental to join the Star Alliance with antitrust immunity, the Division met with DOT personnel and subsequently filed comments, which are available to the public in redacted form.[17] The Division's principal concerns arose in four related areas, which we discuss in turn.

First, the Division was concerned about a loss of competition on specific trans-Atlantic routes from New York where Continental competed against a Star Alliance member on a hub-to-hub basis. Concerns were greatest on routes where antitrust immunity would reduce the number of non-stop competitors from two to one. These were routes to Stockholm and Copenhagen (SAS), Zurich (Swiss) and Lisbon (TAP). In addition, on the New York to Zurich route the number of non-stop competitors would decline from three to two. The Division generally favors "carving out" such routes from antitrust immunity, i.e., limiting the grant of immunity to preserve competition on these routes. This approach has been taken in numerous previous grants of immunity. However, the DOT Show Cause Order did not include carve-outs for any of these routes, stating (p. 12): "We tentatively find that each of the nonstop overlap markets will continue to have adequate competition on a nonstop or connecting basis."

The key question was thus well posed: On trans-Atlantic routes, is competition from connecting traffic sufficiently potent that the elimination of all non-stop competition would not harm passengers? The empirical centerpiece of our comments was designed to answer this question by studying the relationship between the number of non-stop carriers on a trans-Atlantic city-pair route and the fares charged on that route.[18] Using data for the third quarter of 2008, we focused on one-coupon (one-way) and two-coupon (round trip) coach class (fare class X) tickets. To control for the economics of hubs, we restricted our attention to hub-to-hub routes, of which there were 65. We used as additional explanatory variables the mileage of the route and the route's population potential. We found that reducing the number of non-stop competitors on a trans-Atlantic hub-to-hub route from two to one raises the average non-stop fare on that route by 15%, *ceteris paribus*. Likewise, reducing the number of non-stop competitors from three to two raises the average non-stop fare by 6.6%. These findings show directly that the number of non-stop rivals affects fares, whatever disciplining impact connecting traffic has on non-stop fares. We also observed that across the 65

---

[16] Show Cause Order, Docket OST-2008-0234, April 7, 2009.

[17] Comments of the Department of Justice on the Show Cause Order, Docket OST-2008-0234, June 26, 2009.

[18] For further details, see "Appendix B: Empirical Addendum" to the Department of Justice comments.

 Springer

routes studied, 73% of coach passengers fly non-stop, even though average connecting fares are 10% lower than average non-stop fares.

This empirical work demonstrated that granting immunity would significantly diminish competition on the routes where Continental competed head-to-head with a Star alliance member. In other words, granting antitrust immunity on these routes would be costly to passengers. But that left open the question of whether there might be even larger *benefits* to passengers of including these routes in any immunity grant. To answer this question, we conducted empirical work to learn whether antitrust immunity is necessary to achieve significant efficiencies in serving connecting passengers. Any such efficiencies could, in principle, loom large, since the number of connecting passengers served by the Star Alliance is far greater than the number of non-stop passengers served on the overlap routes previously noted. Consistent with the empirical literature, we found that international alliances do indeed lead to significantly lower fares, which is consistent with the theory that they reduce a "double marginalization" problem associated with interline traffic. Critically, however, we found that fares charged by immunized alliances are 3.6% *higher* than fares charged by non-immunized alliances, *ceteris paribus*. In other words, while alliances generate benefits to connecting passengers, antitrust immunity does not. Indeed, many alliances conduct substantial operations without antitrust immunity.

Second, we were concerned about the proposal in the Show Cause Order to *remove* the pre-existing carve-outs on two routes where United and Lufthansa were the only non-stop competitors: Chicago to Frankfurt and Washington, DC, to Frankfurt. The empirical analysis just cited was directly relevant to this issue. The Show Cause Order proposed removing these carve-outs to enable the A++ joint venture to operate with full antitrust immunity, but the Division was concerned that removing the carve-outs would elevate fares on these two routes without providing offsetting benefits to passengers. Third, we had similar concerns with regard to several city-pair routes between the U.S. and Canada where Continental and Air Canada were the only two carriers offering non-stop traffic: Houston to Calgary, Houston to Toronto, Cleveland to Toronto, and New York to Ottawa. The Division's experience and previous analysis indicated that elimination of non-stop competition on routes within North America would lead to higher fares, notwithstanding the remaining competition from connecting traffic and notwithstanding the threat of entry onto the route in question.

