**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| UNITED STATES OF AMERICA, *et al.* |
| *Plaintiffs*, |
| v. |
| US AIRWAYS GROUP, INC. |
| and |
| AMR CORPORATION |
| *Defendants*. |

Case No. 1:13-cv-01236 (CKK)

COMPETITIVE IMPACT STATEMENT

Pursuant to Section 2(b) of the Antitrust Procedures and Penalties Act ("APPA" or "Tunney Act"), 15 U.S.C. § 16(b)-(h), Plaintiffs United States of America ("United States") files this Competitive Impact Statement relating to the proposed Final Judgment submitted on November 12, 2013, for entry in this civil antitrust matter.

I.

NATURE AND PURPOSE OF THE PROCEEDING

On August 13, 2013, the United States and the States of Arizona, Florida, Tennessee, Texas, the Commonwealths of Pennsylvania and Virginia, and the District of Columbia ("Plaintiff States") filed a civil antitrust Complaint seeking to enjoin the proposed merger of

Defendants US Airways Group, Inc. ("US Airways") and AMR Corporation ("American").[1]
The Complaint alleges that the likely effect of this merger would be to lessen competition
substantially for the sale of scheduled air passenger service in city pair markets throughout the
United States, and in the market for takeoff and landing authorizations ("slots") at Ronald
Reagan Washington National Airport ("Reagan National") in violation of Section 7 of the
Clayton Act as amended, 15 U.S.C. § 18.

On November 12, 2013, the United States filed a proposed Final Judgment designed to
remedy the harm to competition that was likely to result from the proposed merger.  The
proposed Final Judgment, which is explained more fully below, requires the divestiture of slots,
gates, and ground facilities at key airports around the country to permit the entry or expansion of
airlines that can provide meaningful competition in numerous markets, eliminate the significant
increase in concentration of slots at Reagan National that otherwise would have occurred, and
enhance the ability of low-cost carriers to compete with legacy carriers on a system-wide basis.

As set forth in the proposed Final Judgment, the Defendants are required to divest or
transfer to purchasers approved by the United States, in consultation with the Plaintiff States:

- 104 air carrier slots[2] at Reagan National and rights and interests in any associated gates
  or other ground facilities, up to the extent such gates and ground facilities were used by
  Defendants to support the use of the divested slots;

- 34 slots at New York LaGuardia International Airport ("LaGuardia") and rights and
  interests in any associated gates or other ground facilities, up to the extent such gates and
  ground facilities were used by Defendants to support the use of the divested slots; and

- rights and interests to two airport gates and associated ground facilities at each of the
  following airports: Chicago O'Hare International Airport ("ORD"), Los Angeles

---

[1] Michigan joined the group of Plaintiff States on September 5, 2013; Texas withdrew from the lawsuit on October 1, 2013 after reaching a settlement with the Defendants.  References to Plaintiff States include Michigan and exclude Texas.
[2] Slots at Reagan National are designated as either "air carrier," which may be operated with any size aircraft, or "commuter," which must be operated using aircraft with 76 seats or less.

International Airport ("LAX"), Boston Logan International Airport ("BOS"), Miami International Airport ("MIA"), and Dallas Love Field ("DAL").

The Reagan National and LaGuardia slots will be sold in bundles, under procedures approved by the United States, in consultation with the Plaintiff States.

Trial in this matter is scheduled to begin on November 25, 2013.  Plaintiffs and Defendants have filed an Asset Preservation Order and Stipulation providing that: (1) Defendants are bound by the terms of the proposed Final Judgment, (2) the litigation will be stayed pending completion of the procedures called for by the APPA, and (3) the proposed Final Judgment may be entered after compliance with the APPA.  Entry of the proposed Final Judgment would terminate this action, except that the Court would retain jurisdiction to construe, modify, or enforce the provisions of the proposed Final Judgment and to punish violations thereof.

II.

DESCRIPTION OF THE EVENTS GIVING RISE TO THE ALLEGED VIOLATION

A.    *The Defendants and the Proposed Transaction*

US Airways is a Delaware corporation headquartered in Tempe, Arizona.  Last year, it flew over fifty million passengers to approximately 200 locations worldwide, taking in more than $13 billion in revenue.  US Airways operates hubs in Phoenix, Charlotte, Philadelphia, and Washington, D.C.

