**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.* | |
| *Plaintiffs*, | |
| v. | Case No. 1:13-cv-01236 (CKK) |
| US AIRWAYS GROUP, INC. | |
| and | |
| AMR CORPORATION | |
| *Defendants*. | |

## RESPONSE OF PLAINTIFF UNITED STATES TO PUBLIC COMMENTS ON THE PROPOSED FINAL JUDGMENT

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................... 1

I.  Procedural History ........................................................................................... 2

II.  The Complaint and the Proposed Settlement .................................................. 4

  A.  The Complaint ............................................................................................. 4

  B.  The Proposed Final Judgment ..................................................................... 6

    1.  Terms of the Proposed Final Judgment and Status of the Divestitures ........... 6

    2.  Explanation of the Proposed Final Judgment ................................... 8

      a.  Consumer Benefits from LCC Entry ...................................... 9

      b.  The Importance of the Remedy Assets to Enhancing LCC Competition ... 11

III.  Standard of Judicial Review ....................................................................... 15

IV.  Public Comments and the United States' Response .................................... 19

  A.  Any Challenge to the Merits of the Complaint Is Beyond the Scope of ..................
      Tunney Act Review ..................................................................................... 21

  B.  The Proposed Settlement Will Counteract Competitive Harm From the ................
      Merger by Enhancing LCC Competition ................................................... 23

    1.  LCCs Provide Meaningful Competition ............................................ 23

    2.  The Remedy Adequately Addresses the Harms Alleged in the Complaint .... 27

  C.  The Remedy Does Not Mandate Changes in Service Patterns at ...........................
      Reagan National ......................................................................................... 31

    1.  Background on Slot Regulation at Reagan National ...................... 32

    2.  Nothing in the Remedy Requires New American to Discontinue ....................
        Service to Particular Airports .......................................................... 35

    3.  Mandating Service on Any Particular Route Is Unwarranted ....................... 38

  D.  Delta Is Not an Appropriate Divestiture Candidate .............................. 39

  E.  Additional Concerns Raised by Commenters ......................................... 44

    1.  Airline Consumer Disclosure and Alliance Issues Are Outside the .................
        Scope of This Action ..................................................................... 44

    2.  The Proposed Final Judgment Precludes New American from Reacquiring ....
        the Divested Gates at LAX; No Modification of the Decree Is Necessary .... 45

    3.  The CIS Fully Complies with Tunney Act Requirements.............................. 47

    4.  The Remedy Is Not the Result of Political Pressure ...................... 49

    5.  Closing of the Merger Prior to Entry of the Final Judgment Is Consistent .......
        with Tunney Act Requirements ..................................................... 50

CONCLUSION .................................................................................................... 51

**INTRODUCTION**

Pursuant to the requirements of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16(b)-(h) ("APPA" or "Tunney Act"), the United States hereby files the public comments concerning the proposed Final Judgment in this case and the United States' response to these comments. For the reasons discussed below, the United States continues to believe that the remedy it obtained from Defendants will address the competitive harm alleged in this action and is plainly in the public interest. Accordingly, the United States proposes no modifications to the proposed Final Judgment.

The remedy is a major victory for American consumers. It will enable Low Cost Carriers ("LCCs") to fly millions of new passengers per year to destinations throughout the country. It fully addresses the harm that would have resulted from New American's control of nearly 70% of the limited takeoff and landing slots at Ronald Reagan Washington National Airport ("Reagan National"). It enables LCCs to acquire otherwise unobtainable slots and gates at Reagan National (Southwest Airlines, JetBlue Airways and Virgin America) and LaGuardia Airport (Southwest and Virgin America), and to obtain gates at other busy airports around the country such as Los Angeles International Airport, Chicago O'Hare International Airport, and Dallas Love Field. And by introducing new low-cost capacity and service on numerous routes around the country, it enhances the ability of LCCs to thwart industry coordination among the legacy carriers. The competitive significance of the remedy is reflected in the value being paid for the divested Reagan National and LaGuardia slots – over $425 million – which is unprecedented in the airline industry and among the most substantial merger remedies in any industry.

1

The United States has received a total of fourteen comments reflecting divergent views.[1]  One suggests that the lawsuit should not have been filed in the first place. Others assert that the settlement does not go far enough to remedy potential harm from the merger, and many raise issues that are outside the scope of an antitrust review.  After careful consideration of these comments, the United States has concluded that nothing in them casts doubt on the very substantial public interest that will be achieved by the proposed remedy.

The United States has published the comments and this response on the Antitrust Division website and is submitting to the Federal Register this response and the website address at which the comments may be viewed and downloaded, as set forth in the Court's Orders dated November 20, 2013 (Docket No. 154) and February 27, 2014 (Docket No. 158).[2]  Following Federal Register publication, the United States will move the Court, pursuant to 15 U.S.C. § 16(b)-(h), to enter the proposed Final Judgment.

## I.    Procedural History

On August 13, 2013, the United States, joined by several states and the District of Columbia ("Plaintiff States"), filed a Complaint in this matter alleging that the proposed merger of US Airways Group, Inc. ("US Airways") and AMR Corporation, the parent of American Airlines, Inc., ("American"), creating New American, would violate Section 7 of the Clayton Act, 15 U.S.C. § 18.

---

[1]  In addition, fifteen individuals sent emails about competition concerns relating to the settlement to the United States using various channels outside of the designated procedures for submitting Tunney Act comments.  The United States has reviewed all of these emails and none of them raise any issue not already addressed in this Response to Comments.  Although these emails are not formal Tunney Act comments, we are nevertheless publishing them in this case but redacting all identifying information about the authors.  If the Court requests, the United States will provide unredacted copies under seal.

[2]  This Response and all of the public comments may be found on the Antitrust Division's website at http://www.justice.gov/atr/cases/usairways/index.html.

In the three months following the filing of the Complaint, Plaintiffs and Defendants actively prepared for trial and accomplished a substantial amount of pre-trial groundwork, including completion of fact discovery.  Trial in this matter was scheduled to begin on November 25, 2013.

While the parties continued to litigate, they engaged in settlement discussions that culminated in a consensual resolution of the matter.  On November 12, 2013, the United States filed the proposed Final Judgment (Docket No. 147-2), a Competitive Impact Statement ("CIS," Docket No. 148), and an Asset Preservation Order and Stipulation signed by the parties consenting to entry of the proposed Final Judgment after compliance with the requirements of the APPA (Docket No. 147-1).

As Defendant AMR Corporation was in bankruptcy, the settlement required approval by the bankruptcy court.  On November 27, 2013, the United States Bankruptcy Court for the Southern District of New York entered an order finding that the settlement satisfied the requirements for approval under the Bankruptcy Code, granted AMR's motion to consummate the merger, and denied a request for a temporary restraining order filed by a private plaintiff seeking to enjoin the merger on antitrust grounds.[3]  AMR exited bankruptcy protection, and the merger closed on December 9, 2013.  The Bankruptcy Court has retained jurisdiction to continue to hear the private case.[4]

Pursuant to the APPA and this Court's November 20, 2013 Order, the United States published the proposed Final Judgment and CIS in the *Federal Register* on

---

[3]  *See* Order Pursuant to Bankruptcy Rule 9019(a) Approving Settlement Between Debtors, US Airways, Inc., and United States Department of Justice, *In re AMR Corp.*, (Bankr. S.D.N.Y. 2013), ECF No. 11321, *available at* http://www.amrcaseinfo.com/pdflib/11321_15463.pdf, and accompanying Memorandum, *available at* http://www.amrcaseinfo.com/pdflib/72_01392.pdf.

[4]  *Fjord v. AMR Corp.*, (*In re AMR Corp.*) Adv. Pr. No. 13-01392 (Bankr. S.D.N.Y.), *docket available at* http://www.amrcaseinfo.com/adversary_01392.php.  (The lead attorney in the private case, Joseph Alioto, submitted a Tunney Act comment in this proceeding.)

November 27, 2013, *see* 78 Fed. Reg. 71377, and caused summaries of the terms of the proposed Final Judgment and CIS, together with directions for submission of written comments relating to the proposed Final Judgment, to be published in the *Washington Post*, *Dallas Morning News*, and *Arizona Republic* for seven days, beginning on November 25, 2013 and ending on December 9, 2013.  Defendants filed the statements required by 15 U.S.C. § 16(g) on December 9, 2013.  The 60-day public comment period ended on February 7, 2014.  The United States received fourteen comments, as described below and attached hereto.

## II.     The Complaint and the Proposed Settlement

### A.     The Complaint

The Complaint alleged that the likely effect of the merger of US Airways and American, which would reduce the number of major domestic airlines from five to four and the number of "legacy airlines"[5] from four to three, would be to lessen competition substantially in the sale of scheduled air passenger service in city pair markets throughout the United States, and in the market for takeoff and landing authorizations ("slots") at Reagan National.[6]

One of the United States' concerns was that the merger would make it easier for the remaining legacy carriers – New American, United and Delta – to cooperate, rather than compete, on price and service.  Amended Complaint ("Am. Compl.," Docket No.

---

[5]  "Legacy airlines," as used herein, refers to the carriers that have operated interstate service since before deregulation and rely on nationwide hub-and-spoke networks.

[6]  Four of the busiest airports in the United States – including Reagan National and LaGuardia – are subject to slot limitations governed by the FAA.  The lack of availability of slots is a substantial barrier to entry at those airports, especially for LCCs.  *See* Am. Compl. ¶¶ 84-86.

73) ¶¶ 41-81.  Such coordinated conduct deprives consumers of the benefits of full and vigorous competition.[7]

As explained in the Complaint, the structure of the airline industry was already conducive to coordinated behavior among the legacy carriers.  *Id.*, ¶¶ 41-47.  For example, on routes where one legacy carrier offers nonstop service, the other legacies generally "respect" (a term used by American) the nonstop carrier's pricing by pricing their connecting service at the same level as the nonstop carrier – notwithstanding the service disadvantages associated with connecting service.  US Airways, however, differed from the other legacy carriers in that on some routes it offered its "Advantage Fares" program under which it provided discounts for connecting service compared to other carriers' nonstop fares, particularly for last-minute travelers.  The structure of the New American network reduced its incentives to continue the Advantage Fare program. *Id.*, ¶¶ 48-58.

In addition to the risk of harm from the likely elimination of the Advantage Fares program, the Complaint alleged that the merger would likely enhance coordinated interaction among the legacy carriers with respect to capacity reductions, *id.*, ¶¶ 59-70, and ancillary fees, *id.*, ¶¶ 71-81.  It also alleged potential anticompetitive effects resulting from the dominance of the merged airline at Reagan National, where it would control 69 percent of the take-off and landing slots, *id.*, ¶¶ 83-90, and from the elimination of head-to-head competition between US Airways and American on numerous nonstop and connecting routes, *id.*, ¶¶ 38 & 82.

---

[7]  The potential for mergers to increase the likelihood of such coordinated interaction among competitors is a central focus of the DOJ's merger review.  *See* U.S. DEP'T OF JUSTICE & FED. TRADE COMM'N, HORIZONTAL MERGER GUIDELINES § 7 (Aug. 19, 2010), *available at* http://www.justice.gov/atr/public/guidelines/hmg-2010.html.

The Complaint also alleged that if the merger went through, the other established legacy carriers – Delta and United – would be unlikely to undercut anticompetitive price increases or expand in response to capacity reductions by the merged airline as "those carriers are likely to benefit from and participate in such conduct by coordinating with the merged firm." *Id.*, ¶ 92. LCCs, such as Southwest, JetBlue, Virgin America, and Spirit Airlines, on the other hand, offer "important competition on routes they fly," but have less extensive networks and face barriers to expansion such as a lack of access to slots and gate facilities necessary to serve constrained airports. *Id.*, ¶¶ 3 & 91, 93. For example, although Southwest carries the most domestic passengers of any airline, its network is limited compared to the legacy carriers with respect to the significant business-oriented routes served from Reagan National and LaGuardia.[8]

## B. The Proposed Final Judgment

### 1. Terms of the Proposed Final Judgment and Status of the Divestitures

As set forth in the proposed Final Judgment, Defendants are required to divest or transfer to purchasers approved by the United States, in consultation with the Plaintiff States:

- 104 air carrier slots at Reagan National (*i.e.*, all of American's pre-merger air carrier slots) and associated gates and other ground facilities;[9]

---

[8] *See, e.g.*, Motion for Leave to File *Amicus Curiae* Brief by Southwest Airlines Co. (Nov. 7, 2013, Docket No. 142) at 3 ("The pro-competitive effect of Southwest's entry and service is effective, however, only when Southwest has the ability to enter a particular market. While Southwest serves over 90 destinations in the United States, it has extremely limited access to Reagan National . . . and LaGuardia . . . due to severe entry restrictions. Service to those airports is significantly limited by the allocation of take-off and landing slots, and Southwest has been able to obtain only a very small number of slots at those two airports.").