Fourth, the Division was concerned about a loss of competition between Continental and United to provide service to mainland China. Continental and United were the only U.S. carriers providing non-stop service to Beijing from the U.S. mainland. Together, they account for 57% of the available non-stop seats to Beijing, with non-immunized Star member Air China accounting for another 41%. Since United and Continental serve China from different gateway airports in the U.S., the issue was not the loss of non-stop competition, as it was on the trans-Atlantic routes. Rather, Continental and United were direct competitors in providing connecting service from many U.S. cities to Beijing. Under the DOT's Show Cause Order, that competition would be lost.

The Division suggested carve-outs and other limitations on the immunity grant, so as to allow the Applicants to achieve alliance efficiencies without harming passengers on certain problematic routes: "Thus, the final Order should carve out the transatlantic

Ex. D 0073
U.S. v. US Airways et al.
No. 1:13-cv-01236 (CKK)

and transborder markets where competitive harm is most likely to occur, maintain existing carve outs, and limit immunity to transatlantic markets." (DOJ Comments, p. 36) Following the filing of our comments, the DOT modified its Show Cause Order. The DOT added a number of carve-outs to the antitrust immunity eventually granted in its Final Order.[19] In the end, the DOT accepted some, but not all of the limitations that the Division recommended to the immunity that was granted to the Applicants. The Division's empirical work was critical to our competition advocacy in this case.

3.2 Reverse Payments in Pharmaceutical Patent Settlements: Cipro Brief

All three branches of the Federal government have been struggling for some years with so-called "reverse payments," in the context of pharmaceutical patent settlements. The term "reverse payment" refers to a situation arising from the peculiar structure of the Hatch–Waxman Act, which established the rules governing the introduction of generic drugs that compete against branded pharmaceuticals that have been subject to patent protection. The courts have been reviewing challenges to patent settlements involving reverse payments. Congress has been considering legislation to bar such agreements or sharply restrict them. And the Federal Trade Commission (FTC) and the Antitrust Division have been formulating their enforcement policies and positions regarding these agreements.

The relevant fact pattern arises (approximately) as follows: A would-be generic entrant seeks the approval of the U.S. Food and Drug Administration (FDA) to offer a generic version of a patented drug (along with the entrant's claim that the patent is invalid or not infringed); the patent holder that sells the branded drug sues the would-be generic supplier for patent infringement; and the two reach a settlement of their patent dispute which contains the following two provisions: (1) an agreement by the generic supplier to refrain from entering the market for at least a portion of the time remaining on the patent, and (2) a substantial payment from the patent holder to the generic supplier. This latter element is commonly called a "reverse payment" because it flows from the patent holder to the alleged infringer, unlike conventional royalty payments (or infringement damages payments), which flow in the other direction.

There is a large literature that analyzes reverse payments,[20] which have been the subject of considerable attention, especially by the FTC, over the past decade. We focus here on the *Cipro* case before the Second Circuit, in which the Antitrust Division articulated a specific legal and economic standard to be applied to reverse payment cases.[21] In this case, the patent holder is Bayer, the generic is Barr, and the drug in question is the antibiotic ciprofloxacin hydrochloride (Cipro). The settlement between Bayer and Barr involved a cash payment from Bayer to Barr of nearly $400 million

---

[19] "Final Order," Docket OST-2008-0234, July 10, 2009.

[20] See, for example, Lemley and Shapiro, "Probabilistic Patents," *Journal of Economic Literature,* (2005), 19(2), 75–98, and the references cited therein. For a recent paper with new empirical findings on agreements involving reverse payments, see Hemphill (2009).

[21] *Arkansas Carpenters Health and Welfare Fund, et al. Bayer et al.*, Case 05-2851-cv(L), Second Circuit, Brief for the United States in Response to the Court's Invitation, July 6, 2009.