American is a Delaware corporation headquartered in Fort Worth, Texas.  AMR Corporation is the parent company of American Airlines.  Last year, American flew over eighty million passengers to approximately 250 locations worldwide, taking in more than $24 billion in revenue.  American operates hubs in New York, Los Angeles, Chicago, Dallas, and Miami.  In November 2011, American filed for bankruptcy reorganization and is currently under the supervision of the Bankruptcy Court for the Southern District of New York.

US Airways and American agreed to merge on February 13, 2013.  US Airways shareholders would own 28 percent of the combined airline, while American shareholders, creditors, labor unions, and employees would own 72 percent.  The merged airline would operate under the American brand name, but the new American would be run by US Airways management.

B.      *The Competitive Effects of the Transaction*

1.      Relevant Markets

Domestic scheduled air passenger service is a relevant product market within the meaning of Section 7 of the Clayton Act.  Because air travel offers passengers significant time savings and convenience over other forms of travel, few passengers would substitute other modes of transportation (car, bus, or train) for scheduled air passenger service in response to a small but significant industry-wide fare increase.

City pairs are relevant geographic markets within the meaning of Section 7 of the Clayton Act.  Passengers seek to depart from airports close to where they live and work, and arrive at airports close to their intended destinations.  Most airline travel is related to business, family events, and vacations.  Thus, most passengers book flights with their origins and destinations predetermined.  Few passengers who wish to fly from one city to another would switch to flights between other cities in response to a small but significant and non-transitory fare increase.

Passengers traveling within city pairs have different preferences for factors such as nonstop service, the flexibility to purchase tickets or change plans at the last minute and, in cities served by more than one airport, the ability to fly in to or out of the airport most convenient to their home or intended destination.  Through a variety of fare restrictions and rules, airlines can profitably raise prices for some of these passengers without raising prices for others.  Thus, the

competitive effects of the proposed merger may vary among passengers depending on their preferences for particular types of service or particular airports.

Slots at Reagan National Airport also constitute a relevant market within the meaning of Section 7 of the Clayton Act.  Reagan National is across the Potomac River from Washington, D.C., and, due to its proximity to the city and direct service via the Metro, airlines actively seek to serve passengers flying into and out of Reagan National.  To serve Reagan National, a carrier must have "slots," which are government-issued rights to take off and land.  Reagan National is one of only four airports in the country requiring federally-issued slots.  Slots at Reagan National are highly valued, difficult to obtain, and only rarely change hands between airlines.  There are no alternatives to slots for airlines seeking to enter or expand their service at Reagan National.

2.     Competitive Effects

As alleged in the Complaint, this merger would combine two of the four major "legacy" carriers, leaving "New American," Delta, and United as the remaining major national network carriers.[3]  Those three carriers would have extensive national and international networks, connections to hundreds of destinations, established brand names, and strong frequent flyer reward programs.  In contrast to the legacy carriers, other carriers (hereinafter referred to as "low-cost carriers" or "LCCs"), such as Southwest Airlines ("Southwest"), JetBlue Airways ("JetBlue"), Virgin America, Frontier Airlines, and Spirit Airlines, have less extensive networks and tend to focus more heavily on lower fares and other value propositions.  Southwest carries the most domestic passengers of any airline, however, its route network is limited compared to the four current legacy carriers, especially to significant business-oriented markets.  Although the

---

[3] Two carriers—Hawaiian Airlines and Alaska Air—are technically "legacy" carriers, as they have operated interstate service since prior to deregulation and rely on hub-and-spoke networks, but each operates in a narrow geographic region.

LCCs serve fewer destinations than the legacy airlines, they generally offer important competition on the routes that they do serve.