[9] Slots at Reagan National are designated as either "air carrier," which may be operated with any size aircraft that meets the operational requirements of the airport, or "commuter," which must be operated using aircraft with 76 seats or fewer.

- 34 slots at New York LaGuardia International Airport ("LaGuardia") and associated gates and other ground facilities; and

- rights to and interests in two airport gates and associated ground facilities at each of the following airports:  Chicago O'Hare International Airport ("ORD"), Los Angeles International Airport ("LAX"), Boston Logan International Airport ("BOS"), Miami International Airport ("MIA"), and Dallas Love Field ("DAL").

Defendants have completed the divestiture of the 34 LaGuardia slots by (1) selling the 10 slots to Southwest that American had been leasing to Southwest (*see* PFJ, § IV.G.1), (2) selling an additional bundle of 12 slots to Southwest, and (3) selling a bundle of 12 slots to Virgin America.  Defendants are in the process of completing the divestiture of the 104 Reagan National slots.  They have divested the 16 slots to JetBlue that American previously had been leasing to JetBlue (*see* PFJ, § IV.F.1) and have sold an additional 24 slots to JetBlue.  Defendants have agreed to divest 56 slots to Southwest[10] and eight slots to Virgin America.  The parties expect to close the Southwest and Virgin America transactions on March 10, 2014 or soon thereafter.  The United States, in consultation with the Plaintiff States, approved the LaGuardia and Reagan National divestitures.  The acquirers will begin operating the slots later this year.  The process for the divestiture of the gates at the remaining airports is expected to occur in the near future.

In addition to the relief provided by the proposed Final Judgment, Defendants reached an agreement with the Plaintiff States to maintain service from at least one of New American's hubs to specified airports in the Plaintiff States for a period of five

---

[10]  Of the 104 air carrier slots being divested, 102 are for daily service and the remaining two are allocated for Sunday-only service.  Southwest is purchasing the bundles of slots containing the two "Sunday-only" slots.  The United States understands that Southwest has declined these "Sunday only" slots and that they will be returned to the Federal Aviation Administration for reallocation in consultation with the Department of Justice.

years, Supplemental Stipulated Order (Docket No. 151), and an agreement with the

United States Department of Transportation ("DOT") to use all of its commuter slots at

Reagan National to serve airports designated as medium, small and non-hub airports (*i.e.*,

airports accounting for less than one percent of annual passenger boardings) for a period

of at least five years.[11]

### 2.  Explanation of the Proposed Final Judgment

The proposed Final Judgment effectively addresses the harm to competition that

was likely to result from the merger.  The LCCs that acquire the assets will establish

stronger positions at strategically important destinations – including top business markets

– where it has been particularly difficult to obtain access.  These assets will provide them

with the incentive to invest in new capacity and position them to offer more meaningful

competition system-wide, forcing legacy carriers to respond to that increased

competition.  And, by increasing the scope of the LCCs' networks, the divestitures will

bring the consumer-friendly policies of the LCCs to more travelers across the country.

For example, neither Southwest nor JetBlue currently charges customers a first bag fee

while all of the legacy carriers charge $25 per bag.

Strengthened by increased access to capacity-constrained airports, the LCCs will

be able to fly more people to more places at more competitive fares.  In this way,

---

[11]  The DOT agreement is available at http://www.dot.gov/airconsumer/merger-usairways-amrcorp.  The European Commission also reviewed the merger.  British Airways, which has been given antitrust immunity with American for the oneworld alliance, and US Airways are the only two nonstop competitors in the Philadelphia-London Heathrow market ("PHL-LHR").  The European Commission cleared the merger after the parties made commitments to divest a slot pair at slot-constrained London Heathrow Airport and to offer supportive interline and frequent flyer agreements to an entrant into the PHL-LHR market.  *See* Press Release, European Commission, "Mergers: Commission approves proposed merger between US Airways and American Airlines' holding company AMR Corporation, subject to conditions" (Aug. 5, 2013), *available at* http://europa.eu/rapid/press-release_IP-13-764_en.htm.

although the proposed remedy will not create a new independent airline or guarantee the continued existence of Advantage Fares on all routes, it will impede the industry's evolution toward a tighter oligopoly and deliver benefits to millions of consumers that could not be obtained even by enjoining the merger.

### a.   Consumer Benefits from LCC Entry

The consumer benefits that flow from LCC entry are well established.  Previous work by the Department of Justice has shown that the presence of an LCC on a nonstop route results in both significant price reductions and capacity increases.[12]  An extensive body of economic research confirms that LCC entry on a route – whether by nonstop or connecting service – reduces fares three times as much as the addition of a legacy competitor.[13]

These substantial consumer benefits have proved particularly meaningful when LCCs are able to gain access to slot-constrained airports.  For example, in 2010, Southwest acquired 36 slots at Newark Liberty International Airport pursuant to a divestiture remedy that addressed competition concerns arising from the merger of

---

[12]  Comments of the U.S. Dep't of Justice, Notice of Petition for Waiver of the Terms of the Order Limiting Scheduled Operations at LaGuardia Airport, Fed'l Aviation Admin., FAA-2010-0109, March 24, 2010 at A-2 (finding an "economically significant impact from the presence of an LCC on nonstop route-level prices, ranging from 21% to 27% average price decreases and a 68% to 118% median increase in number of passengers depending on the data examined").

[13]  *E.g.*, Jan K. Brueckner *et al.*, *Airline Competition and Domestic U.S. Airfares:  A Comprehensive Reappraisal*, 2 ECON. TRANSP. 1-17 (2013) (finding that addition of nonstop LCC service reduces fares by 12% to 33% while entry of nonstop legacy service reduces fares by approximately 4%; similarly, the presence of LCC connecting service lowers fares by as much as 12%, while additional legacy connecting service lowers fares by typically less than 3%); Phillippe Alepin *et al.*, *Segmented Competition in Airlines:  The Changing Roles of Low-Cost and Legacy Carriers in Fare Determination*, (working paper), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2212860 (finding that the addition of nonstop LCC service on a route reduces fares by approximately 24% and the addition of a second nonstop LCC further reduces fares by approximately 13%); *see also* Martin Dresner *et al.*, *The Impact of Low Cost Carriers on Airport and Route Competition*, 30 J. OF TRANSP. ECON. & POL'Y 309-328 (1996); Steven A. Morrison, *Actual, Adjacent, and Potential Competition:  Estimating the Full Effect of Southwest Airlines*, 35 J. OF TRANSP. ECON. & POL'Y 239-256 (2001).

United Airlines and Continental Airlines.  Southwest used those slots to enter six nonstop

routes from Newark (one of which, Newark-BWI, it later exited), resulting in

substantially lower fares to consumers and increased output:

| Route | Year-over-year Percentage Change in Average Fare | Year-over-year Percentage Change in Number of Passengers |
|---|---|---|
| Newark-St. Louis | -27% | 66% |
| Newark-Houston | -15% | 53% |
| Newark-Phoenix | -14% | 57% |
| Newark-Chicago | -11% | 35% |
| Newark-Denver | -5% | 49% |

Passengers flying on these five nonstop routes after Southwest began service saved about

$75 million annually compared to what they would have had to pay prior to Southwest's

entry.[14]  In addition, Southwest was able to incorporate Newark service into its overall

domestic network, offering low fares on connections to Newark from over sixty cities.[15]

In this way, the creation of only a few nonstop routes led to 60 connecting routes.  A

similar multiplier effect is expected with the current divestitures.

Likewise, JetBlue used its limited number of slots at Reagan National to drive

down fares and increase output on the routes it serves.  For example, after JetBlue entered

the Reagan National to Boston route in 2010, average fares dropped by 39 percent year-

over-year and passengers nearly doubled.  US Airways estimated that after JetBlue's

entry, the last-minute fare for round-trip travel between Reagan National and Boston – a

---

[14]  USDOT Origin & Destination Survey.  Percentage changes in average fare and number of
passengers are calculated using data from the first full quarter after entry by Southwest and, as a
baseline, data from four quarters before that entry.  To determine annual consumer savings, the
number of passengers flying on each route for each of the four quarters following Southwest's
entry is multiplied by the dollar amount of the corresponding year-to-year fare change for that
quarter.  The annual amount is the sum of the four quarters for all of the routes.  Data is not
reported for the Newark-BWI route.

[15]  USDOT Origin & Destination Survey, CY 2012.

key business route – dropped by over $700.  *See* Am. Compl. ¶ 88.

### b. The Importance of the Remedy Assets to Enhancing LCC Competition

The proposed settlement significantly eases some of the most intractable barriers to LCC entry and expansion throughout the country.  First and foremost, the remedy provides unprecedented access to Reagan National and LaGuardia, two of the most strategically important – and most constrained – airports highly preferred by business passengers.  The legacy carriers have long dominated these airports and meaningful entry by LCCs has been notoriously difficult.  At Reagan National, where LCCs had only about six percent of the take-offs and landings prior to the divestitures, the remedy transfers twelve percent of the slots to LCCs, nearly tripling LCC presence there.  Likewise, the remedy will extend access at LaGuardia, where LCCs hold less than 10 percent of the slots.  The LCCs that are acquiring the divested slots will be able to offer through their use of the divested slots over four million seats per year at Reagan National and over 1.5 million seats per year at LaGuardia.[16]

Indeed, the transfer of Reagan National slots to LCCs will produce an immediate benefit to consumers in the form of increased capacity because LCCs are likely to use larger planes than US Airways had used.[17]  Comparing the average aircraft size operated by US Airways on routes it has announced it will exit with the average aircraft size

---

[16]  Annual seats calculations are based on the number of divested daily slots at each airport and the average number of seats on the aircraft that the slot acquirers typically use.

[17]  A large proportion of US Airways' Reagan National flights have in recent years been on small regional jets, even though it had sufficient flexibility with its slot portfolio to use larger aircraft.  Absent the remedy, the merged airline would have had two-thirds of the flights at Reagan National but only half the airport's passengers.  *Hearing on Airline Industry Consolidation Before the Subcomm. on Aviation Operations, Saftey and Security of the S Comm. on Commerce, Science and Transportation* (June 19, 2013) 113 Cong. (statement of W. Douglas Parker, Chairman and CEO, US Airways Group).

operated by Southwest and JetBlue at Reagan National in 2013, the number of seats at Reagan National is estimated to increase by over 2 million per year as a direct result of transferring the slots to LCCs, leading to a potential 10% increase in the number of passengers using the airport.[18]

And, for the first time ever, an LCC (Southwest) will be able to offer a wide array of flight options for nonstop and connecting service from Reagan National to points throughout its network, with resulting consumer benefits that, given the large number of slots at issue, are likely to significantly exceed those that occurred after its entry at Newark.  Although Southwest has not yet announced which cities it will serve with the 56 slots it purchased through the divestitures, it will likely have the flexibility to add as many as six to eight new routes to its existing seven Reagan National routes.[19]  The addition of each new route will create new connecting service to many more points throughout the country.[20]

Given that New American's slot holdings at Reagan National will allow it to continue to serve an extensive list of destinations, nearly anywhere Southwest, JetBlue or Virgin America choose to fly with their newly-acquired slots will provide direct

---

[18]  The average aircraft US Airways operated in 2013 on the 16 routes that it plans to exit had 57.6 seats; Southwest and JetBlue operate aircraft with an average of 123.1 seats.  Official Airline Guide.  (The aircraft size on US Airways's current Reagan National-San Diego service is excluded because that service will simply shift to Reagan National-LAX.)

[19]  Carriers typically schedule between three (in small markets) and 10 (in large markets) daily round trips when establishing a new route.