 Springer

along with an agreement by Barr to refrain from introducing a generic version of Cipro until 6 months before the expiration of Bayer's patent.

The antitrust dangers associated with reverse payments are straightforward: the incumbent supplier, in this case Bayer, has a strong incentive to pay the would-be entrant, in this case Barr, to refrain from entering the market and driving prices down. Due to the peculiar structure of the Hatch–Waxman Act, by paying off one generic supplier, the patent holder can in some cases forestall entry by *any* generic for some period of time. Blocking generic entry leads to sharply higher joint profits, since generic entry typically reduces prices substantially, benefiting consumers at the expense of the patent holder that markets the branded drug. In the absence of a patent, a payment by an incumbent supplier to a would-be entrant in exchange for the entrant's agreement to stay out of the market would be blatantly anticompetitive.

Nonetheless, a number of courts have been reluctant to find settlements that involve reverse payments to be illegal agreements under the Sherman Act, §1, observing that patents generally confer on their owners the right to exclude others from practicing the patented invention. Indeed, the Second Circuit itself, in the *Tamoxifen* case, ruled that reverse payments do not violate the Sherman Act unless either (1) the settlement extends the monopoly beyond the patent's scope, (2) the patent was procured by fraud, or (3) the infringement suit settlement was objectively baseless.[22] Despite this prior ruling, the panel considering the *Cipro* case solicited the views of the United States.

The core economic and legal issue in these cases is how to handle the apparent tension between the Sherman Act, which prohibits agreements that restrict competition, and the Patent Act, which grants exclusionary rights to patent holders. The Antitrust Division's brief takes the position that reverse payments are "presumptively illegal" because they restrict competition *beyond* the rights to exclude that are inherent in the patent. More specifically, the brief observes that the patent grant confers on the patent holder a bundle of rights, including the right to seek a court-ordered injunction to prevent another party from continuing to make or sell an allegedly infringing product.

However, invoking this right necessarily requires the patent holder to bear a number of risks. Most notably, the court may find the patent to be invalid, or not infringed. In addition, the court may refuse to issue a preliminary or a permanent injunction.[23] These risks are greatest for "weak patents": those relatively likely to be found, in full patent litigation, to be invalid or not infringed. Private settlements involving reverse payments allow patent holders patents to exclude rivals without bearing the risk that their patent will be found invalid or not infringed. Once patents are correctly viewed as probabilistic—any given patent may or may not be found valid and infringed if fully litigated—it is clear that a reverse payment allows a patent holder, especially one with a weak patent, to achieve greater exclusionary power than is inherent in its patent.

---

[22] *In re Tamoxifen Citrate Antitrust Litigation,* 466 F. 3d 187 (Second Circuit, 2006).

[23] Preliminary injunctions apply during the pendency of the patent litigation; they are rarely issued. Permanent injunctions apply after the patent is found valid and infringed. The Supreme Court's decision in the *eBay* case made it more difficult for patent holders to obtain permanent injunctions, especially in cases where the patent holder does not compete against the infringer;. *eBay* Inc v. MercExchange, L.L.C., 547 U.S. 388 (2006).

Ex. D 0075
U.S. v. US Airways et al.
No. 1:13-cv-01236 (CKK)

The brief filed by the Antitrust Division explains this economic logic, putting it in the context of the relevant patent and antitrust laws and precedents. For reasons given in the brief, the Antitrust Division favors making reverse payments presumptively unlawful, rather than *per se* unlawful, which would allow the courts to learn more about such agreements, potentially allowing reverse payments in specific situations where they promote rather than stifle competition. As of this writing, the Second Circuit is still considering the case.

## 4 Conclusion

In spite of the economy-wide downturn during the past year, the Division continued to be a busy and intellectually active place. Proposed mergers presented a significant number of challenging economic issues to investigate and evaluate, and we took advantage of a number of competition advocacy opportunities to provide input on important issues of legal and economic policy.

This coming year will present additional challenges as the Division, jointly with the FTC, will be holding hearings to help us reassess, and potentially modify, the Horizontal Merger Guidelines. Moreover, the Division, jointly with U.S. Department of Agriculture, will be holding a series of hearings on several issues relating to competition in the agriculture industry.