This merger would leave three very similar legacy airlines—Delta, United, and the New American.  By further reducing the number of legacy airlines and aligning the economic incentives of those that remain, the merger would make it easier for the remaining legacy airlines to cooperate, rather than compete, on price and service.  Absent the merger, US Airways and American, as independent competitors, would have unique incentives to disrupt coordination that already occurs to some degree among the legacy carriers.  US Airways' network structure provides the incentive to offer its "Advantage Fares" program, an aggressive discounting strategy aimed at undercutting the other airlines' nonstop fares with cheaper connecting service.  American, having completed a successful reorganization in bankruptcy, would have the incentive, and indeed, it has announced the intention to undertake significant growth at the expense of its competitors.  The merger would diminish these important competitive constraints.

The merger would also entrench the merged airline as the dominant carrier at Washington Reagan National Airport, where it would control 69 percent of the take-off and landing slots.  The merger would eliminate head-to-head competition between American and US Airways on the routes they both serve from the airport and would effectively foreclose entry or expansion by other airlines that might increase competition at Reagan National.

Finally, the merger would eliminate head-to-head competition between US Airways and American on numerous non-stop and connecting routes.

### 3.    Entry and Expansion

New entry, or expansion by existing competitors, would be unlikely to prevent or remedy the merger's likely anticompetitive effects absent the proposed divestitures.  Operational barriers

limit entry and expansion at a number of important airports.  Four of the busiest airports in the United States—including Reagan National and LaGuardia—are subject to slot limitations governed by the FAA.  The lack of availability of slots is a substantial barrier to entry at those airports, especially for low-cost carriers.  Slots at these airports are concentrated in the hands of large legacy airlines that have little incentive to sell or lease slots to those carriers most likely to compete aggressively against them.  As a result, slots are expensive, difficult to obtain, and change hands only rarely.

Access to gates can also be a substantial barrier to entry or expansion at some airports.  At several large airports, a significant portion of the available gates are leased to established airlines under long-term exclusive-use leases.  In such cases, a carrier seeking to enter or expand would have to sublease gates from incumbent airlines.

In addition to operational constraints, new entrants and those seeking to expand must overcome the effects of corporate discount programs offered by dominant incumbents; loyalty to existing frequent flyer programs; a less well-known brand; and the risk of aggressive responses to new entry by the dominant incumbent carrier.  However, especially in large cities, low-cost carriers have demonstrated some ability to overcome those disadvantages with the help of lower costs, when they are able to obtain access to the necessary airport facilities.

III.

EXPLANATION OF THE PROPOSED FINAL JUDGMENT

The Complaint alleges several ways that the elimination of US Airways and American as independent competitors will result in harm to consumers.  As things stand today, each carrier places important competitive constraints on the other large network carriers.  US Airways undercuts the nonstop fares of legacy carriers through its Advantage Fares program.  American

had planned to fly more planes.  The Complaint alleges that the merger will diminish New American's incentives to maintain these strategies and increase its incentives to coordinate with the other legacy carriers rather than compete.  The Complaint also alleges harm resulting from increased slot concentration at DCA.

The proposed remedy seeks to address both the harm resulting from increased slot concentration at DCA and the broader harms alleged in the Complaint by requiring the divestiture of an unprecedented quantity of valuable facilities at seven of the most important airports in the United States.  The access to key airports made possible by the divestitures will create network opportunities for the purchasing carriers that would otherwise have been out of reach for the foreseeable future.  Those opportunities will provide increased incentives for those carriers to invest in new capacity and expand into additional markets.

The proposed remedy will not create a new independent competitor, nor does it purport to replicate American's capacity expansion plans or create Advantage Fares where they might otherwise be eliminated.  Instead, it promises to impede the industry's evolution toward a tighter oligopoly by requiring the divestiture of critical facilities to carriers that will likely use them to fly more people to more places at more competitive fares.  In this way, the proposed remedy will deliver benefits to consumers that could not be obtained by enjoining the merger.

The divestiture of 104 air carrier slots at Reagan National and 34 slots at LaGuardia will not only address the localized competitive concerns at those airports, but will deliver substantial additional benefits.  American and US Airways currently compete head-to-head on two routes from Reagan National (Raleigh-Durham and Nashville) and one route from LaGuardia (Charlotte).  In addition, JetBlue and Southwest offer service on a limited number of routes at these airports through use of slots leased from American on terms that could be renegotiated or

cancelled by the New American.[4]  Through the remedy, Southwest and JetBlue will have the opportunity to obtain permanent access to the slots they are currently leasing from American, and those LCCs and others will have the opportunity to acquire more slots at DCA and at LGA as well.  This will allow them to provide greatly expanded service on numerous routes, including new nonstop and connecting service to points throughout the country.