[20]  If Southwest were to institute nonstop service between Reagan National and, for example, Chicago's Midway Airport (Southwest's top airport in terms of departures), it would simultaneously create convenient one-stop service between Reagan National and over 55 additional airports that Southwest serves from Midway.

competition with New American.[21]   The remedy also has ensured that JetBlue will retain

permanent access to the sixteen slots it formerly leased from American.  JetBlue uses

these slots to serve routes on which it competes directly with US Airways (and now New

American).  One of the harms alleged from the merger was the likelihood that New

American would have cancelled the lease to eliminate that competition.[22]

      Similarly, gate divestitures at O'Hare, Los Angeles (LAX), Boston, Dallas Love

Field, and Miami will expand the presence of LCCs at these strategically important

airports located throughout the country.  The acquirers will be able to offer increased

competition not just on nonstop flights to and from these key airports, but also on

connecting flights nationwide.  O'Hare and LAX, two of New American's major hubs,

are among the most highly congested airports in the country, and competitors have

historically had difficulties obtaining access to gates and other facilities at those

airports.[23]   Dallas Love Field is much closer to downtown Dallas than American's largest

hub at Dallas-Fort Worth International Airport ("DFW").  Gates at DFW are readily

available, but Love Field is gate constrained.  Although today's operations at Love Field

---

[21]   For example, JetBlue has announced that it will add three additional routes with twelve of the
twenty-four new Reagan National slots it has acquired.  Two (Charleston, SC and Hartford, CT)
will add a competitor to routes that would otherwise only be served by New American from
Reagan National, and the other (Nassau, Bahamas) will add LCC service on a route New
American has announced it will exit.  *See* Press Release, JetBlue, "JetBlue Adds Three Nonstop
Destinations for Customers at Ronald Reagan Washington National Airport, Offers Introductory
One-Way Fares as Low as $30" (Mar. 6, 2014), *available at*
http://investor.jetblue.com/phoenix.zhtml?c=131045&p=irol-NewsArticle.

[22]   *See* Am. Compl. ¶¶ 87-88.

[23]   For example, Virgin America originally announced its intent to serve O'Hare in 2008, but its
plans were delayed over three years due to a lack of gate availability.  Press Release, Virgin
America, "Virgin America Breezes Into O'Hare" (Feb. 17, 2011) (describing long-term efforts to
obtain gate access), *available at* http://www.virginamerica.com/press-release/2011/virgin-
america-breezes-into-chicago-ohare.html.  The comments submitted by Allegiant Airlines
demonstrate the importance to LCCs of obtaining gates at LAX.

are severely restricted under current law,[24] those restrictions are due to expire in October 2014, at which point Love Field will have a distinct advantage over DFW in serving business customers near downtown Dallas.  The divestitures will position the acquirer to provide vigorous competition to New American's nonstop and connecting service out of DFW.  And as there is limited ability to enter or expand at Boston, the divestitures will provide relief there too.[25]

Importantly, the consumer benefits of opening access to these key constrained airports will extend beyond the passengers directly served at those seven airports.  Given the importance of the airports to business travelers, the LCCs that are acquiring the slots and gates will have a more robust product for business and corporate travel.  For example, as a result of the divestitures, Virgin America – one of only a few airlines to start domestic service in recent years – will enter LaGuardia, expand at Reagan National, and may expand at other constrained airports as the gate divestitures progress.  As such, it will supplement its West Coast presence with service to major East Coast business destinations (and potentially additional destinations around the country), thereby establishing greater scope and scale.[26]

---

[24]  Under legislation known as the Wright Amendment, airlines operating out of Love Field may not operate nonstop service on aircraft with more than 56 seats to any points beyond Texas, New Mexico, Oklahoma, Kansas, Arkansas, Louisiana, Mississippi, Missouri or Alabama.

[25]  Although access issues at Miami are not as acute as at the other airports, the proposed Final Judgment also ensures that a carrier seeking to enter or expand at Miami will have access to two of the gates and associated ground facilities currently leased by US Airways.

[26]  Virgin America has announced its interest in beginning service from Love Field to major business destinations throughout the country.  Press Release, Virgin America, "Virgin America Plans Dallas Expansion:  Airline wants to bring more business-friendly, low-fare flight competition to Dallas with new flights from Love Field," *available at* http://www.virginamerica.com/press-release/2014/virgin-america-plans-dallas-expansion.html.

Moreover, the passenger demand generated in cities where the divestitures will occur will enhance the LCCs' incentives to invest in new capacity elsewhere. For example, if Southwest were to add nonstop service from Reagan National to Nashville, the new source of passengers from the major population center of Washington, D.C., could support entry or expansion on additional routes out of Nashville. At the same time, Southwest's marketing position in Nashville would be enhanced because the nation's capital is included in the service offerings available in Nashville.[27] That would in turn make it easier for Southwest to attract passengers to its other destinations and incentivize Southwest to add capacity to meet that demand.

Thus, taken together, the divestitures will substantially improve the LCCs' network quality and attractiveness to customers, position them to offer more meaningful competition system-wide, and enable them to grow faster than they otherwise would, both in the depth and breadth of their networks.[28]

## III. Standard of Judicial Review

The APPA requires that proposed consent judgments in antitrust cases brought by the United States be subject to a sixty-day public comment period, after which the court shall determine whether entry of the proposed Final Judgment "is in the public interest." 15 U.S.C. § 16(e)(1). In making that determination, the court, in accordance with the statute as amended in 2004, is required to consider:

---

[27] As Southwest's CEO stated, "We have a lot of customers that love Southwest Airlines . . . and a lot of them want to go to Reagan." Charisse Jones, "JetBlue, Southwest Gain Slots at Reagan Airport," USA TODAY (Jan. 30, 2014), *available at* http://usat.ly/1b9U3ah.

[28] We are not suggesting that this remedy eliminates all entry barriers faced by LCCs. As alleged in the Complaint, airlines (including LCCs) face entry impediments, particularly where the origin or destination airport is another airline's hub. Am. Compl. ¶ 91. However, LCCs have demonstrated some ability to overcome those disadvantages with the help of lower costs, and we expect that the network-wide strengthening brought about by the divestitures will, over time, help the LCCs overcome some of the other obstacles that limit their ability to expand.

(A)     the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and

(B)     the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1).  In considering these statutory factors, the court's inquiry is necessarily a limited one as the government is entitled to "broad discretion to settle with the defendant within the reaches of the public interest."  *United States v. Microsoft Corp.*, 56 F.3d 1448, 1461 (D.C. Cir. 1995); *see also United States v. SBC Commc'ns, Inc.,* 489 F. Supp. 2d 1 (D.D.C. 2007) (assessing public interest standard under the Tunney Act); *United States v. InBev N.V./S.A.*, 2009-2 Trade Cas. (CCH) ¶ 76,736, 2009 U.S. Dist. LEXIS 84787, No. 08-1965 (JR) at *3 (D.D.C. Aug. 11, 2009) (discussing nature of review of consent judgment under the Tunney Act; inquiry is limited to "whether the government's determination that the proposed remedies will cure the antitrust violations alleged in the complaint was reasonable, and whether the mechanisms to enforce the final judgment are clear and manageable").

Under the APPA a court considers, among other things, the relationship between the remedy secured and the specific allegations set forth in the Complaint, whether the decree is sufficiently clear, whether the enforcement mechanisms are sufficient, and whether the decree may positively harm third parties.  *See Microsoft,* 56 F.3d at 1458-62. With respect to the adequacy of the relief secured by the decree, a court may not "engage in an unrestricted evaluation of what relief would best serve the public."  *United States v*

*BNS, Inc.,* 858 F.2d 456, 462 (9th Cir. 1988) (citing *United States v. Bechtel Corp.,* 648

F.2d 660, 666 (9th Cir. 1981)).  Instead,

> [t]he balancing of competing social and political interests affected by a proposed
> antitrust consent decree must be left, in the first instance, to the discretion of the
> Attorney General.  The court's role in protecting the public interest is one of
> insuring that the government has not breached its duty to the public in consenting
> to the decree.  The court is required to determine not whether a particular decree
> is the one that will best serve society, but whether the settlement in *"within the
> reaches of the public interest."*  More elaborate requirements might undermine
> the effectiveness of antitrust enforcement by consent decree.

*Bechtel,* 648 F.2d at 666 (emphasis added) (citations omitted).

In determining whether a proposed settlement is in the public interest, the

government is entitled to deference as to its "predictions as to the effect of the proposed

remedies." *Microsoft,* 56 F.3d at 1461; *see also SBC Commc'ns,* 489 F. Supp. 2d at 17

(explaining that district court "must accord deference to the government's predictions

about the efficacy of its remedies"); *United States v. Archer-Daniels-Midland Co.,* 272 F.

Supp. 2d 1, 6 (D.D.C. 2003) (noting that the court should grant due respect to the United

States' "prediction as to the effect of the proposed remedies, its perception of the market

structure, and its views of the nature of the case"); *United States v. Morgan Stanley*, 881

F. Supp. 2d 563, 567 (S.D.N.Y. 2012) (government entitled to deference).

Courts "may not require that the remedies perfectly match the alleged violations."

*SBC Commc'ns,* 489 F. Supp. 2d at 17.  Rather, the ultimate question is whether "the

remedies [obtained in the decree are] so inconsonant with the allegations charged as to

fall outside of the 'reaches of the public interest.'" *Microsoft,* 56 F.3d at 1461.

Accordingly, the United States "need only provide a factual basis for concluding that the

settlements are reasonably adequate remedies for the alleged harms." *SBC Commc'ns,*

489 F. Supp. 2d at 17.  And, a "proposed decree must be approved even if it falls short of

the remedy the court would impose on its own, as long as it falls within the range of acceptability or is within the reaches of the public interest." *United States v. Am. Tel. & Tel. Co.,* 552 F. Supp. 131, 151 (D.D.C. 1982) (citations and internal quotations omitted); *see also United States v. Alcan Aluminum Ltd.,* 605 F. Supp. 619, 622 (W.D. Ky. 1985) (approving the consent decree even though the court would have imposed a greater remedy).

In its 2004 amendments to the Tunney Act,[29] Congress made clear its intent to preserve the practical benefits of using consent decrees in antitrust enforcement, adding the unambiguous instruction that "[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. § 16(e)(2). The procedure for the public-interest determination is left to the discretion of the court, with the recognition that the court's "scope of review remains sharply proscribed by precedent and the nature of the Tunney Act proceedings." *SBC Commc'ns*, 489 F. Supp. 2d at 11; *see also United States v. Enova Corp.*, 107 F. Supp. 2d 10, 17 (D.D.C. 2000) ("[T]he Tunney Act expressly allows the court to make its public interest determination on the basis of the competitive impact statement and response to public comments alone.").

---

[29]  The 2004 amendments substituted "shall" for "may" in directing relevant factors for courts to consider and amended the list of factors to focus on competitive considerations and to address potentially ambiguous judgment terms. *Compare* 15 U.S.C. § 16(e) (2004), *with* 15 U.S.C. § 16(e)(1) (2006); *see also SBC Commc'ns*, 489 F. Supp. 2d at 11 (concluding that the 2004 amendments "effected minimal changes" to Tunney Act review).

## IV.   Public Comments and the United States' Response

The United States received fourteen public comments.[30]   The comments have

been posted on the website of the Antitrust Division pursuant to the Court's November

20, 2013 Order.  The comments are summarized below:

- Delta Air Lines filed comments that argue that the Complaint mischaracterizes airline competition and overstates the potential harm from the merger.  Delta asserts that the legacy airlines do not engage in oligopolistic pricing; instead, according to Delta, they compete vigorously with one another.  Delta also argues that divestiture of Reagan National slots exclusively to LCCs would be harmful to consumers because LCCs would serve large, leisure-oriented markets instead of the small- and medium-sized communities that Delta states it would be more likely to serve.  Thus, Delta argues that it should not be precluded from acquiring Reagan National divestiture slots.  Delta also makes similar arguments with respect to the two American gates at Dallas Love Field, where Delta currently operates limited service by sub-leasing one of American's gates.  It claims that divesting those gates to an LCC would harm Dallas-area passengers by depriving them of Delta's network service.

- Senator John D. Rockefeller IV, Senator John Thune, Congressman Bill Shuster, and Congressman Nick J. Rahall II submitted a joint letter expressing their concerns that "the proposed Final Judgment would negatively impact competition for airline service to small communities and rural areas."  While acknowledging that providing additional slots and gates to LCCs is likely to increase competition on certain routes, they express concern that existing service to smaller communities would not be protected.  They urge the DOJ to allow all carriers to bid for the divested slots and gates, arguing that LCCs would be unlikely to use those assets to serve small communities.  Senator Thune wrote separately to reiterate the concerns expressed in the joint letter, noting that Southwest's recent announcement to cease service at the three smaller airports of Jackson, Mississippi; Branson, Missouri; and Key West, Florida demonstrates that Southwest and other LCCs are not interested in serving smaller markets.

- Six commenters generally oppose the settlement on grounds that it fails to remedy harms that were alleged in the Complaint,[31] or additional harms that the

---

[30]  As discussed, *supra* n.1, the United States also received fifteen individual emails about the merger or settlement that were sent using various channels outside of the designated procedures for submitting Tunney Act comments.