Beyond that, important challenges remain with respect to formulating and implementing sound economic policies towards single-firm conduct, and in continuing our ongoing efforts to forge greater convergence with our sister competition authorities around the world.

**Acknowledgments**   The authors would like to thank the outstanding staff economists at the Antitrust Division for their work on the matters discussed herein, as well as many others, over the course of the past year. They would also like to thank Sarolta Lee for assisting in the preparation of this manuscript.

## References

Athey, S., & Ellison, G. (2007). Position auctions and consumer search. Working Paper.
Brueckner, J. K. (2003). International airfares in the age of alliances: The effects of codesharing and antitrust immunity. *Review of Economics and Statistics, 85*(1), 105–118.
Brueckner, J. K., & Whalen, W. T. (2000). The price effects of international airline alliances. *The Journal of Law and Economics, 43*(2), 503–545.
Carlton, D., Greenlee, P., & Waldman, M. (2008). Assessing the anticompetitive effects of multiproduct pricing. NBER Working Paper.
Edelman, B., Ostrovsky, M., & Schwarz, M. (2007). Internet advertising and the generalized second-price auction: Selling billions of dollars worth of keywords. *American Economic Review, 97*(1), 242–259.
Hemphill, S. (2009). An aggregate approach to antitrust: Using new data and rulemaking to preserve drug competition. *Columbia Law Review, 109*(4), 629–688.
Heyer, K., & Kimmel, S. (2009). Merger review of firms in financial distress. EAG Discussion Paper Series, 09–1.
Langer, A., & Miller, N. H. (2008). Automobile prices, gasoline prices, and consumer demand for fuel economy. EAG Discussion Paper Series. 08–11.
Lemley, M., & Shapiro, C. (2005). Probabilistic patents. *Journal of Economic Literature, 19*(2), 75–98.
Miller, N. H. (2009). Strategic leniency and cartel enforcement. *American Economic Review, 99*(3), 750–768.

 Springer

Economics at the Antitrust Division

Raskovich, A. (2008). Should banking be kept separate from commerce. EAG Discussion Paper Series, 08–9.

Varian, H. R. (2007). Position auctions. *International Journal of Industrial Organization, 25*(6), 1163–1178.

Werden, G. J. (2009). Remedies for exclusionary conduct should protect and preserve the competitive process. *Antitrust Law Journal, 76*(1), 65.

Whalen, W. T. (2007). A panel data analysis of code-sharing, antitrust immunity, and open skies treaties in international aviation markets. *Review of Industrial Organization, 30*, 39–61.

⚛ Springer

Ex. D 0077
U.S. v. US Airways et al.
No. 1:13-cv-01236 (CKK)

Exhibit E

AO 88B  (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the

District of Columbia

| | | |
|---|---|---|
| United States of America and Plaintiff States | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.   1:13-cv-01236-CKK |
| US Airways Group, Inc. and AMR Corporation | ) | |
| | ) | (If the action is pending in another district, state where: |
| *Defendant* | ) | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:  United Airlines, Inc.                                    1015 15th Street, N.W.
     c/o C T Corporation System, registered agent            Washington, DC 20005

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material:

　　　[Attached Schedule]

| Place: U.S. Department of Justice, Antitrust Division 450 5th Street, N.W., Suite 8000, Attn: Barry Joyce Washington, DC 20530 | Date and Time: 09/30/2013 5:00 pm |
|---|---|

　　☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

　　　The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

Date:　　09/04/2013

　　　　　　　*CLERK OF COURT*
　　　　　　　　　　　　　　　　　　OR

_____            _____
　*Signature of Clerk or Deputy Clerk*                           Barry Joyce
　　　　　　　　　　　　　　　　　　　　　　　　　*Attorney's signature*

The name, address, e-mail, and telephone number of the attorney representing *(name of party)*   United States of America
_____ , who issues or requests this subpoena, are:

Barry Joyce  450 5th Street Northwest Washington, DC 20530, barry.joyce@usdoj.gov, 202-353-4209

AO 88B  (Rev.  06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.   1:13-cv-01236-CKK