Similarly, gate divestitures at O'Hare (ORD), Los Angeles (LAX), Boston (BOS), Dallas Love Field (DAL), and Miami (MIA) would expand the presence of potentially disruptive competitors at these strategically important airports located throughout the country.[5]  ORD and LAX, two of American's major hubs, are among the most highly congested airports in the country, and competitors have historically had difficulties obtaining access to gates and other facilities at those airports to be able to enter or expand service.  The divestitures will give competing carriers an expanded foothold at these important airports in the center of the country and the west coast, respectively.  Likewise, there is limited ability to enter or expand at BOS; the divestitures will provide relief there.  Although access issues at Miami are not as acute as at the other airports, the proposed Final Judgment also ensures that a carrier seeking to enter or expand at Miami will have access to two of the gates and associated ground facilities currently leased by US Airways.

The proposed Final Judgment also includes divestitures at Dallas Love Field, an airport near American's largest hub at Dallas-Fort Worth International Airport ("DFW").  Gates at DFW are readily available, but Love Field, which is much closer to downtown Dallas, is highly gate-

---

[4] JetBlue and American currently engage in an exchange in which JetBlue trades 24 slots at New York's JFK International Airport to American in exchange for American trading 16 slots at Reagan National to JetBlue. Southwest currently leases ten slots from American at LaGuardia.
[5] We estimate that each gate can support between eight and ten round trips per day and thus, two gates at each of these key airports will provide for commercially viable and competitive patterns of service for the recipients of the divested gates.

constrained.  Although today operations at Love Field are severely restricted under current law,[6] those restrictions are due to expire in October 2014, at which point Love Field will have a distinct advantage versus DFW, particularly in serving business customers.  The divestitures will position a low-cost carrier to provide vigorous competition to the New American's nonstop and connecting service out of DFW.

Past antitrust enforcement demonstrates that providing LCCs with access to constrained airports results in dramatic consumer benefits.  In 2010, in response to the United States' concerns regarding competitive effects of the proposed United/Continental merger, United and Continental transferred 36 slots, three gates and other facilities at Newark to Southwest.  Southwest used those assets to establish service on six nonstop routes from Newark, resulting in substantially lower fares to consumers.  For example, average fares for travel between Newark and St. Louis dropped 27% and fares for travel between Newark and Houston dropped 15%.  In addition, Southwest established connecting service to approximately 60 additional cities throughout the United States.

The proposed remedy will require the divestiture of almost four times as many slots as were divested at the time of the United/Continental merger, plus gates and additional facilities at key airports throughout the country.  In total, the divestitures will significantly strengthen the purchasing carriers, provide the incentive and ability for those carriers to invest in new capacity, and position them to provide more meaningful competition system-wide.

A.    *The Divestiture of Slots at Reagan National*

Section IV.F of the Proposed Final Judgment requires that the New American permanently divest 104 air carrier slots at Reagan National, two of which shall be slots currently

---

[6] Under legislation known as the Wright Amendment, airlines operating out of Love Field may not operate nonstop service on aircraft with more than 56 seats to any points beyond Texas, New Mexico, Oklahoma, Kansas, Arkansas, Louisiana, Mississippi, Missouri or Alabama.

held by US Airways and the remainder from American, including 16 slots American currently leases to JetBlue in exchange for slots at John F. Kennedy International Airport.  New American will offer to make the slot exchange with JetBlue permanent.  The remaining 88 slots (plus any of the 16 traded slots that JetBlue declines) will be divided into bundles, taking into account specific slot times to ensure commercially viable and competitive patterns of service for the recipients of the divested slots.  New American will divest these slot bundles to at least two different carriers approved by the United States in its sole discretion, in consultation with the Plaintiff States.

In addition, New American will either sublease or transfer to the purchaser of any Reagan National slots, gates and other ground facilities (*e.g.*, ticket counters, hold-rooms, leased jet bridges, and operations space), up to the extent such gates and facilities were used by Defendants to support the use of the divested slots, on the same terms and conditions pursuant to which the New American currently leases those facilities.