[31]  Comments of The American Antitrust Institute ("AAI"), joined by AirlinePassengers.org, Association for Airline Passenger Rights, Business Travel Coalition, Consumer Travel Alliance, and FlyersRights.org ("AAI Cmts."); Comments of Mr. Daniel Martin Bellemare; Comments of Mr. Carl Lundgren on behalf of Relpromax Antitrust, Inc. ("Relpromax Cmts."); Comments of the Consumers Union; Comments of Mr. Howard Park.

commenters foresee from the transaction.[32]  These comments urge that the
settlement should be rejected and the merger enjoined.  The commenters generally
assert or presume that the United States would succeed at trial in obtaining all
relief sought in its Complaint (*e.g.*, Bellemare Cmts. at 8; Messina/Alioto Cmts. at
4-5), and take the position that new LCC entry fostered by the divestitures will
not be significant in comparison to the alleged harm and will not remedy the loss
of competition in all of the city-pair markets that might be affected by the merger.
Two commenters contend that the settlement violates a "rule" that
"anticompetitive effects in one market may not be justified by pro-competitive
benefits in another market."  AAI Cmts. at 11; Consumers Union Cmts. at 2.  In
addition to challenging the adequacy of the relief, two of the comments suggest
that the settlement resulted from improper influence (Messina/Alioto Cmts. at 1-
2; FlyersRights.org Cmts. at 1), and one argues that the CIS contains insufficient
economic analysis (Relpromax Cmts. at 1).

- The Wayne County, Michigan Airport Authority ("WCAA"), operator of Detroit
  Metropolitan Airport ("DTW"), filed comments stating that, "[f]or the most part,
  it appears that the proposed Settlement promotes [DOJ's] goals" of fostering
  airline competition and avoiding anti-competitive effects.  It expresses concerns,
  however, that the remedy will result in New American eliminating service on the
  Reagan National-DTW route, leaving Delta as the only carrier on that route.
  WCAA expresses its view that it is unlikely that any other carrier will provide
  competing service.  WCAA therefore requests that the Final Judgment be
  modified to secure a commitment from New American to continue to operate on
  the route or to mandate that acquirers of the divested slots provide service to
  DTW.  WCAA Cmts. at 2-5 & 7.  WCAA also filed Supplemental Comments
  stating that New American has announced its intention to eliminate service on the
  Reagan National-DTW route.

- In addition to joining the AAI Comments, the Consumer Travel Alliance ("CTA")
  and FlyersRights.org each submitted separate comments.  While noting that the
  proposed settlement "is clearly an attempt to preserve the same competition and
  comparison-shopping that American consumers should enjoy," CTA argues that,
  if the merger goes forward, DOJ should urge DOT to promote airline competition
  in three areas: (1) disclosure of fees for ancillary products and services and their
  distribution through all channels, (2) disclosure of all code-shares, and (3) more
  limited grants by DOT of antitrust immunity for alliance agreements between US
  and foreign airlines.  CTA Cmts. at 2-4.  FlyersRights.org argues that the Court
  should "require full disclosure of settlement negotiations and lobbying and hold
  an evidentiary hearing where passenger groups can be represented as interveners
  or amicus parties."  FlyerRights.org Cmts. at 2.

---

[32]  Comments of Mr. Gil D. Messina and Mr. Joseph Alioto ("Messina/Alioto Cmts.").  These
commenters represent plaintiffs in the *Fjord v. AMR Corp.* lawsuit challenging the merger
discussed *supra* n.4 and accompanying text.

- Allegiant Air, LLC ("Allegiant") is an LCC interested in expanding service to LAX, and it hopes to obtain access to the LAX divestiture gates.  Its comments express concern that even after New American relinquishes claims to "preferential use" of the divested gates, it may operate out of them on a "common use" basis, thereby limiting LCC access.  Allegiant requests that the Final Judgment be clarified to make clear that American may not use the divested gates even on a "common use" basis, and that DOJ work with the LAX airport operator to ensure that LCCs have priority access to the gates.  Allegiant Cmts. at 2-4.

As several of the comments raise similar issues, we will address the comments in five groupings:  (1) whether the Complaint was justified; (2) whether the remedy fully resolves the harms alleged in the Complaint; (3) the effect of the remedy on service patterns at Reagan National; (4) whether Delta is an appropriate divestiture candidate; and (5) procedural issues relating to the proposed Final Judgment and CIS as well as other miscellaneous concerns.  Unless otherwise noted, citations to specific comments merely are representative of comments on that issue and are not an indication that other comments were not considered.

## A.    Any Challenge to the Merits of the Complaint Is Beyond the Scope of Tunney Act Review

Delta argues that one of the key theories of the United States' case is simply wrong:  it states that the allegations in the Complaint regarding competitive harm from coordination among the legacy carriers on capacity, fares and fees are unfounded.  Delta asserts that the legacy carriers vigorously compete against each other on price and product quality, and it points to low margins in the industry as evidence that the legacy airlines do not coordinate.[33]  Given its claims that the airline industry is highly

---

[33]  Delta argues that the low rate of return on investment in the airline industry relative to other industries over the past ten years "disproves" that there is a history of coordinated conduct among the legacy carriers.  Delta Cmts at 12-15.  The airline industry has suffered at times from poor financial performance (although recent record earnings by a number of carriers suggest that this history may not reflect current industry conditions).  But there is no basis in law or economics to conclude that coordinated conduct cannot occur in the presence of financial distress.  Firms may

competitive and that the legacy carriers do not coordinate, Delta appears to be arguing that the United States' challenge to the American/US Airways merger was fundamentally flawed, such that the merger should have been approved unconditionally.[34]

The United States "need not prove its underlying allegations in a Tunney Act proceeding." *SBC Commc'ns*, 489 F. Supp. 2d at 20.  Indeed, challenges to the validity of the United States' case, or alleging that it should not have been brought, are challenges to the initial exercise of the United States' prosecutorial discretion and are outside the scope of a Tunney Act proceeding.  A Tunney Act proceeding is not an opportunity for a "de novo determination of facts and issues," but rather "to determine whether the Department of Justice's explanations were reasonable under the circumstances" because "[t]he balancing of competing social and political interests affected by a proposed antitrust decree must be left, in the first instance, to the discretion of the Attorney General." *United States v. Western Elec. Co.*, 993 F.2d 1572, 1577 (D.C. Cir. 1993) (citations and internal quotation marks omitted).  Courts consistently have refused to consider "contentions going to the merits of the underlying claims and defenses." *United States v. Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981).  Thus, Delta's challenge to the legitimacy of the United States' underlying case is beyond the purview of Tunney Act review.

---

be especially tempted to coordinate when they are facing tough economic times.  *See* Carl Shapiro, *Competition Policy in Distressed Industries*, Remarks as Prepared for Delivery to ABA Antitrust Symposium: Competition as Public Policy, May 13, 2009, 7-8 *available at* http://www.justice.gov/atr/public/speeches/245857.pdf.

[34]  *See* Delta Cmts. at 9 ("The Government's case for blocking the transaction between [American] and [US Airways] was predicated in significant part on three fallacies about competition in the industry.").

Nevertheless, the United States notes in response to this comment that the merger raised serious competition issues and that the Complaint provides specific allegations of competitive effects arising from the transaction, particularly with respect to coordination among the legacy carriers (including Delta), that fully justified the filing of this action. *See infra* § IV.D.

### B.   The Proposed Settlement Will Counteract Competitive Harm From the Merger by Enhancing LCC Competition

Several commenters maintain that the proposed remedy fails to resolve fully the harms alleged in the Complaint.[35]  These commenters point to the extensive harm alleged in the Complaint and assert that the new LCC entry fostered by the divestitures will not neutralize all of the competitive losses in all of the city pair markets that might be affected by the merger.  The following discussion responds to commenters' contentions that LCCs will not offer meaningful competition and that the remedy does not perfectly match the allegations of harm.

### 1.   LCCs Provide Meaningful Competition

Several commenters question the sufficiency of the competition that LCCs – and in particular Southwest – will offer as a result of the remedy.  As a general response to this point, substantial evidence supports the conclusion of the United States that LCC competition is effective and that providing slots and gates to enable LCCs to expand their networks will have a significant pro-competitive effect.  *See supra*, § II.B.

Delta argues specifically that LCCs are not significant competitors for most passengers, especially business passengers.  Delta adopts a misleading term for LCCs –

---

[35]  *See, e.g.,* AAI Cmts. at 12 ("At bottom, the Department's settlement does not adequately remedy the harms alleged in the government's complaint."); Messina/Alioto Cmts. at 7 ("[T]he proposed settlement does not address the central concerns raised by the DOJ's complaint.").

domestic leisure carriers or "DLCs" – in an attempt to paint an inaccurate picture of LCCs as only serving leisure passengers, only serving large cities and dense routes, and only providing no-frills service.[36]

Although LCCs' route networks are not as extensive as those of the legacy carriers, it is simply not the case that LCCs single-mindedly compete for leisure customers to the exclusion of business passengers, or fly high-volume routes to the exclusion of serving smaller communities.  For example, Southwest, the largest LCC, has reported that approximately 35% of its passengers are travelling on business and that corporate sales are increasing.[37]  It serves numerous medium and small communities, including Rochester, Grand Rapids, and Corpus Christi.  Moreover, a key part of Southwest's business model is to provide frequent flights on its routes, a service attribute highly attractive to business passengers.  Similarly, JetBlue, although smaller than Southwest, also serves small and medium communities – including Richmond, Hartford, and Portland, Maine – and provides frequent service on the business routes where it flies.[38]  On the Boston-Washington route described in the Complaint – a classic business

---

[36] *E.g.*, Delta Cmts. at 21 ("Given the limitations of their business model, DLCs simply *cannot and do not* cater to travelers beyond the most price-sensitive consumers seeking travel between popular, often densely populated markets.  Thus, divestitures to DLCs will add little competition for time-sensitive passengers, for business passengers, or for passengers traveling from small- to medium-sized communities.") (emphasis in original).

[37] Southwest Airlines Co., Q3 2013 Earnings Conference Call, Corrected Transcript 13 (Oct. 24, 2013).  Southwest's Chief Marketing Officer recently explained: "A lot of people view Southwest as a leisure carrier because of our low fares, but our DNA is about being a business airline." Jennifer Rooney, *Southwest Airlines CMO Kevin Krone Explains What's Behind The New Grown-Up Ads*, FORBES.COM, Apr. 22, 2012, *available at* http://onforb.es/11Fqy7v.

[38] For example, JetBlue serves JFK-Buffalo with nine flights per day and JFK-Boston with seven flights per day.  These routes are generally characterized as business, not leisure, markets.

route – JetBlue has ten daily frequencies and carries more passengers than American, United and Delta combined.[39]

It is also not the case that LCCs offer only basic, no-frills service that is unattractive to business passengers.  In some cases, LCCs have actually been at the forefront in adding amenities designed to attract business customers.  JetBlue's service has proved particularly appealing to Boston business travelers.[40]  It recently introduced lie-flat seats and other amenities on certain trans-continental flights to appeal to premium customers.[41]  Virgin America also caters to business passengers, billing its flights to corporate travel customers as "your corner office in the sky."[42]  Virgin America was the first domestic airline to offer fleetwide WiFi, and its premium class service has been named the best among domestic airlines in an annual poll of business travelers for several years in a row (Delta was fifth in the most recent poll).[43]  Southwest and the other LCCs have also been upgrading their in-flight amenities to better attract business passengers.

---

[39]  While JetBlue was historically oriented to leisure traffic, in recent years it has "increased [its] relevance to the business customer, particularly in Boston" where it is the largest carrier.  JetBlue Corp., Annual Report (Form 10-K) at 8 (Feb. 20, 2013).  JetBlue's CEO stated that 20% of its overall customers – and 30% of its Boston customers – are business passengers.  JetBlue, Q4-2011 Earnings Conference Call Transcript (Jan. 26, 2012).

[40]  One Boston-based business flyer told the *Wall Street Journal*: "The word spread pretty quickly around here: [JetBlue] had service and nice planes. . . .  A lot of people in the business community prefer it.  The fares are very competitive."  Susan Carey, *How JetBlue Cracked Boston*, WALL ST. J. (Feb. 8, 2012) *available at* http://on.wsj.com/xHdvX4.

[41]  Press Release, JetBlue, JetBlue Introduces Mint[TM]: The Best Coast-to-Coast Premium Service at an Unbelievably unPremium Price (Sept. 30, 2013) http://investor.jetblue.com/phoenix.zhtml?c=131045&p=irol-newsArticle&ID=1859952.  JetBlue has also upgraded its standard product to include in-flight wi-fi and DirecTV.  JetBlue was the first airline to offer DirecTV free of charge at every seat.