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

This subpoena for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

Ex. E 0079
U.S. v. US Airways et al.
No. 1:13-cv-01236 (CKK)

## Federal Rule of Civil Procedure 45 (c), (d), and (e) (Effective 12/1/07)

**(c) Protecting a Person Subject to a Subpoena.**

  **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

  **(2)** *Command to Produce Materials or Permit Inspection.*

  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

  **(i)** At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.

  **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3)** *Quashing or Modifying a Subpoena.*

  **(A)** *When Required.* On timely motion, the issuing court must quash or modify a subpoena that:

  **(i)** fails to allow a reasonable time to comply;

  **(ii)** requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;

  **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

  **(iv)** subjects a person to undue burden.

  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:

  **(i)** disclosing a trade secret or other confidential research, development, or commercial information;

  **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or

  **(iii)** a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial.

  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

  **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

  **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(d) Duties in Responding to a Subpoena.**

  **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2)** *Claiming Privilege or Protection.*

  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

  **(i)** expressly make the claim; and

  **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(e) Contempt.** The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).

## RULE 45 SUBPOENA SCHEDULE
## FOR THE PRODUCTION OF DOCUMENTS

If you believe that the Subpoena can be narrowed in any way that is consistent with the Department of Justice's need for documents and information, please discuss any questions or possible modifications with the Department of Justice representatives identified on the last page of this Subpoena.

1.    Submit one copy of each organizational chart in effect for each year from 2011 to 2013, for the company as a whole and for each of the company's divisions involved in pricing (air fares or ancillary fees) or network planning.

2.    Submit one copy each of your business plans, growth and expansion plans, marketing plans, pricing plans, strategic plans, capital budgets, analyses of competitor's fleet plans, and network plans and fleet plans (e.g., a 5-year or a 10-year plan) created at any time since January 1, 2011.

3.    Submit one copy of each regularly prepared report that tracks systemwide fare changes.

4.    Submit one copy of each regularly prepared report that evaluates other airlines' fare availability, fare inventory, or yield management.

5.    Submit documents sufficient to show each tool (e.g., software, program, database) used by your company to monitor other airlines' (a) fare changes in public and private tariffs, (b) corporate fares and discounts, (c) fare availability, (d) bookings, and (e) corporate bookings.

6.    Submit any studies or analyses by your company, since January 1, 2007, of US Airways' pricing strategies, and your company's actual or contemplated responses to any US Airways' pricing strategies.

7.    Submit all documents relating to your company's decision to raise ticket change fees to $200 in 2013.

8.    Submit one copy of each regularly prepared chart or report created since January 1, 2010, that tracks or monitors the ancillary fees of other airlines.

9.    Submit one copy of each checked baggage fee policy, each ticket change fee policy, and frequent flyer redemption fee policy posted at any time on your company's website from January 1, 2008, to present.

10.   Submit documents sufficient to show your company's plans for service at Reagan National Airport, including any slots your company intends to purchase, sell, or lease at Reagan National Airport.

11.   Submit a copy of each report, study or analysis that discusses the strengths or

1

Ex. E 0081
U.S. v. US Airways et al.
No. 1:13-cv-01236 (CKK)

weaknesses of American Airlines or US Airways as competitors for corporate accounts.

12.     Submit all documents reflecting any communication between your company and US Airways or American Airlines that discuss *United States and Plaintiff States v. US Airways Group, Inc. and AMR Corporation,* Civil Action No. 1:13-cv-01236, filed in the United States District Court for the District of Columbia.

13.     Submit data created since January 1, 2010, from any model used by your company to estimate or project the market share, passengers or revenue of existing or additional scheduled air passenger service in a city pair that was used in the analysis of the United-Continental merger contained in the Expert Report of Daniel Rubinfeld in *Michael C. Malaney et al. v. UAL Corporation, United Airlines, Inc., and Continental Airlines, Inc.* (Aug. 24, 2010), including all output files and documents sufficient to interpret such output files, including any definitions of data fields.