Following the divestiture of the Reagan National slots, if requested by the purchasers, Defendants shall lease back the slots for no consideration for a period not to exceed 180 calendar days, or as may be extended at the request of the purchaser, with the approval of the United States, in consultation with the Plaintiff States.  The value of this rent-free lease back will naturally be reflected in the purchase price of the slots.  A transfer of this magnitude will naturally entail a transition period for both the acquirers and the Defendants.  The lease-back provisions are designed to allow purchasers sufficient time to institute new service while incentivizing them to establish that service reasonably quickly.

B.      *The Divestiture of Slots and Facilities at LaGuardia*

Section IV.G of the Proposed Final Judgment requires that New American permanently divest 34 air carrier slots at LGA.  New American will offer to divest to Southwest on commercially reasonable terms the 10 slots Southwest currently leases from American.  The United States will identify the remaining 24 slots to be divested taking into account specific slot times to ensure commercially viable and competitive patterns of service for the recipients of the divested slots.  The 24 slots (in addition to any of the 10 leased slots that Southwest declines) will be divided into bundles and divested to carriers approved by the United States in its sole discretion, in consultation with the Plaintiff States.

In addition, New American will either sublease or transfer to the purchaser of any LaGuardia slots gates and other ground facilities (*e.g.*, ticket counters, hold-rooms, leased jet bridges, and operations space), up to the extent such gates and facilities were used by Defendants to support the use of the divested slots, on the same terms and conditions pursuant to which the New American currently leases those facilities.  With respect to gates, New American will make reasonable best efforts to facilitate any gate moves necessary to ensure that the purchasing carrier can operate contiguous gates.

Following the divestiture of the LaGuardia slots, if requested by the purchasers, Defendants shall lease back the slots for no consideration for a period not to exceed 180 calendar days, or as may be extended at the request of the purchaser, with the approval of the United States, in consultation with the Plaintiff States.  The value of this rent-free lease back will naturally be reflected in the purchase price of the slots.  A transfer of this magnitude will naturally entail a transition period for both the acquirers and the Defendants.  The lease-back

provisions are designed to allow purchasers sufficient time to institute new service while incentivizing them to establish that service reasonably quickly.

     C.    *The Divestiture of Gates at Other Key Airports*

     Section IV.H of the Proposed Final Judgment requires that New American will transfer, consistent with the practices of the relevant airport authority, to another carrier or carriers approved by DOJ in its sole discretion, in consultation with the Plaintiff States, all rights and interests in two gates, to be identified and approved by DOJ in its sole discretion, in consultation with the Plaintiff States, and provide reasonable access to ground facilities (e.g., ticket counters, baggage handling facilities, office space, loading bridges) at each of:  ORD, LAX, BOS, MIA, DAL on commercial terms and conditions identical to those pursuant to which the gates and facilities are leased to New American.  New American will make reasonable best efforts to facilitate any gate moves necessary to ensure that the transferee can operate contiguous gates.

     D.    *Divestiture Trustee*

     In the event the Defendants do not accomplish the divestitures as prescribed by the proposed Final Judgment, Section V of the proposed Final Judgment provides that the Court will appoint a Divestiture Trustee selected by the United States, in consultation with the Plaintiff States, to complete the divestitures.  If a Divestiture Trustee is appointed, the proposed Final Judgment provides that the Defendants will pay all costs and expenses of the Divestiture Trustee.  After his or her appointment becomes effective, the Divestiture Trustee will file monthly reports with the Court and the United States setting forth his or her efforts to accomplish the divestiture.

     E.    *Monitoring Trustee*

     Section VII of the proposed Final Judgment permits the United States, in consultation with the Plaintiff States, to appoint a Monitoring Trustee, subject to approval by the Court.  If a

Monitoring Trustee is appointed, the proposed Final Judgment provides that the Defendants will pay all costs and expenses of the Monitoring Trustee.  After his or her appointment becomes effective, the Monitoring Trustee will file reports with the Court and the United States every ninety days or more frequently as needed setting forth the Defendants' efforts to comply with the terms of the Final Judgment.