[42]  *See, e.g.*, Corporate Travel, VirginAmerica.com, http://www.virginamerica.com/corporate-travel.html.

[43]  The Best Airlines and Hotels for Business Travelers, cntraveler.com http://cntrvlr.com/1890tST (Oct. 2013).

Moreover, while Delta minimizes the competitive significance of LCCs in its comments, it has acknowledged in other settings the significant competitive effect that LCCs exert, stating in its most recent annual report that carriers such as Southwest, JetBlue, Spirit and Allegiant "have placed significant competitive pressure on us in the United States and on other network carriers in the domestic market."  Delta Air Lines, Inc., Annual Report (Form 10-K) 17 (Feb. 21, 2014).  The other legacy carriers likewise attest to the significance of LCC competition.[44]

AAI questions the competitive significance and long-term impact of Southwest's entry on fares and service.  However, the actual examples of the effects of LCC entry at slot-constrained airports discussed above (*supra* § II.B.2.a) provide compelling evidence of the importance of LCC competition.  While AAI casts doubt on the long-term impact of Southwest's entry on the Newark routes,[45] the average fare for the five Newark routes over the three years since Southwest's entry has decreased compared to pre-entry levels

---

[44] *See* American Airlines Group, Inc., Annual Report (Form 10-K) 26 (Feb. 27, 2014) ("Low-cost carriers have a profound impact on industry revenues. . . .  [LCCs] are expected to continue to increase their market share through growth and, potentially, consolidation, and could continue to have an impact on our overall performance."); United Continental Holdings, Inc., Annual Report (Form 10-K) 19 (Feb. 25, 2013) ("The increased market presence of low-cost carriers, which engage in substantial price discounting, has diminished the ability of large network carriers to achieve sustained profitability on domestic and international routes."); US Airways Group, Inc., Annual Report (Form 10-K) 10 (Feb. 20, 2013) ("[R]ecent years have seen the growth of low-fare, low-cost competitors in many of the markets in which we operate.  These competitors include Southwest, JetBlue, Allegiant, Frontier, Virgin America and Spirit.  These low cost carriers generally have lower cost structures than US Airways.").

[45] AAI Cmts. at 8 & n.15.  AAI further states that "[r]ecent empirical studies suggest that the 'Southwest effect' has significantly petered out."  *Id.* at 8 & n.16.  AAI fails to note that the principal study it cites, MICHAEL D. WITTMAN & WILLIAM S. SWELBAR, EVOLVING TRENDS OF U.S. DOMESTIC AIRFARES:  THE IMPACTS OF COMPETITION, CONSOLIDATION AND LOW-COST CARRIERS (MIT Int'l Ctr. For Air Transp., Report No. ICAT-2013-07, Aug. 2013), found that "the presence of an LCC like Southwest, JetBlue, Allegiant, or Spirit is associated with a decrease in average one-way fare of between $15-$36," with the 2012 "Southwest effect" constituting a $17 average decrease in fares.  Wittman at 20.  Moreover, the true consumer savings is even greater as the study did not account for the fact that Southwest does not charge baggage fees.

and has decreased 17% relative to changes in national average fares during this period.[46] In other words, relative to the trend in nationwide air fares, consumers in those five Newark routes have enjoyed significantly lower fares since Southwest's entry. Moreover, Southwest has grown at the destination cities served out of Newark, demonstrating the additional procompetitive impact that can arise from opening slot-constrained airports to LCCs.[47]

### 2. The Remedy Adequately Addresses the Harms Alleged in the Complaint

Some commenters argue that the remedy is not in the public interest in that it does not match the harms alleged in the Complaint. In particular, they emphasize that the remedy does not provide for the continuation of US Airways's Advantage Fare program or address each city-pair route in which American and US Airways provided competing service.[48] As the United States acknowledged in the CIS, the proposed remedy does not purport to replicate the precise form of competition that will be lost as a result of the

---

[46] The national airline ticket price is calculated using DOT data, *available at* http://www.rita.dot.gov/bts/airfares/national/table. Newark market fare changes are calculated from USDOT Origin & Destination Survey.

[47] AAI dismisses this possibility by suggesting that it has not occurred at the six cities in which Southwest began to serve from Newark with slots it acquired in connection with the United-Continental merger. AAI Cmts. at 8 n.17. However, AAI incorrectly relies on departures by all airlines from these airports rather than focusing on Southwest. In the three years since its entry into these airports from Newark, Southwest has increased seats at these airports by over 10%. (Seat changes are calculated from the Official Airline Guide.)

[48] AAI argues that the settlement violates an "out-of-market benefits rule" and that "anticompetitive benefits in one market [cannot] be justified by precompetitive consequences in another." The "rule" that AAI points to relates to how a court can find a Section 7 violation based on likely anticompetitive effects in one market, notwithstanding evidence of likely benefits in other markets. As explained above, however, the United States' concerns with this transaction were broad in nature. There is no "rule" precluding a settlement that reasonably resolves broad competitive issues even if it does not completely eliminate the possibility of harm in some markets. Indeed, the Department has made clear that it has prosecutorial discretion in considering out-of-market pro-competitive benefits, *see* U.S. DEPT. OF JUSTICE & FED. TRADE COMM'N., HORIZONTAL MERGER GUIDELINES 30 n.14 (2010), *available at* www.justice.gov/atr/public/guidelines/hmg-2010.html.

merger.  Rather, it requires the divestiture of significant assets at key airports to LCCs, a divestiture that will result in the expansion of LCC competition across the nation and the delivery of substantial consumer benefits.

These procompetitive benefits compare favorably with – and in some ways exceed – those afforded by preserving competition between US Airways and American. For example, the benefits of LCC entry and expansion enabled by the remedy will extend to a larger number of passengers and deliver a greater overall benefit to consumers as compared to the Advantage Fare program.  The Advantage Fare program is targeted at a narrow segment of passengers, namely, price-sensitive business passengers who purchase less than fourteen days prior to departure and are willing to take connecting instead of nonstop service.  As the Complaint noted, approximately 2.5 million roundtrip passengers purchased Advantage Fare tickets in 2012, representing about four percent of the approximately 62.5 million roundtrip passengers who traveled on the routes where Advantage Fares were offered that year.[49]

By comparison, we expect Southwest, JetBlue and Virgin America to offer over four million seats per year – enough capacity for two million roundtrip passengers – at Reagan National through their use of the divested slots (which, as discussed above, is over two million more seats than US Airways and American would likely have offered absent the remedy).  Similarly, we expect the acquirers of the LaGuardia slots to offer over 1.5 million seats per year – 750,000 roundtrips – through their use of the divested slots at that airport, and millions of additional passengers will benefit from the new LCC service resulting from the airport gate divestitures.  All of the passengers served by LCCs

---

[49]  Am. Compl. ¶ 58 & US DOT Origin & Destination Survey.

as a result of the divestitures will benefit from lower fares, not just the last-minute shoppers that were the primary focus of US Airways's Advantage Fare program. Benefits will also extend to passengers flying on legacy carriers on routes where the remedy injects new LCC competition because the legacy carriers will likely lower their prices in response to the new competition.[50]

Another source of harm alleged in the Complaint was the loss of head-to-head competition between US Airways and American on city-pair routes throughout the country. As set forth in the Complaint and Appendix A, American and US Airways provided competing service on seventeen nonstop routes and hundreds of connecting routes. Although the remedy will not replicate the competition lost in each of these routes, it will allow LCCs to launch more than seventeen new nonstop routes and enter and expand service on connecting routes across the country, almost all of which will be in competition with New American. Travelers flying on these routes will likely benefit from substantial savings because LCC competition typically has a much larger effect on fares than legacy competition.[51] While we do not know at this point the specific routes the LCCs will enter using the divestiture assets (and therefore cannot quantify likely effects), we can be confident that the head-to-head competition the LCCs will provide will substantially benefit millions of consumers nationwide.

Despite these benefits, some commenters challenge the adequacy of the proposed remedy because it does not eliminate the possibility of harm on every route, pointing in

---

[50] *See* Kerry M. Tan, *Incumbent Response to Entry by Low-Cost Carriers in the U.S. Airline Industry*, working paper (May 20, 2013), http://ssrn.com/abstract=2006471; *see also supra* n.13 (listing studies).

[51] As described above, LCC entry on a route – whether by nonstop or connecting service – can have as much as three times the benefit on fares as that of entry by legacy carriers. *See supra* n.13 and accompanying text.

particular to the fact that the United States cited high concentration levels in approximately 1,000 city pair markets in Appendix A of its Complaint. *See, e.g.*, AAI Cmts. at 4. It is well established, however, that courts "must accord deference to the government's predictions about the efficacy of its remedies, and may not require that the remedies perfectly match the alleged violation." *SBC Commc'ns*, 489 F. Supp. 2d at 17. As described above, the United States' primary concerns with this transaction were broad in nature and the proposed remedy reasonably addresses those broad competitive issues even if it does not seek to precisely match harm on a route-by-route basis. [52]

Such comments also ignore the fact that there has been no finding of liability in this case. Market concentration statistics are a "useful indicator" of the likely competitive effects of the transaction, Am. Cmpl. ¶ 37, and can be used to establish a presumption that a transaction is unlawful under Section 7 of the Clayton Act. However, even if the United States were successful in establishing this presumption, Defendants would have sought to rebut it by arguing that the cited market concentration statistics (high HHIs) are not indicative of competitive harm on all 1,000 routes, especially those

---

[52] Route-specific remedies are simply not feasible in this case nor would they be desirable. Unlike in some other industries, slot and other airport facilities necessary to serve air transportation markets are generally not dedicated to a specific market, but can be redeployed in different city-pair markets that originate or terminate at the same airport. For example, a slot that is currently used to serve Reagan National-Nashville could alternatively be used to serve Reagan National-Hartford. Thus, it is not possible to divest a route or a set of routes to a competing carrier. The government could, in theory, impose behavioral rules focused on protecting consumers in particular markets – *e.g.*, setting a cap on fares charged by New American, mandating that the merged carrier employ an "Advantage Fares" type pricing program, or requiring a buyer of divested gates to serve a particular route. But those types of behavioral remedies would be exceedingly difficult to craft, entail a high degree of risk of unintended consequences, entangle the government and the Court in market operations, and raise practical problems such as the need for ongoing government monitoring and enforcement. Even a full-stop injunction of the merger would not have guaranteed continued competition between the merging airlines on specific routes, nor would it have afforded the opportunity to obtain much of the relief that was made possible by the settlement.

that already enjoy some LCC service or where one of the merging parties had a relatively small share.  Def. AMR Corp.'s Answer (Docket No. 80) at 2-3.  In essence, the significance of these market concentration statistics would have been highly disputed at trial.  While the United States believes it would have prevailed on these issues at trial, the settlement avoids the risk and uncertainty of further litigation for all involved – factors that are appropriate for this Court to consider when evaluating whether a proposed remedy is in the public interest.  *See SBC Commc'ns*, 489 F. Supp. 2d at 15 ("room must be made for the government to grant concessions in the negotiation process for settlements").

The proposed remedy secures substantial benefits for millions of American consumers and advances competition in ways that would not have been possible even if the United States had prevailed at trial.  *SBC Commc'ns*, 489 F. Supp. 2d at 23 ("Success at trial was surely not assured, so pursuit of that alternative may have resulted in no remedy at all.  While a trial may have created an even greater evidentiary record, that benefit may not outweigh the possible loss of the settlement remedies.").  Thus, giving deference to the government's assessment, the proposed settlement is well within "the reaches of the public interest."

## C. The Remedy Does Not Mandate Changes in Service Patterns at Reagan National

Several commenters expressed concerns that service patterns at Reagan National could change as a result of the slot divestitures.[53]  New American has announced its

---

[53] *See* Delta Cmts. at 6-7; Rockefeller *et al*. Cmts. at 1; WCAA Cmts. at 2.

intention to drop service from Reagan National to certain destinations,[54] and the purchasers of the slots have not yet announced all of the new routes they intend to fly. Slots are generally not designated for use in specific markets, and thus the acquirers may make different choices about where to fly than US Airways and American have made in the past.  The United States was aware of the potential impact on existing service when crafting the remedy and took steps to ensure that the divestitures would not preclude New American from using its approximately 500 remaining slots to continue to serve any market it currently serves.  While there may be some changes in service at Reagan National in the immediate aftermath of the divestitures, on balance, the competitive landscape at the airport will be greatly improved as LCCs acquire the resources they need to compete effectively across a broad range of routes.[55]  As discussed above, the effect of the divestitures will be a significant net increase in the number of seats operated at Reagan National.