14.     Submit outbound destination airport/inbound origin airport for roundtrip itineraries (to determine which roundtrip coupons comprise the outbound journey and which roundtrip coupons comprise the return journey) for each ticket itinerary record produced to the Department of Justice in response to Civil Investigative Demand No. 27638.

2

## DEFINITIONS

A.    The terms **"you," "your," "the company"** or **"your company"** mean the company to which the subpoena was served, its parents, predecessors, divisions, subsidiaries, affiliates, partnerships, and joint ventures, and all directors, officers, employees, agents, and representatives of the foregoing. The terms "parent," "subsidiary," "affiliate," and "joint venture" refer to any person in which there is partial (50 percent or more) or total ownership or control between the company and any other person.

B.    The terms "**and**" and "**or**" have both conjunctive and disjunctive meanings.

C.    The term **"discussing"** means analyzing, constituting, summarizing, reporting on, considering, recommending, setting forth, or describing a subject. Documents that contain reports, studies, forecasts, analyses, plans, proposals, evaluations, recommendations, directives, procedures, policies, or guidelines regarding a subject should be treated as documents that discuss the subject. However, documents that merely mention or refer to a subject without further elaboration should not be treated as documents that discuss that subject.

D.    The term **"document"** is synonymous in meaning and scope to that term in Federal Rule of Civil Procedure 45(a)(1)(A)(iii). The term includes electronically stored information, including all electronic communications (e.g., emails and attachments), files, data, and databases. The term includes all metadata associated with that document. The term includes each copy that is not identical to any other copy.

E.    The term **"including"** means including but not limited to.

F.    The term **"relating to"** means in whole or in part constituting, containing, concerning, discussing, describing, analyzing, identifying, or stating.

3

## INSTRUCTIONS

A.      In addition to the specific instructions below, this Subpoena incorporates the instructions set forth in Federal Rule of Civil Procedure 45.

B.      Unless otherwise specified, this Subpoena calls for documents related to air passenger service, and not cargo service.

C.      Unless otherwise specified, this Subpoena requires the company to submit all responsive documents that were created, altered, or received by the company since January 1, 2011.

D.      You do not need to re-submit documents that you already submitted to the Department of Justice pursuant to Civil Investigative Demand No. 27638 issued during the investigation that preceded this lawsuit.

E.      Submit the response to this Subpoena in the following manner:

1.      Mark each page of each document submitted – whether in hard-copy or electronic format – with corporate identification and consecutive document control numbers.

2.      Provide any index of documents prepared by any person in connection with your response to this Subpoena. If the index is available in electronic form, provide it in that form.

3.      Unless otherwise requested by a Department representative, produce electronic documents (e.g., e-mail) and data in electronic form only. Produce electronic documents and data in a format that allows the Department to access and use them, together with instructions and all other materials necessary to use or interpret the data, including record layouts and data dictionaries. For data submitted electronically, submit a description of the data's source. For documents and data submitted electronically, label each electronic media device so as to identify the contents of that media device. For electronic media containing electronic documents, the label must state which custodians' documents are contained on the device and the document control numbers of those documents.

F.      Before you prepare documents or information for production in electronic form (for example, before you attempt to copy, for your response to this Subpoena, documents or information from an electronically stored source onto a disk or other electronic storage medium), contact a Department of Justice representative to explain the manner in which the documents or information are stored, and the types of information that are available on the electronic source. Department representatives must approve the format and production method for electronic

4

data in advance of the submission by the company of its response to this Subpoena.

G.    If the company or its agent uses or intends to use software or technology to identify or eliminate potentially responsive documents and information produced in response to this Subpoena, including search terms, predictive coding, near de-duplication, de-duplication and email threading, identify in advance the search terms and method(s) to be used to conduct all or any part of the search.

H.    If the company is unable to respond to any question fully, supply the information that is available. Explain why such answer is incomplete, the efforts made by the company to obtain the information, and the source from which the complete answer may be obtained.

I.    Any documents that are withheld in whole or in part from production based on a claim of privilege shall be withheld in accordance with Rule 26(b)(5).


If you have any questions about this Subpoena or suggestions for possible modifications, please contact:

Barry Joyce at (202) 353-4209 or  Shobitha Bhat at (202) 532-4535.

5