F.      *Prohibition on Reacquisition*

Section XII of the proposed Final Judgment prohibits the merged company from reacquiring an ownership interest in the divested slots or gates during the term of the Final Judgment.  The proposed Final Judgment will not prevent New American from engaging in short-term trades or exchanges involving the divested slots at Reagan National or LGA for scheduling purposes.

G.      *Future Transactions*

The proposed Final Judgment requires Defendants to provide advance notification of any future slot acquisition at Reagan National by the merged company, regardless of whether the transaction meets the reporting thresholds set forth in the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, 15 U.S.C. § 18a (the "HSR Act").  The proposed Final Judgment further provides for waiting periods and opportunities for the United States to obtain additional information analogous to the provisions of the HSR Act.

H.      *Stipulation and Order Provisions*

Defendants have entered into the Stipulation and Order attached as an exhibit to the Explanation of Consent Decree Procedures, which was filed simultaneously with the Court, to ensure that, pending the divestitures, the Divestiture Assets are maintained.  The Stipulation and

Order ensures that the Divestiture Assets are preserved and maintained in a condition that allows the divestitures to be effective.

IV.

REMEDIES AVAILABLE TO POTENTIAL PRIVATE LITIGANTS

Section 4 of the Clayton Act, 15 U.S.C. § 15, provides that any person who has been injured as a result of conduct prohibited by the antitrust laws may bring suit in federal court to recover three times the damages the person has suffered, as well as costs and reasonable attorneys' fees.  Entry of the proposed Final Judgment will neither impair nor assist the bringing of any private antitrust damage action.  Under the provisions of Section 5(a) of the Clayton Act, 15 U.S.C. § 16(a), the proposed Final Judgment has no prima facie effect in any subsequent private lawsuit that may be brought against Defendants.

V.

PROCEDURES AVAILABLE FOR MODIFICATION
OF THE PROPOSED FINAL JUDGMENT

The United States and Defendants have stipulated that the proposed Final Judgment may be entered by the Court after compliance with the provisions of the APPA, provided that the United States has not withdrawn its consent.  The APPA conditions entry upon the Court's determination that the proposed Final Judgment is in the public interest.

The APPA provides a period of at least sixty (60) days preceding the effective date of the proposed Final Judgment within which any person may submit to the United States written comments regarding the proposed Final Judgment.  Any person who wishes to comment should do so within sixty (60) days of the date of publication of this Competitive Impact Statement in the Federal Register, or the last date of publication in a newspaper of the summary of this Competitive Impact Statement, whichever is later.  All comments received during this period

15

will be considered by the United States Department of Justice, which remains free to withdraw

its consent to the proposed Final Judgment at any time prior to the Court's entry of judgment.

The comments and the response of the United States will be filed with the Court.  In addition,

comments will be posted on the U.S. Department of Justice, Antitrust Division's internet website

and, under certain circumstances, published in the Federal Register.

      Written comments should be submitted to:

> William H. Stallings
> Chief, Transportation, Energy & Agriculture Section
> Antitrust Division
> United States Department of Justice
> 450 Fifth Street, N.W., Suite 8000
> Washington, DC 20530

The proposed Final Judgment provides that the Court retains jurisdiction over this action, and the

parties may apply to the Court for any order necessary or appropriate for the modification,

interpretation, or enforcement of the Final Judgment.

VI.

### ALTERNATIVES TO THE PROPOSED FINAL JUDGMENT

      The United States considered, as an alternative to the proposed Final Judgment, a full

trial on the merits against the Defendants.  The United States could have continued the litigation

and sought preliminary and permanent injunctions against the proposed merger.  However, the

proposed Final Judgment avoids the time, expense, and uncertainty of a full trial on the merits.

Moreover, the United States is satisfied that the divestiture of assets described in the proposed

Final Judgment is an appropriate remedy.  The proposed relief will facilitate entry and expansion

by low-cost carriers at key slot-constrained and gate-constrained airports, thereby enhancing the

ability of the purchasing carrier(s) to provide meaningful competition to New American and

other legacy carriers.

VII.