### 1. Background on Slot Regulation at Reagan National

In order to appreciate the competitive implications of the Reagan National slots divestitures, it is important to understand the federal regulation at the airport.  Demand for access to Reagan National has exceeded its capacity since before the airline industry was deregulated.  The FAA promulgated the first set of slot rules in 1969 in order to manage the problem.  The rule, known as the High Density Rule ("HDR") limited the

---

[54]  Press Release, American Airlines, American Airlines to Implement Network Changes as a Result of DOJ-Mandated Slot Divestitures (Jan. 15, 2014), *available at* http://hub.aa.com/en/nr/pressrelease/american-airlines-to-implement-network-changes-as-a-result-of-doj-mandated-slot-divestitures.

[55]  The fact that a nonstop flight from Reagan National to a particular city may be discontinued does not mean that passengers from that city are unable to fly to Washington.  As New American stated in its press release announcing the nonstop routes it had decided to cut, "[c]ustomers in these communities will still have access to DCA, which remains a key hub for American, through connecting flights from one or more of the airline's other eight hubs." *Id.*

number of landing and take-off slots available at Reagan National and other congested airports.[56] Since 1969, the FAA and Congress have periodically revised the number of takeoffs and landings permitted at the airports and made various changes to the slot rules. Reagan National is also subject to a federally-imposed 1,250-mile "perimeter rule" limiting the distance of nonstop flights to and from the airport.

Many airlines consider flights to this airport to be a valuable part of the service they offer to travelers. Yet, for decades, carriers wishing to enter or expand at Reagan National have had problems obtaining slots. After the FAA's initial allocation, a carrier wishing to begin or expand service at Reagan National could theoretically buy or lease slots from an airline that already owned them, but slots have been offered for sale or trade infrequently. In April 2000, Congress enacted the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century ("AIR-21") which directed DOT to grant a limited number of "exemptions" to the Reagan National slots rules in an attempt to address these access problems, among other goals.[57] The Act created a limited number of exemptions

---

[56] High Density Traffic Airports, 14 C.F.R. § 93.121-133. Under the HDR, the FAA allocated slots to airlines based on their existing operating schedules at the airports. Subject to the FAA's "use or lose" regulations and other conditions, the carriers were essentially granted access to the slots in perpetuity, and had permission to buy, sell, and trade them. The rules divided slots into two categories: "air carrier" slots useable by any type of aircraft, and "commuter" slots that are restricted to smaller aircraft. The airports governed by the rule at the time were LaGuardia, John F. Kennedy International, Newark Liberty International, O'Hare and Reagan National. Although LaGuardia, JFK, and Newark are still subject to slot controls, Reagan National is the only airport governed by the HDR today.

[57] Wendell H. Ford Aviation Investment and Reform Act for the 21st Century, 49 U.S.C. § 41718, Pub. L. No. 106-181, 114 Stat. 61, 112-115 (2000). Through AIR-21, Congress established criteria for DOT to use when granting "within-perimeter" exemptions that reflect a balance of competition and other goals: "[T]he Secretary shall develop criteria for distributing slot exemptions for flights within the perimeter to such airports under this paragraph in a manner that promotes air transportation: (1) by new entrant air carriers and limited incumbent air carriers; (2) to communities without existing nonstop air transportation to Ronald Reagan Washington National Airport; (3) to small communities; (4) that will provide competitive nonstop air transportation on a monopoly nonstop route to Ronald Reagan Washington National Airport;

for flights beyond the 1,250-mile perimeter limit and for destinations within the perimeter.[58]  Unlike slots, exemptions are granted to airlines for service on a particular route, and the grantee airline generally cannot transfer an exemption to another airline.[59]  Although exemptions have provided modest improvements to the access problems that smaller carriers face at the airport, the scarcity of slots is still a substantial barrier to entry.

A major slots transaction substantially changed the distribution of slot holdings at Reagan National in 2011.  Pursuant to the "US Airways-Delta Slots Swap," Delta traded 84 slots (almost half of its Reagan National slot holdings at the time) to US Airways in exchange for slots at LaGuardia.  DOT approved the transaction subject to, among other remedies, the parties divesting 16 Reagan National slots to carriers who held less than 5 percent of the slots at the airport, a group that consisted exclusively of LCCs.[60]  Delta divested 16 of its remaining slots to satisfy DOT's requirement.

Despite the efforts of Congress and DOT to ease access to Reagan National, over 90 percent of the authorizations to take-off and land at the airport remained in the hands of legacy carriers prior to this merger remedy.[61]  The Reagan National slot divestitures

---

or (5) that will produce the maximum competitive benefits, including low fares."  49 U.S.C. § 41718(b).

[58]  Many of the "outside perimeter" exemptions were granted to legacy carriers.

[59]  49 U.S.C. § 41714(j).  Two subsequent federal statutes, enacted in 2003 and 2012, expanded the number of exemptions at DCA. Vision 100-Century of Aviation Reauthorization Act (Vision 100), Pub. L. No. 108-176 § 425, 117 Stat. 2490, 2555 (2003) and the FAA Modernization and Reform Act of 2012, Pub. L. No. 112-95 § 414, 126 Stat. 11, 90 (2012).

[60]  Petition for Waiver of the Terms of the Order Limiting Scheduled Operations at LaGuardia Airport, 76 Fed. Reg. 63,702, 63,703 (October 13, 2011).  The transaction required DOT review because the rules governing LaGuardia prohibit permanent transfers of slots without a waiver from DOT.

[61]  A total of 808 daily slots and 64 daily exemptions have been allocated to commercial airlines.  New American would have held 69 percent of the slots post-merger, but as a result of the remedy,

pursuant to the proposed Final Judgment resulted in the transfer of an unprecedented 12 percent of the slots at the airport from legacy carriers to low-cost carriers.  As the LCCs begin to provide service using the newly-acquired slots, the competitive landscape at Reagan National will change significantly and benefit consumers in Washington, D.C. and across the nation.

### 2. Nothing in the Remedy Requires New American to Discontinue Service to Particular Airports

Three commenters suggest that the proposed settlement will negatively impact third parties.  Members of Congress and Delta, on the one hand, assert that service from Reagan National to certain small communities currently served by US Airways will be eliminated as a result of the divestitures.[62]  The operator of the Detroit Airport, on the other hand, asserts that the large city of Detroit will lose a competitor on the Reagan National-Detroit route, partly as a result of measures that were taken to protect small communities.  The United States recognizes that the Court should consider the impact of the settlement on third parties.  *Microsoft*, 56 F.3d at 1462 ("And, certainly, if third parties contend that they would be positively injured by the decree, a district judge might well hesitate before assuming that the decree is appropriate.").  Here, however, the settlement itself does not mandate that New American eliminate service on any particular

---

its share will drop to 57 percent, which is comparable to US Airways' pre-merger holdings.  Delta holds 13 percent, and United holds 9 percent.  Post-divestitures, Southwest will hold 9 percent, JetBlue will hold 7 percent, and Virgin America will hold 1 percent.  Other carriers at the airport include Air Canada, Alaska Airlines, Frontier Airlines, and Sun Country Airlines, all with less than 2 percent.  (Shares are based on July 2013 FAA slot holdings and exemption data and do not reflect changes in slot holdings as the result of Republic's recent sale of Frontier, which may prompt the reallocation of a small number of slots.)

[62]  Notably, none of the small communities allegedly affected by the remedy filed comments, and several of them are located in states that separately settled with the defendants.

route, and in fact it ensures that New American will retain enormous flexibility to determine which routes it will serve with its remaining slots.

The proposed Final Judgment intentionally does not call for the divestiture of any of US Airways's or American's "commuter" slots (a total of about 150), which are particularly well-suited for service to small communities given that they are limited to smaller-sized aircraft. Instead, it calls only for divestiture of "air carrier" slots. This distinction was made to increase the likelihood that New American's service to small and medium communities would be maintained. Defendants' agreement with DOT, *see supra* n.11 and accompanying text, also is designed to preserve service to small communities by requiring New American to use its commuter slots at Reagan National to serve medium and small airports.[63]

Moreover, New American will remain the largest holder of slots at Reagan National, with over 50 percent of the total number at the airport. Other than the commitments it has made to DOT with respect to commuter slots, it will maintain complete flexibility to deploy its slots in any way it sees fit.[64] It will not be obligated to eliminate service on any route. US Airways and Delta made this very point when

---

[63] Even in cases where third parties have property or contract rights in the particular assets being divested, courts have approved settlements where the decree contains "provisions designed to protect against undue harm." *See United States v. Pearson plc*, 55 F. Supp. 2d 43, 46-47 (D.D.C. 1999) (finding decree requiring divestiture of certain textbook lines to be in public interest notwithstanding claim by impacted author that his forthcoming book would be negatively affected by divestiture). Although the communities served from Reagan National do not have a property or contract right to the slots that airlines use to provide such service, the government has nevertheless structured the relief to guard against potential undue disruptions to small communities.

[64] It also seems likely that New American has sufficient capacity to complete the divestitures and maintain service to most, if not all, of the cities it currently serves simply by using its slots more efficiently, *e.g.*, by using larger aircraft and reducing frequency on some of its routes. US Airways, in particular, has a history of flying high-frequency, low-load factor, and often low-capacity aircraft carrying a high percentage of connecting passengers on a number of its Reagan National routes.

responding to DOT's concerns in connection with the US Airways-Delta Slots Swap.

DOT was concerned that as Delta and US Airways gave up slots at Reagan National and

LaGuardia, respectively, they would eliminate service on particular routes where they

competed against each other.  US Airways and Delta explained:

> Here, . . . Delta and US Airways are selling only some of their DCA and LGA slots to each other and each will continue to be independent competitors and retain substantial slots at both airports. The slots each retains (and those each is selling) are not tied to any particular city-pair. How the carriers decide to schedule their remaining slots is completely within each carrier's unilateral discretion, and nothing in this transaction obligates Delta or US Airways to stop competing on any route.[65]

In short, New American would be making a business decision as to which routes

it serves.  An inherent feature of the airline industry, and independent of any changes in

slot holdings, is that airlines reassess how to deploy their assets and enter and exit routes

as they seek to take advantage of profit opportunities.  For example, in early 2013, US

Airways stopped providing nonstop service between Reagan National and Bentonville,

Arkansas (XNA), a market it had entered only five months earlier.  Going back in time,

US Airways exited a number of markets it formerly served from Reagan National – *e.g.*,

Cleveland (CLE), Houston (IAH), Chicago (ORD), and Atlanta (ATL) – despite not

having given up a single slot.[66]

---

[65]  Comments of Delta Air Lines, Inc. and US Airways, Inc. at 31, Federal Aviation Administration Notice of a Petition for Waiver of the Terms of the Order Limiting Scheduled Operations at LaGuardia Airport (2010) (Docket No. FAA-2010-0109), *available at* http://www.regulations.gov/#!documentDetail;D=FAA-2010-010.

[66]  US Airways exited Cleveland in November 2005, Houston in February 2006, O'Hare in July 2006, and Atlanta in October 2008.  Delta's route choices at Reagan National have been even more fluid.  It has eliminated service to cities such as Ft. Lauderdale (FLL), Birmingham (BHM), Milwaukee (MKE), Lansing (LAN), Melbourne (MLB), Baton Rouge (BTR), Raleigh/Durham (RDU), and Huntsville (HSV) – none of which was prompted by the loss of slots.  In March 2012, Delta even chose to return a pair of exemptions that it had been granted specifically for service on the Reagan National-Jackson, Mississippi (JAN) route, rather than continuing to fly the route.

It is not surprising that New American would make some changes to its service patterns as a result of the merger, and indeed it has announced that it will make some adjustments at Reagan National.  It recently announced that it would no longer operate "year-round, daily nonstop service to 17 destinations from DCA" including large cities such as San Diego, Minneapolis, and Detroit, and small communities such as Jacksonville (NC) and Fort Walton Beach.[67]  US Airways had added its Reagan National service to nearly all of these cities within the last two years.  But none of these cities were guaranteed nonstop US Airways service in perpetuity.  As time progressed, US Airways may well have chosen to shift out of additional markets independently of the merger.[68]

### 3.   Mandating Service on Any Particular Route Is Unwarranted

Wayne County Airport Authority ("WCAA") expressed its concern that, following the divestitures, New American will eliminate service on the Reagan National-Detroit route, leaving Delta as the only carrier on the route.  WCAA asserted that it is unlikely that any other carrier will replace that lost competition, and that the settlement

---

[67]  *American Airlines to Implement Network Changes as a Result of DOJ-mandated Slot Divestitures*, PR Newswire, Jan. 15, 2014, *available at* http://hub.aa.com/en/nr/pressrelease/american-airlines-to-implement-network-changes-as-a-result-of-doj-mandated-slot-divestitures.  The complete list includes Augusta, GA (AGS); Detroit, MI (DTW); Fayetteville, NC (FAY); Fort Walton Beach, FL (VPS); Islip, NY (ISP); Jacksonville, NC (OAJ); Little Rock , AR (LIT); Minneapolis, MN (MSP); Montreal, Canada (YUL); Myrtle Beach, SC (MYR); Nassau, Bahamas (NAS); Omaha, NE (OMA); Pensacola, FL (PNS); San Diego, CA (SAN); Savannah, GA (SAV); Tallahassee, FL (TLH); and Wilmington, NC (ILM).