STANDARD OF REVIEW UNDER THE APPA
FOR THE PROPOSED FINAL JUDGMENT

The Clayton Act, as amended by the APPA, requires that proposed consent judgments in antitrust cases brought by the United States be subject to a sixty-day comment period, after which the court shall determine whether entry of the proposed Final Judgment "is in the public interest." 15 U.S.C. § 16(e)(1).  In making that determination, the court, in accordance with the statute as amended in 2004, is required to consider:

> (A)     the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and

> (B)     the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A) & (B).  In considering these statutory factors, the court's inquiry is necessarily a limited one as the government is entitled to "broad discretion to settle with the defendant within the reaches of the public interest."  *United States v. Microsoft Corp.*, 56 F.3d 1448, 1461 (D.C. Cir. 1995); *see generally United States v. SBC Commc'ns, Inc.*, 489 F. Supp. 2d 1 (D.D.C. 2007) (assessing public interest standard under the Tunney Act); *United States v. InBev N.V./S.A.*, 2009-2 Trade Cas. (CCH) ¶ 76,736, 2009 U.S. Dist. LEXIS 84787, No. 08-1965 (JR), at *3, (D.D.C. Aug. 11, 2009) (noting that the court's review of a consent judgment is limited and only inquires "into whether the government's determination that the proposed

remedies will cure the antitrust violations alleged in the complaint was reasonable, and whether the mechanism to enforce the final judgment are clear and manageable.").[7]

As the United States Court of Appeals for the District of Columbia Circuit has held, under the APPA a court considers, among other things, the relationship between the remedy secured and the specific allegations set forth in the government's complaint, whether the decree is sufficiently clear, whether enforcement mechanisms are sufficient, and whether the decree may positively harm third parties. *See Microsoft*, 56 F.3d at 1458-62. With respect to the adequacy of the relief secured by the decree, a court may not "engage in an unrestricted evaluation of what relief would best serve the public." *United States v. BNS, Inc.*, 858 F.2d 456, 462 (9th Cir. 1988) (citing *United States v. Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981)); *see also Microsoft*, 56 F.3d at 1460-62; *United States v. Alcoa, Inc.*, 152 F. Supp. 2d 37, 40 (D.D.C. 2001); *InBev*, 2009 U.S. Dist. LEXIS 84787, at *3. Courts have held that:

> [t]he balancing of competing social and political interests affected by a proposed antitrust consent decree must be left, in the first instance, to the discretion of the Attorney General. The court's role in protecting the public interest is one of insuring that the government has not breached its duty to the public in consenting to the decree. The court is required to determine not whether a particular decree is the one that will best serve society, but whether the settlement is "*within the reaches of the public interest*." More elaborate requirements might undermine the effectiveness of antitrust enforcement by consent decree.

*Bechtel*, 648 F.2d at 666 (emphasis added) (citations omitted).[8] In determining whether a proposed settlement is in the public interest, a district court "must accord deference to the

---

[7] The 2004 amendments substituted "shall" for "may" in directing relevant factors for a court to consider and amended the list of factors to focus on competitive considerations and to address potentially ambiguous judgment terms. *Compare* 15 U.S.C. § 16(e) (2004), *with* 15 U.S.C. § 16(e)(1) (2006); *see also SBC Commc'ns*, 489 F. Supp. 2d at 11 (concluding that the 2004 amendments "effected minimal changes" to Tunney Act review).

[8] *Cf. BNS*, 858 F.2d at 464 (holding that the court's "ultimate authority under the [APPA] is limited to approving or disapproving the consent decree"); *United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975) (noting that, in this way, the court is constrained to "look at the overall picture not hypercritically, nor with a microscope, but with an artist's reducing glass"). *See generally Microsoft*, 56 F.3d at 1461 (discussing whether "the remedies [obtained in the decree are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest'").

government's predictions about the efficacy of its remedies, and may not require that the remedies perfectly match the alleged violations." *SBC Commc'ns*, 489 F. Supp. 2d at 17; *see also Microsoft*, 56 F.3d at 1461 (noting the need for courts to be "deferential to the government's predictions as to the effect of the proposed remedies"); *United States v. Archer-Daniels-Midland Co.*, 272 F. Supp. 2d 1, 6 (D.D.C. 2003) (noting that the court should grant due respect to the United States' prediction as to the effect of proposed remedies, its perception of the market structure, and its views of the nature of the case).