[68]  And despite New American's claim that the changes were "a result of DOJ-mandated divestitures," some changes were clearly independent of the divestitures – *e.g.*, there is no possible connection between the settlement and New American's decision to exit Reagan National-San Diego, which was made possible through an "out of perimeter" slot exemption that New American will continue to hold and use for additional service to LAX.  The remedy did not require divestiture of any exemptions, such as those needed to provide service to LAX or San Diego.  New American chose on its own to stop serving San Diego in favor of increasing service to LAX.

should be revised to ensure that a second carrier commits to serving the market.[69]  As explained above, the settlement itself does not require New American to eliminate its existing service on any route, including Reagan National-Detroit.  Any modification that would restrict how airlines use their assets would be likely to inhibit, not promote, competition.  One of the benefits of the proposed remedy is that LCCs will, for the first time, have a meaningful ability to shift slots to serve different routes as market conditions change.  For example, if prices increase on the Reagan National-Detroit route following New American's exit, Southwest and JetBlue will now have sufficient slot resources such that they could consider entering the market in the future, even if they decide not to serve that route as an initial matter.  Such flexibility would be lost if slot holders were locked in to serving particular routes.

### D.      Delta Is Not an Appropriate Divestiture Candidate

Delta, while first arguing that the government's theory of liability was flawed (*supra* § IV.A), asserts that it should be entitled to acquire a significant portion of the remedy assets, namely slots at Reagan National and the two gates at Dallas Love Field. Section IV.N. of the proposed Final Judgment requires that the assets be divested to an acquirer or acquirers who in the judgment and sole discretion of the United States "will remedy the competitive harm alleged in the Complaint."  In response to Delta's request to acquire assets, the United States considered all the facts and circumstances in determining whether Delta should be considered an appropriate divestiture candidate. The United States concluded that divesting assets to Delta would fail to address the harm

---

[69]  WCAA Cmts. at 5-7.  Some may argue that the United States should similarly preserve service to the other markets New American has announced it will exit.  Such a result, however, would raise the same significant concerns with mandating service discussed above, *see supra*, n.52.

arising from the merger and would be inconsistent with the goals that the remedy seeks to achieve.

In cases involving allegations of coordinated effects arising from a proposed merger, divestiture assets should not be acquired by firms that are part of the oligopoly. As the Antitrust Division's Policy Guide to Merger Remedies explains:

> If the concern is one of coordinated effects among a small set of post-merger competitors, divestiture to any firm in that set would itself raise competitive issues. In that situation, the Division likely would approve divestiture only to a firm outside that set. [FN: Indeed, if harmful coordination is a concern because the merger is removing a uniquely positioned maverick, the divestiture likely would have to be to a firm with maverick-like interests and incentives.][70]

The Complaint describes oligopoly behavior by the legacy carriers (including Delta), such as examples of legacy carriers "respecting" the nonstop prices of cooperating legacies but undercutting the nonstop fares of US Airways in response to its Advantage Fares program and tactics used to deter aggressive discounting and prevent fare wars.[71] Delta's Comments ignore these specific allegations of coordinated behavior.

The allegations of coordination among the legacy carriers fully justify the United States' discretionary decision to direct that the divestiture assets be sold to firms that are unlikely to follow industry consensus, in this case the LCCs. The goal of the divestiture remedy is to enhance the ability of the LCCs to frustrate coordination among the legacy carriers. Allowing Delta to acquire divestiture assets would undermine the effectiveness

---

[70] U.S. DEP'T OF JUSTICE, ANTITRUST DIV., ANTITRUST DIVISION POLICY GUIDE TO MERGER REMEDIES 28 (2011) [hereinafter *Remedies Guide*]; *see also id.* at 31 ("However, this concern is adequately and more directly addressed by applying the fundamental test that the proposed purchaser must not itself raise competitive concerns."). The same concepts appeared in the Antitrust Division's 2004 Policy Guide to Merger Remedies. *See generally* PHILLIP E. AREEDA AND HERBERT HOVENKAMP, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶ 990d (3rd ed. 2011 and Supp. 2013) (discussing *Remedies Guide*).

[71] Am. Compl. ¶¶ 48-54 (describing legacy carriers' response to the Advantage Fares program) & ¶ 43 (describing "cross-market initiatives" between Delta and US Airways).

of the remedy to accomplish this goal and, given Delta's status as the second largest slot holder at Reagan National, would exacerbate the slot concentration issues at that airport.[72]

      Delta further claims that an LCC-only divestiture of slots would be "harmful to competition" as Delta would be more likely than LCCs to serve small- and medium-sized communities, including those communities that New American is exiting.  Delta Cmts. at 24-30.  Delta's argument ignores the substantial benefits of LCC competition, especially with respect to entry at slot-constrained airports long dominated by legacy carriers (*see supra* § II.B.2.a).  It also ignores the fact that LCCs routinely serve small- and medium-sized communities; indeed, JetBlue has already announced schedules for half of the twelve roundtrip flights it will serve from Reagan National with its divested slots and five of these six new flights will be to small- or medium-sized communities, either to replace service that New American is exiting or in competition with New American.[73]  Southwest is likely to serve many more such cities when it announces its schedule at Reagan National.  Finally, Delta fails to note that *none* of the proposed markets it claims it would serve with the additional forty-four slots it requests (*i.e.*, over

---

[72]  *See Remedies Guide*, *supra* note 70, at 28 ("[I]f the concern is that the merger will enhance an already dominant firm's ability unilaterally to exercise market power, divestiture to another large competitor in the market is not likely to be acceptable, although divestiture to a fringe incumbent might.").

[73]  JetBlue will provide two flights a day to Charleston, SC (small community, competing against New American), two to Hartford, CT (medium community, competing against New American), and one to Nassau, Bahamas (small community, New American is exiting).  The other flight announced so far will be to Tampa, Florida.  JetBlue expects to announce the remaining six flights later this year.  Press Release, JetBlue, "JetBlue Adds Three Nonstop Destinations for Customers at Ronald Reagan Washington National Airport, Offers Introductory One-Way Fares as Low as $30" (Mar. 6, 2014), *available at* http://investor.jetblue.com/phoenix.zhtml?c=131045&p=irol-NewsArticle.

40% of the total number of Reagan National slots being divested) corresponds to routes New American is exiting.[74]

With respect to the divestiture of the Love Field gates, Delta argues that "no reasonable justification" exists to favor LCCs over Delta.[75]  Delta Cmts. at 30-34.  But the point of the Love Field divestiture is for an LCC to offer service at the airport that even Delta recognizes is "poised to become a highly attractive option for business travelers from across the nation who will be drawn by its proximity to the Dallas city center."  *Id.* at 31.  The acquirer of the gates will be able to offer a compelling product to sought-after business passengers who otherwise would favor New American's service out of its hub at DFW.  Obtaining access to Love Field will significantly enhance the acquirer's ability to meaningfully compete against New American, thereby furthering the overall goals of the remedy.  *See supra* § II.B.2.b.  In contrast, Delta, given its overall size and scope as well as its presence at DFW, can and does challenge New American for the business of corporate customers flying to and from the Dallas area.

Delta also asserts that it is the only airline that can offer business travelers at Love Field a network of domestic and international destinations, but Delta's network offerings are not unique at Love Field.  United Airlines, which has access to two gates at Love Field, offers a network of locations substantially similar to Delta's.  Delta also argues that only it offers a "premium product" that includes amenities such as a first-class cabin and

---

[74]  *Compare* Delta Cmts. at 29 (listing proposed routes to serve) *with supra* n.67 (listing cities American has announced it will discontinue service from Reagan National).

[75]  Historically, the Wright Amendment restricted service from Love Field to destinations in certain nearby states.  In 2006, Congress enacted the Wright Amendment Reform Act of 2006, under which the perimeter restrictions will be removed effective October 13, 2014.  However, that statute also ratified and effectuated an agreement among American, Southwest and Dallas-Ft. Worth area authorities that capped the number of gates at Love Field to twenty.  *See* The "Five Party Agreement," (July 11, 2006) reproduced in S. Rep. No. 109-317, at 4-15 (2006)).  Southwest leases 16 of the Love Field gates and American and United lease two each.

"Wi-Fi-enabled" aircraft, but it ignores the fact, as discussed above (*supra* § IV.B.1), that many LCCs offer, and were frequently pioneers in offering, products and amenities that appeal to business travelers.[76]

Finally, Delta's claim that it will be improperly evicted due to the divestiture is similarly unavailing.  Delta currently operates one gate under a sub-lease from American that is terminable on thirty-days' notice.  (Another airline, Seaport, sub-leases the other American gate.)  But for the remedy, New American was likely to terminate the subleases and operate the gates itself,[77] an outcome that Delta surely recognizes given the competitive value of the gates once the Wright Amendment restrictions expire in October of this year.  Delta, therefore, never had a contractual (or other) right or expectation that it would be able to remain at the American gate.  The divestiture does not change this fact.

In the end, the thrust of Delta's position is that its private interests in obtaining divestiture assets should trump the remedial goals of the proposed Final Judgment.[78]

---

[76] Delta also argues that it should obtain the Love Field gates to prevent Southwest, which currently operates 16 of the 20 gates at Love Field, from becoming even more dominant at the airport.  As discussed in the CIS, providing a LCC with the opportunity to differentiate itself from the large hub carrier in Dallas should increase its competitive vigor and ability to grow.  CIS at 9-10.  Delta incorrectly assumes that restricting eligible bidders for the American gate interests would result in acquisition by Southwest.  At least one other LCC has expressed significant interest.  Press Release, Virgin America, "Virgin America Plans Dallas Expansion: Airline wants to bring more business-friendly, low-fare flight competition to Dallas with new flights from Love Field," *available at* http://www.virginamerica.com/press-release/2014/virgin-america-plans-dallas-expansion.html.  The United States will take all competitive factors into account when determining which acquirer to approve.

[77] *See* Terry Maxon, *The New American Airlines would have liked to have used the Dallas Love Field gates*, THE DALLAS MORNING NEWS AIRLINE BIZ BLOG (Jan. 28, 2014, 6:10 PM), http://aviationblog.dallasnews.com/2014/01/the-new-american-airlines-would-have-liked-to-have-used-the-dallas-love-field-gates.html/?nclick_check=1.

[78] It is in Delta's interests to restrain the growth of LCCs, as the more LCCs grow, the more likely it is that they will expand offerings that compete with Delta.  For example, as LCCs obtain more slots at Reagan National, the more likely it will be that they will initiate service on the

Yet, no third party has a right to demand that the Government exercise its discretion in approving divestiture buyers to better serve the private interests of that third party. While a court may inquire into the impact of the settlement on third parties, it "should not reject an otherwise adequate remedy simply because a third party claims it could be better treated." *Microsoft*, 56 F.3d at 1461 n.9.

### E.    Additional Concerns Raised by Commenters

#### 1.    Airline Consumer Disclosure and Alliance Issues Are Outside the Scope of This Action

The Consumer Travel Alliance ("CTA") recognizes that the PFJ contains "some good first steps" to prevent harm from the merger, but argues that the competitiveness of the airline industry is undermined by the failure of the Department of Transportation to take action in several areas: "while DOJ is attempting to address the loss of airline competition through settlement regarding this merger, the DOT diminishes competition by not requiring truthful disclosure of airfares and ancillary fees, deception created by code-sharing and the de facto mergers spawned by DOT's liberal allowance of antitrust immunity." CTA Cmts. at 2. It urges that the Department of Justice advocate to DOT that it take action in these areas to increase disclosure requirements and reduce the breadth of airline alliances. Similarly, Mr. Bellemare's Comments appear to suggest that the Court should enjoin the proposed merger so that the United States could seek the

---

highly-profitable "hub routes" that Delta currently serves (such as Reagan National to Minneapolis or Detroit). Such a result could significantly reduce fares and profits, as occurred when JetBlue was able to compete against USAirways on its Reagan National-Boston route, *see* Am. Compl. ¶ 88. The fewer slots that are available to low-cost competitors, the less likely it will be that a LCC will have sufficient slots to challenge Delta in any of its lucrative Reagan National routes. The same concept applies at Love Field, where the divestiture may allow an LCC to offer highly competitive service to business passengers that otherwise may have chosen Delta's service from DFW.

repeal of the "regulatory barrier" to entry posed by slot restrictions at Reagan National and other airports.  Bellemare Cmts. at 16.