Courts have greater flexibility in approving proposed consent decrees than in crafting their own decrees following a finding of liability in a litigated matter. "[A] proposed decree must be approved even if it falls short of the remedy the court would impose on its own, as long as it falls within the range of acceptability or is 'within the reaches of public interest.'" *United States v. Am. Tel. & Tel. Co.*, 552 F. Supp. 131, 151 (D.D.C. 1982) (citations omitted) (quoting *United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975)), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001 (1983); *see also United States v. Alcan Aluminum Ltd.*, 605 F. Supp. 619, 622 (W.D. Ky. 1985) (approving the consent decree even though the court would have imposed a greater remedy). To meet this standard, the United States "need only provide a factual basis for concluding that the settlements are reasonably adequate remedies for the alleged harms." *SBC Commc'ns*, 489 F. Supp. 2d at 17.

Moreover, the court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its Complaint, and does not authorize the court to "construct [its] own hypothetical case and then evaluate the decree against that case." *Microsoft*, 56 F.3d at 1459; see also *InBev*, 2009 U.S. Dist. LEXIS 84787, at *20 ("the 'public interest' is not to be measured by comparing the violations alleged in the complaint

against those the court believes could have, or even should have, been alleged").  Because the

"court's authority to review the decree depends entirely on the government's exercising its

prosecutorial discretion by bringing a case in the first place," it follows that "the court is only

authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire

into other matters that the United States did not pursue.  *Microsoft*, 56 F.3d at 1459-60.  As this

Court confirmed in *SBC Communications*, courts "cannot look beyond the complaint in making

the public interest determination unless the complaint is drafted so narrowly as to make a

mockery of judicial power."  *SBC Commc'ns*, 489 F. Supp. 2d at 15.

     In its 2004 amendments, Congress made clear its intent to preserve the practical benefits

of utilizing consent decrees in antitrust enforcement, adding the unambiguous instruction that

"[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing

or to require the court to permit anyone to intervene."  15 U.S.C. § 16(e)(2).  The language wrote

into the statute what Congress intended when it enacted the Tunney Act in 1974, as Senator

Tunney explained:  "[t]he court is nowhere compelled to go to trial or to engage in extended

proceedings which might have the effect of vitiating the benefits of prompt and less costly

settlement through the consent decree process." 119 Cong. Rec. 24,598 (1973) (statement of

Senator Tunney).  Rather, the procedure for the public interest determination is left to the

discretion of the court, with the recognition that the court's "scope of review remains sharply

proscribed by precedent and the nature of Tunney Act proceedings."  *SBC Commc'ns*, 489 F.

Supp. 2d at 11.[9]

---

[9]  *See United States v. Enova Corp.*, 107 F. Supp. 2d 10, 17 (D.D.C. 2000) (noting that the "Tunney Act expressly allows the court to make its public interest determination on the basis of the competitive impact statement and response to comments alone"); *United States v. Mid-Am. Dairymen, Inc.*, 1977-1 Trade Cas. (CCH) ¶ 61,508, at 71,980 (W.D. Mo. 1977) ("Absent a showing of corrupt failure of the government to discharge its duty, the Court, in making its public interest finding, should . . . carefully consider the explanations of the government in the competitive impact statement and its responses to comments in order to determine whether those explanations are reasonable under the circumstances."); S. Rep. No. 93-298, 93d Cong., 1st Sess., at 6 (1973) ("Where the public

VIII.

DETERMINATIVE DOCUMENTS

There are no determinative materials or documents within the meaning of the APPA that

were considered by the United States in formulating the proposed Final Judgment.


Respectfully submitted,


/s_____
Michael D. Billiel (DC Bar #394377)
Antitrust Division
U.S. Department of Justice
450 Fifth Street, N.W., Suite 4100
Washington, DC  20530
Telephone: (202) 307-6666
Facsimile: (202) 307-2784
E-mail: michael.billiel@usdoj.gov




Dated: November 12, 2013

---

interest can be meaningfully evaluated simply on the basis of briefs and oral arguments, that is the approach that
should be utilized.").