As CTA appears to recognize, the problems it describes and the remedies it proposes exist independently from this transaction, and are outside the scope of the Tunney Act proceedings in this action.  The same is true of the entry constraints posed by the need to allocate the limited resource of runway and airspace capacity at Reagan National and the New York airports.  With respect to the latter issue, the proposed Final Judgment explicitly addresses the transaction's impact on slot holdings and entry at slot-controlled airports.  We note, moreover, that the Department of Justice does regularly consult with DOT on a formal and informal basis to preserve and advance airline competition.

### 2. The Proposed Final Judgment Precludes New American from Reacquiring the Divested Gates at LAX; No Modification of the Decree Is Necessary

Allegiant, an LCC, submitted a comment on the divestiture of gates at Los Angeles International Airport ("LAX").  Allegiant believes that New American intends to attempt to gain access to the gates identified in the proposed Final Judgment (31A and 31B) under the airport's common use procedures,[79] and that this would result in the gates not being available for use by LCCs as intended by the proposed Final Judgment.[80] Allegiant requests that the Final Judgment be modified to make clear that the prohibition

---

[79] Airport gates leased to a particular carrier on a preferential use basis allow the leasing carrier to use the gate subject to the airport authority's ability to provide access to another airline if the gate is not being used by the lessor.  The airport authority often controls some "common use" gates and allocates them to carriers on a per-use basis.

[80] Allegiant's concern about this issue, which other LCCs have also raised with the Department of Justice, demonstrates that there is unmet demand for gates at LAX and that Delta's claim to the contrary, Delta Cmts. at 31 n.50, is false.

on re-acquisition of divested assets (Section XII) applies to use of gates on a common use basis.  Allegiant further submits that the United States should work with the relevant airport authority, Los Angeles World Airports ("LAWA"), to ensure that the gates be available to LCCs.

As Allegiant correctly states, the purpose of the requirement that Defendants divest two gates at LAX and the four other key airports is to provide access to LCCs in order to allow them to expand their networks.  The intent of the decree is that there be two gates available for LCC use beyond what would have existed but for the divestiture.  The gate divestiture can be accomplished either by Defendants sub-leasing the gates to one or more LCCs on the same terms as Defendants lease the gates or by Defendants turning the gates back to the airport "to enable the Acquirer to lease them from the airport operator."  Section IV.H.  The decree also prohibits Defendants from re-acquiring "any interest" in the divested assets.  Section XII.

The divestiture process with respect to the key airport gates – including those at LAX – has not yet begun.[81]  Nevertheless, the United States has been in communication with LAWA concerning the issues raised by the terms of the proposed Final Judgment.[82]  The United States believes that the existing language in the proposed Final Judgment prohibiting Defendants from taking any action to impede the divestiture or re-acquiring "any interest" in the divested assets is sufficient to prevent New American from using the

---

[81]  Prior to the settlement agreement between the United States and Defendants, US Airways was in the process of moving to Terminal 3 at LAX where the two gates subject to the decree are located.  It was originally intended that US Airways would occupy the gates under a preferential use lease, but due to the settlement that lease has not been executed and the two gates subject to the divestiture are common use gates controlled by the airport.

[82]  Until the divestiture process is completed, the two gates may be used by New American or any other carrier granted access under the airport's common use rules.

airport's procedures to block LCC access to the two gates.  Accordingly, it is not necessary to modify the proposed Final Judgment.

### 3.   The CIS Fully Complies with Tunney Act Requirements

Relpromax argues that the Competitive Impact Statement ("CIS") is deficient and requests that the Court require the United States to rewrite the CIS and resubmit it for public comment.  Relpromax faults the CIS for failing "to provide substantive economic analysis."  Relpromax Cmts. at 13.  Although couched in terms of an alleged failure by the United States to comply with the Tunney Act, Relpromax's objections are in fact largely an objection to the proposed Final Judgment itself.  The CIS fully complies with the Tunney Act requirements.

Congress enacted the Tunney Act, among other reasons, "to encourage additional comment and response by providing more adequate notice [concerning a proposed consent judgment] to the public."  S. Rep. No. 93-298 at 5 (1973); H.R. Rep. No. 93-1463 at 7 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6535, 6538.  The CIS is the primary means by which Congress sought to provide more adequate notice to the public.  The Tunney Act requires that the CIS "recite":

> (1)   the nature and purpose of the proceeding;

> (2)   a description of the practices or events giving rise to the alleged violations of the antitrust laws;

> (3)   an explanation of the proposal for a consent judgment, including an explanation of any unusual circumstances giving rise to such proposal or any provision contained therein, relief to be obtained thereby, and the anticipated effects on competition of such relief;

> (4)   the remedies available to potential private plaintiffs damaged by the alleged violation in the event that such proposal for a consent judgment is entered in such proceeding;

(5)     a description of the procedures available for modification of such proposal; and

(6)     a description and evaluation of alternatives to such proposal actually considered by the United States.

15 U.S.C. § 16(b).

There is no dispute that the CIS satisfies the requirements of the Tunney Act with respect to items 1, 2, 4 and 5 listed above.  Relpromax asserts that the CIS fails to adequately address item 3 (explanation of the proposed judgment) because it lacks sufficient economic analysis.[83]  Relpromax provides its own economic analysis, arguing that it shows that the proposed decree is inadequate.[84]  Relpromax's comments about the adequacy of the CIS are thus in fact complaints about the substance of the proposed Final Judgment.  It is clear from the detailed substantive comments filed here (including those of Relpromax) that the CIS contains sufficient explanation to allow the public to understand the provisions of the decree and submit meaningful comments.

Relpromax also complains that the CIS does not meet the Tunney Act requirements because the description of alternatives to the decree considered by the United States (item 6 above) discusses only continuing to litigate the case through trial.

---

[83]  Relpromax seems to suggest that a CIS should include a level of analysis similar to that contained in a Regulatory Impact Analysis ("RIA") required by Executive Orders 13563 and 12866 when a federal regulatory agency is considering a significant rule.  Relpromax Cmts. at 15.  RIAs must contain detailed cost-benefit analyses as well as a discussion of a number of specified possible alternatives to a proposed regulation.  *See* OFFICE OF MGMT. & BUDGET, EXEC. OFFICE OF THE PRESIDENT, OMB CIRCULAR A-4, REGULATORY ANALYSIS (2003).  This is far beyond what is required in a CIS.

[84]  Relpromax purports to quantify harm from the merger and benefits from the proposed remedy.  Relpromax Cmts. at 2-9.  However, most of its estimates consists merely of "round number figures" for harms the author was "unable to calculate."  *Id.* at 4.  Moreover, Relpromax's methodology grossly understates the likely benefits of the proposed remedy.  In particular, it assumes that any LCC entry and expansion that results from improved access to congested airports will merely serve to partially offset price increases resulting from lost competition between the merging parties.  On the contrary, in markets where the proposed remedy facilitates LCC entry and expansion, consumers are likely to enjoy substantial net benefits.

48

Relpromax argues that because the statute refers to "alternatives" in the plural the United States is required to describe multiple alternatives.  Relpromax Cmts. at 10-11.  The statute only requires that the CIS describe alternatives the United States "actually considered."  15 U.S.C. § 16(b).  In this case the United States did not consider alternatives other than continuing the litigation, and therefore the CIS meets the requirements of the Tunney Act.

### 4.   The Remedy Is Not the Result of Political Pressure

Certain commenters argue that that the settlement is not in the public interest because – according to them – the settlement resulted from lobbying by the airlines and political pressure directed toward the United States.  Messina/Alioto Cmts. at 1; FlyerRights.org Cmts. at 1.  Any allegations that the settlement is the result of improper lobbying or political pressure are both unsubstantiated and meritless.  The settlement resulted from good faith negotiations between the Antitrust Division and Plaintiff States, on the one hand, and Defendants, on the other.  It reflects substantial relief that addresses the competitive harm alleged in the Complaint.  In short, there is no basis to allege that the settlement results from any impropriety.[85]

The commenters' mere speculation of bad faith or malfeasance is insufficient to justify rejection of a proposed consent decree.  *See United States v. Associated Milk Producers*, 394 F. Supp. 29, 39-40 (W.D. Mo. 1975), *aff'd*, 534 F.2d 113 (8th Cir. 1976) (finding that lobbying activities by the defendant – even ones that are "intensive and

---

[85]   The Messina/Alioto comments also wrongly suggest that the representatives of consumers, unlike the airlines, did not have access to federal officials.  Messina/Alioto Cmts. at 1-2.  In fact, as some of the other commenters can attest, the Department of Justice had meetings and conversations with affected parties throughout the entire investigation and litigation process.  The United States took the views of consumers into account when crafting the proposed relief.  The United States was not, of course, at liberty to share the details of sensitive settlement negotiations with third parties.

gross" – were insufficient to reject proposed decree or require further evidentiary hearing).  Moreover, one commenter's request for a "full disclosure of the papers leading up to the settlement," FlyerRights.org Cmts. at 1, should be rejected as the commenter offers no reason to doubt the sufficiency of Defendants' compliance with the Tunney Act's disclosure requirements, 15 U.S.C. § 16(g), and no basis to otherwise justify a fishing expedition.  *See Associated Milk Producers*, 394 F. Supp. at 38-40.

### 5. Closing of the Merger Prior to Entry of the Final Judgment Is Consistent with Tunney Act Requirements

Two commenters suggest that allowing Defendants to consummate the merger prior to entry of the Final Judgment was inconsistent with the Tunney Act and not appropriate.  AAI Cmts. at 1 n.1; Relpromax Cmts. at 12-13.  It is common practice to close a transaction prior to completion of the Tunney Act process.  Nothing in the Tunney Act prevents the parties from closing and courts have long acknowledged and accepted this practice.  *See, e.g., United States v. InBev N.V./S.A.,* 2009-2 Trade Cas. (CCH) ¶ 76,736 at 8 (D.D.C. 2009) ("consistent with asserted Department of Justice policy . . . the merger was allowed to close . . . while approval of the proposed Final Judgment [was] pending"); *United States v. SBC Commc'ns, Inc.,*  489 F. Supp. 2d 1, 8 (D.D.C. 2007) (noting that the transaction closed over a year prior to entry of the Final Judgment "in keeping with [DOJ's] standard practice that neither stipulations nor pending proposed final judgments prohibit the closing of the mergers"); *United States v. Pearson plc,*  55 F. Supp. 2d 43, 44-45 (D.D.C. 1999) (observing that the transaction was consummated and divestitures completed prior to the public interest determination under the Tunney Act).[86]

---

[86]  The Bankruptcy Court hearing the AMR case specifically rejected as "based on a faulty assumption" the private plaintiff's argument that the Tunney Act bars consummation of a merger pending entry of a proposed Final Judgment.  Memorandum of Decision and Order at 22-23, *In re*

Of course, the United States retains the right to withdraw its consent to the decree or the settlement could be rejected by the Court.  Defendants, by choosing to close prior to entry of the Final Judgment, have accepted the risk of undoing the merger should it be necessary.

## CONCLUSION

After reviewing the public comments, the United States continues to believe that the proposed Final Judgment, as drafted, provides an effective and appropriate remedy for the antitrust violation alleged in the Complaint and is therefore in the public interest. Upon publication of this Response to Comments in the *Federal Register*, the United States will file a certification that all of the requirements of the APPA have been satisfied, and will file a motion with this Court to enter the proposed Final Judgment. The United States submits that a hearing is not necessary.

Dated: March 10, 2014

Respectfully submitted,

/s/ *Michael D. Billiel*
Michael D. Billiel (D.C. Bar No. 394377)
U.S. Department of Justice
Antitrust Division
450 Fifth Street, NW, Suite 8000
Washington, DC 20530
Telephone: (202) 307-6666
Facsimile: (202) 307-5802
Email: michael.billiel@usdoj.gov

---

*AMR Corp.* & *Fjord v. AMR Corp.*, (Bankr. S.D.N.Y. Nov. 27, 2013) (11-15463 & Adv. Pr. No. 13-01392), *available at* http://www.amrcaseinfo.com/pdflib/72_01392.pdf.  The Bankruptcy Court denied plaintiff's request to enjoin the closing of the merger.  *Id.*