# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA, *et al.*

    Plaintiffs,

    v.

US AIRWAYS GROUP, INC., *et al.*

    Defendants.

**Civil Action No. 13-cv-1236 (CKK)**

## MEMORANDUM OPINION
(April 25, 2014)

Presently before the Court is the United States' [161] Motion for Entry of the Proposed Final Judgment. Upon consideration of the pleadings[1], the relevant legal authorities, and the record as a whole, the Court GRANTS the United States' Motion for Entry of the Proposed Final Judgment.

## I. BACKGROUND

At the time of the filing of the Complaint in this litigation, Defendant US Airways was a Delaware corporation headquartered in Tempe, Arizona. CIS at 3. In the year 2012, it flew over fifty million passengers to approximately 200 locations worldwide, taking in more than $13 billion in revenue. *Id.* American Airlines was a Delaware corporation headquartered in Fort

---

[1] Am. Compl., ECF No. [73]; Competitive Impact Statement, ECF No. [148] ("CIS"); Response of Pl. United States to Public Comments on the Proposed Final Judgment, ECF No. [159] ("Gov't Resp."); Pl. United States of America's Mot. and Mem. for Entry of the Proposed Final Judgment, ECF No. [161] ("Gov't Mot."); Proposed Final Judgment, ECF No. [161-1] ("PFJ"); Brief of the Am. Antitrust Inst. as Amicus Curiae to Reply to the Response of Pl. United States to Public Comments on the Proposed Final Judgment, ECF No. [163-1] ("AAI Amicus Brief"); Brief of Amici Curiae, Carolyn Fjord, et al., in Opp'n to Pl.'s Mot. for Entry of Proposed Final Judgment and in Reply to Pl.'s Response to Public Comments on the Proposed Final Judgment, ECF No. [165], Ex. A ("Fjord Amicus Brief").

Worth, Texas. *Id.* Defendant AMR Corporation was the parent company of American Airlines. *Id.* In the year 2012, American flew over eighty million passengers to approximately 250 locations worldwide, taking in more than $24 billion in revenue. *Id.* US Airways and AMR Corporation agreed to merge on February 13, 2013. *Id.* at 4.

On August 13, 2013, the United States and the States of Arizona, Florida, Tennessee, and Texas, the Commonwealths of Pennsylvania and Virginia, and the District of Columbia filed a civil antitrust Complaint seeking to enjoin the proposed merger of Defendants.[2] *See* Complaint, ECF No. [1]. The initial Complaint, as well as the Amended Complaint[3] filed on September 5, 2013, alleged that the likely effect of this merger would be to lessen competition substantially for the sale of scheduled air passenger service in city pair markets throughout the United States, and in the market for takeoff and landing authorizations ("slots") at Ronald Reagan Washington National Airport ("Reagan National") in violation of Section 7 of the Clayton Act as amended, 15 U.S.C. § 18. *See* Am. Compl. ¶ 96. The Court subsequently set a trial date of November 25, 2013. *See* Order, ECF No. [56].

On November 12, 2013, the parties reached a settlement, and the United States filed a proposed Final Judgment designed to remedy the harm to competition that was likely to result from the proposed merger. The proposed Final Judgment requires the divestiture of slots, gates, and ground facilities at seven airports around the country. CIS at 2-3. Specifically, the

---

[2] Michigan joined the Plaintiffs on September 5, 2013, and Texas withdrew from the lawsuit on October 1, 2013, after reaching a settlement with Defendants. *See* Am. Compl; Pl. State of Texas's Mot. to Voluntarily Dismiss its Claims With Prejudice, ECF No. [95]. Accordingly, as used in this opinion, "Plaintiff States" refers to Arizona, Florida, Michigan, Tennessee, Pennsylvania, Virginia, and the District of Columbia.

[3] Given that the Amended Complaint is the operative complaint in this action, unless otherwise specified, the term "Complaint" in this opinion refers to the Amended Complaint filed on September 5, 2013.

Defendants are required to divest or transfer to purchasers approved by the United States, in consultation with the Plaintiff States:

- 104 air carrier slots[4] at Reagan National (i.e., all of American's pre-merger air carrier slots) and rights and interests in any associated gates or other ground facilities, up to the extent such gates and ground facilities were used by Defendants to support the use of the divested slots;

- 34 slots at New York LaGuardia International Airport ("LaGuardia") and rights and interests in any associated gates or other ground facilities, up to the extent such gates and ground facilities were used by Defendants to support the use of the divested slots; and

- Rights and interests to two airport gates and associated ground facilities at each of the following airports: Chicago O'Hare International Airport ("O'Hare"), Los Angeles International Airport ("LAX"), Boston Logan International Airport ("Boston Logan"), Miami International Airport ("Miami International"), and Dallas Love Field.

*Id.* at 2-3. The United States argues that this remedy permits the entry or expansion of airlines that can provide meaningful competition in numerous markets, eliminates the significant increase in concentration of slots at Reagan National that otherwise would have occurred, and enhances the ability of low-cost carriers to compete with legacy carriers on a system-wide basis. The subject slots and facilities have been or are in the process of being divested to several airlines, specifically Southwest Airlines, JetBlue Airways, and Virgin America. Gov't Resp. at 7.

---

[4] Both Reagan National and LaGuardia are subject to slot limitations governed by the FAA, which limit the number of take-offs and landings at each of these airports. CIS at 7. Slots at Reagan National are designated as either "air carrier," which may be operated with any size aircraft that meets the operational requirements of the airport, or "commuter" which must be operated using aircraft with seventy-six seats or fewer. *Id.* at 2 n. 2.

In addition to the relief provided by the proposed Final Judgment, Defendants reached an agreement with the Plaintiff States to maintain service from at least one of the merged airline's hubs to specified airports in the Plaintiff States for a period of five years. Supplemental Stipulated Order, ECF No. [151] at 4-6. Defendants also reached an agreement with the United States Department of Transportation to use all of the merged airline's commuter slots (as opposed to air carrier slots) at Reagan National to serve airports designated as medium, small and non-hub airports (i.e. airports accounting for less than one percent of annual passenger boardings) for a period of at least five years. *See* Gov't Resp. at 8 & n. 11.

Pursuant to the requirements of the Antitrust Procedures and Penalties Act ("APPA" or "Tunney Act"), 15 U.S.C. § 16(b)-(h), the United States published the proposed Final Judgment and the accompanying Competitive Impact Statement ("CIS") in the Federal Register on November 27, 2013. *See* 78 Fed. Reg. 71377. The United States also had summaries of the terms of the proposed Final Judgment and CIS, together with directions for submission of written comments relating to the proposed Final Judgment, published in the *Washington Post*, *Dallas Morning News*, and *Arizona Republic* for seven days, beginning on November 25, 2014, and ending on December 9, 2013. Gov't Resp. at 4. The sixty-day period for public comment on the proposed Final Judgment ended on February 7, 2014. *Id.* The United States received a total of fourteen comments by the deadline. *Id.* The United States received an additional fifteen e-mails from individuals expressing concerns about competition that were sent through means other than those designated for submitting comments under the Tunney Act. *Id.* at 2 n. 1. On March 10, 2014, the United States filed with the Court its [159] Response to Public Comments on the Proposed Final Judgment along with the public comments and e-mails that it received. This filing responds to both the comments and the e-mails the United States received. Pursuant to 15

U.S.C. § 16(d), and with the Court's authorization, *see* Order, ECF No. [154] at 2-3, the United States posted the comments and its Response to Comments on the Antitrust Division's website. *See* U.S. Department of Justice: Antitrust Division, *U.S. and Plaintiff States v. US Airways Group, Inc. and AMR Corporation*, http://www.justice.gov/atr/cases/usairways/index.html (last visited Apr. 25, 2014). On March 13, 2014, the United States published in the *Federal Register* its Response to Public Comments on the Proposed Final Judgment and the location on the Antitrust Division's website at which the comments are accessible. *See* 79 Fed. Reg. 14279.

Because Defendant AMR Corporation was in bankruptcy at the time of the settlement, the parties' agreement also required approval by the bankruptcy court. Gov't Resp. at 3. On November 27, 2013, the United States Bankruptcy Court for the Southern District of New York entered an order finding that the settlement satisfied the requirements for approval under the Bankruptcy Code, granted AMR's motion to consummate the merger, and denied a request for a temporary restraining order filed by a private plaintiff seeking to enjoin the merger on antitrust grounds. *See* Order Pursuant to Bankruptcy Rule 9019(a) Approving Settlement Between Debtors, US Airways, Inc. and United States Department of Justice, *In re AMR Corp.*, No. 11-15463 (Bankr. S.D.N.Y. Nov. 27, 2013), ECF No. 11321. AMR exited bankruptcy protection, and the merger closed on December 9, 2013. Gov't Resp. at 3. The Bankruptcy Court has retained jurisdiction to hear the private case. *Fjord v. AMR Corp.*, (*In re AMR Corp.*) Adv. Pr. No. 13-01392 (Bankr. S.D.N.Y. filed Aug. 6, 2013).

On March 13, 2014, the United States filed with this Court the present Motion for Entry of the Proposed Final Judgment. Alongside this motion, the United States filed a [161-2] Certificate of Compliance which states that all of the requirements of the APPA have been satisfied. After receiving this motion along with the accompanying certification, the Court left

5

the record in this case open for an additional twenty-one days until 5:00 PM on April 3, 2014, in order to allow filings by parties seeking to lodge additional comments prior to the Court's decision on the proposed Final Judgment. *See* Order, ECF No. [162] at 2.

On April 1, 2014, the American Antitrust Institute ("AAI") sought leave to file an amicus brief in reply to the United States' response to the public comments on the proposed Final Judgment. *See* Unopp. Mot. of the Am. Antitrust Inst. for Leave to File Brief as Amicus Curiae to Reply to the Response of Pl. United States to Public Comments on the Proposed Final Judgment, ECF No. [163] ("AAI Mot."). On April 4, 2014, a group of consumers and travel professionals (the "Fjord amici") also sought leave to participate as amici, attaching a proposed brief replying to the United States' response to public comments. *See* Unopp. Mot. for Leave to File Brief Amici Curiae by Carolyn Fjord, et al., and in Opp. to Pl.'s Mot. for Entry of Final Judgment and for a Hearing on the Proposed Final Judgment, ECF No. [165] ("Fjord Mot."). The parties do not oppose either group's participation as amici. AAI Mot. at 2; Fjord Mot. at 2. In light of this Court's "inherent authority" to permit amici participation, *Jin v. Ministry of State Sec.*, 557 F.Supp.2d 131, 136 (D.D.C. 2008), the Court will grant AAI leave to file its amicus brief. In addition, although the Fjord amici filed their brief after the Court's deadline and provide no explanation for this delay, the Court will nevertheless grant the motion and consider their brief in light of the fact that their participation is unopposed and in the interests of considering all available information. Accordingly, by separate Order issued this day, the Court grants both AAI and the Fjord amici leave to file their briefs. *See* Order, ECF No. [167].

In addition, on March 11, 2014, the Court Clerk's Office received an e-mail to its online suggestion box from a private citizen who objected to the settlement on the grounds that it was insufficient to counteract the alleged anticompetitive harms of the merger. A redacted version of

this e-mail has been placed on the docket.  *See* Order, ECF No. [166].

## II. LEGAL STANDARD

The Clayton Act, as amended by the APPA, requires that proposed consent judgments in antitrust cases brought by the United States be subject to a sixty-day comment period, after which the court shall determine whether entry of the proposed Final Judgment "is in the public interest." 15 U.S.C. § 16(e)(1). In making that determination, the court, in accordance with the statute as amended in 2004, is required to consider:

> (A) the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and

> (B) the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

*Id.*  A court must engage in an independent determination of whether the proposed consent judgment is in the public interest.  *United States v. Microsoft*, 56 F.3d 1448, 1458 (D.C. Cir. 1995).  Nevertheless, the court's inquiry is limited, as the United States is entitled to "broad discretion to settle with the defendant within the reaches of the public interest."  *Id.* at 1461. "With respect to the adequacy of the relief secured by the decree, a court may not 'engage in an unrestricted evaluation of what relief would best serve the public.'"  *United States v. Graftech Int'l*, No. 10-cv-2039, 2011 WL 1566781, at *12 (D.D.C. Mar. 24, 2011) (quoting *United States v. BNS, Inc.*, 858 F.2d 456, 462 (9th Cir. 1988)).  Accordingly "a district court is not permitted to reject proposed remedies merely because the court believes other remedies are preferable." *United States v. SBC Commc'ns, Inc.*, 489 F.Supp.2d 1, 15 (D.D.C. 2007) (citation omitted).  *See*

*also United States v. Republic Serv., Inc.*, 723 F.Supp.2d 157, 160 (D.D.C. 2010) (finding that "[i]n light of the deferential review to which the government's proposed remedy is accorded, [amicus curiae's] argument that an alternative remedy may be comparably superior, even if true, is not a sufficient basis for finding that the proposed final judgment is not in the public interest"). "[A] proposed decree must be approved even if it falls short of the remedy the court would impose on its own, as long as it falls within the range of acceptability or is within the reaches of public interest." *United States v. AT&T*, 552 F.Supp. 131, 151 (D.D.C. 1982) (citation omitted).

"Such a rule is justified because '[r]emedies which appear less than vigorous may well reflect an underlying weakness in the government's case, and for the district judge to assume that the allegations in the complaint have been formally made out is quite unwarranted.'" *SBC Commc'ns, Inc.*, 489 F.Supp.2d at 15 (quoting *Microsoft*, 56 F.3d at 1461). "Moreover, room must be made for the government to grant concessions in the negotiation process for settlements." *Id.* (citing *Microsoft*, 56 F.3d at 1461 ("it could also be that this was a concession the government made in bargaining.")). Nor in making this assessment is the court "tasked with deciding whether [the] merger[] as a whole run[s] afoul of the antitrust laws." *Id.* at 3. Rather, a court must simply determine "whether there is a factual foundation for the government's decisions such that its conclusions regarding the proposed settlements are reasonable." *Id.* at 15-16. *See also United States v. Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981) ("The court's role in protecting the public interest is one of insuring that the government has not breached its duty to the public in consenting to the decree.").

In making this determination the court "must accord deference to the government's predictions about the efficacy of its remedies, and may not require that the remedies perfectly match the alleged violations . . . ." *SBC Commc'ns, Inc.*, 489 F.Supp.2d at 17. *See also*

*Microsoft*, 56 F.3d at 1461 (noting the need for courts to be "deferential to the government's predictions as to the effect of the proposed remedies"); *United States v. Archer-Daniels-Midland Co.*, 272 F.Supp.2d 1, 6 (D.D.C. 2003) (noting that "[a] district court must accord due respect to the government's prediction as to the effect of proposed remedies, its perception of the market structure, and its view of the nature of the case").  As other courts of this district have noted, "it is improper for a court to require a proposed settlement to perfectly remedy antitrust violations when those violations have not yet been proven at trial, and when the government needs room to negotiate a settlement." *SBC Commc'ns, Inc.*, 489 F.Supp.2d at 16.  An imperfect match between the remedy and alleged violations may "only reflect underlying weakness in the government's case or concessions made during negotiation." *Id.* at 17.

"Moreover, the court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its Complaint . . . ." *Graftech*, 2011 WL 1566781, at *13.  A court may not "construct [its] own hypothetical case and then evaluate the decree against that case." *Microsoft*, 56 F.3d at 1459.  Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" and inquire into matters that the United States did not pursue. *Id.* at 1459-60.  Indeed, a court "cannot look beyond the complaint in making the public interest determination unless the complaint is drafted so narrowly as to make a mockery of judicial power." *SBC Commc'ns*, 489 F.Supp.2d at 15.

A court is not required to hold an evidentiary hearing or to permit intervenors as part of its review under the Tunney Act. *Id.* at 10 (citing 15 U.S.C. § 16(e)(2)).  A court can make its public interest determination based on the competitive impact statement and response to public

comments alone. *United States v. Enova Corp.*, 107 F.Supp.2d 10, 17 (D.D.C. 2000).

## III. DISCUSSION

### A. Harm Alleged from Merger

The Complaint sets out several harms to competition that would result from the merger of Defendants. First, and most obviously, the merger would eliminate two independent competitor airlines, ending head-to-head competition between US Airways and American on numerous nonstop and connecting routes. Am. Compl. ¶ 82.

Second, the merger of Defendants would leave the market with three similar "legacy" airlines – Delta, United, and the merged airline. *Id.* ¶ 3. These three carriers would have extensive national and international networks, connections to hundreds of destinations, established brand names, and strong frequent flyer mile programs. *Id.* ¶ 32. By contrast, other carriers such as Southwest Airlines, JetBlue Airways, Virgin America, Frontier Airlines, and Spirit Airlines, which the United States refers to in the CIS as "low-cost carriers" or "LCCs", lack the extensive networks of the legacy airlines. *Id.* The Complaint alleged that by reducing the number of legacy airlines from four to three and by aligning the economic incentives of these remaining airlines, the merger would render it easier for the remaining legacy airlines to cooperate, rather than compete, on price and service. *Id.* ¶¶ 41-46, 71-81. In the absence of the merger, both US Airways and American had indicated their intent to disrupt such coordination among legacy carriers. US Airways' network structure provided it the incentive to offer an "Advantage Fares" program, through which it offered discounts over other airlines' nonstop fares with its own cheaper connecting service. *Id.* ¶¶ 48-58. Similarly, upon emerging from bankruptcy, American was expected to undertake significant growth at the expense of its competitors. *Id.* ¶¶ 68-70. The merger casts into doubt these existing or expected disruptive

strategies. Accordingly, the Complaint expressed concern that the merger would shift the airline market to a tighter oligopoly with coordinated pricing among the remaining legacy airlines.

Third, the Complaint alleged that the merger would entrench the merged airline as the dominant carrier at Reagan National, where it would control sixty-nine percent of the take-off and landing slots. *Id.* ¶ 83. According to the United States, the merger would effectively foreclose entry or expansion by other airlines that might increase competition at Reagan National. *Id.* ¶¶ 84-86.

In addition to laying out the potential harms from the merger, the Complaint also explained that new entry or expansion by existing competitors to the legacy airlines would be unlikely to prevent or remedy these anticompetitive effects. *Id.* ¶¶ 91-94. Although LCCs offer important competition to the legacy airlines, they have less extensive networks than legacy carriers and face several barriers to entry and expansion. For example, four of the busiest airports in the country – Reagan National, LaGuardia, John F. Kennedy International, and Newark Liberty International – are subject to slot limitations governed by the FAA. The lack of availability of slots is a substantial barrier to entry at these airports. Slots at these airports are concentrated in the hands of legacy airlines that have little incentive to sell or lease slots to LCCs – the carriers most likely to compete aggressively against them. According to the United States, slots are expensive, difficult to obtain, and change hands only rarely. There are no alternatives to slots for airlines seeking to enter or expand their service at Reagan National. LCC expansion is also stymied by limited access to gates. At several large airports, a significant portion of the available gates are leased to established airlines under long-term exclusive-use leases. In such cases, a carrier seeking to expand or enter would have to sublease gates from incumbent airlines. The Complaint expressed concern that because of these high barriers to entry and expansion,

LCCs would be unlikely to counteract the anticompetitive effects of the merger.

## B. Review of Final Judgment

The Final Judgment seeks to address both the harm resulting from increased slot concentration at Reagan National and the broader harms alleged in the Complaint by requiring the divestiture of facilities at seven important airports – Reagan National, LaGuardia, O'Hare, LAX, Boston Logan, Miami International, and Dallas Love Field – including substantial divestitures at Reagan National and LaGuardia.

As an initial matter, the divestiture of slots at Reagan National addresses the localized competitive concern at this airport. Gov't Resp. at 11. Prior to the divestitures, LCCs held only six percent of the take-off-and landing slots at this airport. *Id.* The Final Judgment transfers an additional twelve percent of slots to LCCs, which constitutes all of Defendant American's pre-existing air carrier slots at Reagan National. *Id.* In addition, LCCs will also enjoy a substantially increased presence at LaGuardia, where they held less than ten percent of the slots prior to the divestitures. *Id.*

Similarly, although the Final Judgment does not create a new independent competitor nor replicate American's capacity expansion plans nor affirmatively preserve the Advantage Fares program, the United States predicts that it will impede the airline industry's evolution toward a tighter oligopoly. *Id.* at 8-9. The proposed Final Judgment significantly eases the high barriers to LCC entry and expansion identified in the Complaint by providing these non-legacy airlines access to strategically important and slot-constrained airports. *Id.* at 11. The United States argues that access to these key airports made possible by the divestitures will create otherwise unavailable network opportunities for the purchasing LCCs. LCCs will not only use these slots and gates to add new routes, but will incorporate these new routes into their existing networks,

making them more significant competitors to the remaining legacy airlines. *Id.* at 15. The United States admits that the remedy does not eliminate all entry barriers faced by LCCs. *Id.* at 15 n. 28. However, because LCCs have shown some ability to overcome other disadvantages with the help of lower costs, the United States expects that the network-wide strengthening brought about by the divestitures will, over time, help the LCCs overcome some of the other obstacles that limit their ability to expand. *Id.* Accordingly, the United States predicts that these divestitures to LCCs will provide increased incentives for these carriers to invest in new capacity and to expand into additional markets, providing more meaningful competition system-wide to legacy carriers.

In making its predictions about the disruptive tendencies of LCC entry or expansion, the United States relies on past experience and research. Previous work by both the Department of Justice and academics has shown that the presence of an LCC on a nonstop route results in substantial price reductions and capacity increases. *Id.* at 9 n. 13 (citing Jan K. Brueckner *et al.*, *Airline Competition and Domestic U.S. Airfares: A Comprehensive Reappraisal*, 2 ECON. TRANSP. 1-17 (2013); Phillippe Alepin *et al.*, *Segmented Competition in Airlines: The Changing Role of Low-Cost and Legacy Carriers in Fare Determination,* (working paper), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2212860; Martin Dresner *et al.*, *The Impact of Low Cost Carriers on Airport and Route Competition*, 30 J. OF TRANSP. ECON & POL'Y 309-328 (1996); Steven A. Morrison, *Actual, Adjacent, and Potential Competition: Estimating the Full Effect of Southwest Airlines*, 35 J. OF TRANSP. ECON & POL'Y 239-256 (2001)). In addition, the United States also relies on past instances where LCCs gained access to slot-constrained airports. *Id.* at 9-11. In 2010, in response to the United States' concerns regarding competitive effects of the proposed United/Continental merger, United and Continental transferred thirty-six

slots, three gates and other facilities at Newark Liberty International Airport to Southwest. *Id.* at 9-10. Southwest used those assets to establish service on six nonstop routes from Newark, resulting in substantially lower fares to consumers. For example, average fares for travel between Newark and St. Louis dropped twenty-seven percent and fares for travel between Newark and Houston dropped fifteen percent. In addition, through these additional Newark routes, Southwest established connecting service to approximately sixty additional cities throughout the United States, strengthening its larger network through the acquisition of assets at a single airport.

Here, the Final Judgment will require the divestiture of many more slots, gates, and additional facilities than were divested during the United/Continental merger. The United States expects that these substantial divestitures will significantly strengthen the purchasing carriers, providing the incentive and ability for these LCCs to invest in new capacity and provide legitimate competition to the remaining legacy carriers nationwide. Just as Southwest was able to offer service on sixty routes through the addition of six nonstop flights from Newark, the United States expects a similar (and larger) multiplier effect with the divestitures here.

The United States also points to past experience from the entry of JetBlue into Reagan National as evidence that divesting assets to LCCs will reduce the anticompetitive effects of Defendants' merger. *Id.* at 10-11. Prior to the current divestiture, JetBlue had only had a limited number of slots at Reagan National. Nevertheless, it used these limited slots to drive down fares and increase output on the routes it did serve. For example, after JetBlue began service from Reagan National to Boston in 2010, average fares dropped by thirty-nine percent and passengers nearly doubled. Indeed, US Airways estimated that after JetBlue's entry, the last-minute fare for round-trip travel between Reagan National and Boston dropped by over $700. *Id.* (citing Am.

14

Compl. ¶ 88).

Evaluating the proposed Final Judgment under the limited standard appropriate under the Tunney Act, the Court finds that the settlement agreement is "within the reaches of the public interest." *Microsoft*, 56 F.3d at 1461. The United States has provided a reasonable basis for concluding that the settlement will mitigate the anticompetitive effects of combining two of the remaining legacy airlines. In addition to reducing slot concentration at Reagan National, the settlement provides LCCs with substantial assets at key airports. The United States predicts, based on past research and experience, that providing LCCs with these otherwise unavailable opportunities will create incentives for LCCs to invest in new capacity, expand into new markets, and provide more meaningful system-wide competition to the three remaining legacy airlines, impeding the shift to oligopoly in the airline market. Specifically, the United States predicts that Southwest, JetBlue, and Virgin America's acquisition of slots at Reagan National and LaGuardia will allow them to provide greatly expanded service on numerous routes, including new nonstop and connecting service to points throughout the country. Similarly, gate divestitures at O'Hare, LAX, Boston Logan, Miami International, and Dallas Love Field will expand the presence of these potentially disruptive competitors at strategically important airports. Through these divestitures, the United States believes, LCCs will establish stronger positions at strategically important destinations where obtaining access has been especially difficult due to legacy airline entrenchment. At the same time, these LCCs will have new incentives to invest in new capacity and generate additional passenger demand. These predictions, which are founded on past experience and research, are entitled to the Court's deference. *See Microsoft*, 56 F.3d at 1461 (noting the need for courts to be "deferential to the government's predictions as to the effect of the proposed remedies"); *Archer-Daniels-Midland*, 272 F.Supp.2d at 6 (noting that "[a] district

court must accord due respect to the government's prediction as to the effect of proposed remedies, its perception of the market structure, and its view of the nature of the case").

None of the remaining Tunney Act factors suggest a different conclusion. As discussed, in reviewing the proposed Final Judgment, the Court must also consider additional factors besides those relating to competitive concerns in the relevant market. First, the Court must address "anticipated effects of alternative remedies actually considered." 15 U.S.C. § 16(e)(1)(A). As an alternative to the Final Judgment, the United States considered a full trial on the merits against the Defendants in which the United States would have sought an injunction against the merger. CIS at 16. The Final Judgment avoids the time, expense, and particularly the uncertainty of a full trial on the merits. "Success at trial was surely not assured, so pursuit of that alternative may have resulted in no remedy at all. While a trial may have created an even greater evidentiary record, that benefit may not outweigh the possible loss of the settlement remedies." *SBC Commc'ns*, 489 F.Supp.2d at 23. *See also* 15 U.S.C. § 16(e)(1)(B) (requiring "consideration of the public benefit, if any, to be derived from a determination of the issues at trial").

The Court also finds no cause for concern in the proposed settlement's "provisions for enforcement and modification." *Id.* § 16(e)(1)(A). "The proposed final judgment[] contain[s] standard provisions that maintain the Court's jurisdiction and en[s]ure compliance with the decrees as entered." *SBC Commc'ns*, 489 F.Supp.2d at 24. The Court retains jurisdiction over this action for ten years to enable any party to apply for further orders necessary to carry out, construe, modify, ensure, enforce, or punish violations of the proposed Final Judgment. PFJ §§ XV, XVI. In addition, to ensure that all necessary actions are being taken by Defendants, the Final Judgment permits the United States, in consultation with the Plaintiff States and with the

Court's approval, to appoint a Monitoring Trustee. *Id.* § VII. Defendants are further required to submit affidavits to the United States describing their efforts to comply with the Final Judgment. *Id.* § X. Finally, the Final Judgment empowers the United States to investigate compliance with the agreement through such means as inspection of documents, interviews, and written discovery. *Id.* § XI. Taken together, the Court finds that these enforcement and modification provisions are appropriate. *See SBC Commc'ns*, 489 F.Supp.2d at 24 (finding largely identical provisions "adequate . . . for the enforcement and modification of the final judgments.").

Finally, the Court must also consider "whether [the proposed final judgment's] terms are ambiguous." 15 U.S.C. § 16(e)(1)(A). Based on the Court's review, the proposed Final Judgment is sufficiently clear, as it clearly and specifically describes the assets to be divested, how these divestitures will be made, the circumstances in which modifications may be made, and how the Final Judgment can be enforced. As the Court addresses, *infra*, objections to the contrary are unavailing.

## C. Objections to Final Judgment

The objections filed during the public comment period and by amici do not dissuade the Court from the view that the settlement is within the reaches of the public interest. The Court addresses these objections below.

### 1. Failure to Remedy Harms Alleged

First, several commenters and both amici contend that the proposed Final Judgment fails to fully resolve the harms alleged in the Complaint. *See, e.g.,* AAI Amicus Brief at 8-17; Fjord Amicus Brief at 10-16. They argue that new LCC entry fostered by the divestitures will not neutralize all of the competitive losses in all of the city pair markets that might be affected by the merger. In this respect, these commenters and amici question the competitive significance and

long-term impact of LCC entry on fares and services. One commenter (Delta) specifically questions whether LCCs will provide significant competition to legacy carriers for business travelers. Gov't Resp., Appendix, Att. 6 (Comments of Delta Airlines, Inc.) at 20-24. In addition, AAI argues that the divestitures are not of a significant scope to remedy the anticompetitive harms from the merger. AAI Amicus Brief at 8-13. Relatedly, commenters also point to the settlement's failure to preserve US Airways' Advantage Fares program and specifically maintain competition on each city pair route on which Defendants provided competing service. Fjord Amicus Brief at 10-12. The Court finds these objections unavailing.

The United States has provided significant evidence to support its prediction that LCCs will provide meaningful and effective competition through their acquisition of the divested assets. As an initial matter, the United States provides evidence that LCCs are not limited to leisure travelers and do compete with legacy carriers for business travelers. *See* Gov't Resp. at 24 ("Southwest, the largest LCC, has reported that approximately 35% of its passengers are travelling on business and that corporate sales are increasing."); *id.* (noting that JetBlue "provides frequent service on the business routes that it flies."); *id.* at 25 ("Virgin America also caters to business passengers, billing its flights to corporate travel customers as 'your corner office in the sky.'"). Moreover, in support of its predictions of LCC entry and expansion, the United States points to the scope of the divestitures here as well as past evidence of the effect of LCC entry on fares. *Id.* at 8-15. Although AAI argues that the divestitures are too small in scope to provide the gains the United States hopes, the United States provides evidence of the significant impact of previous, smaller-scale divestitures to LCCs. In addition, as noted, the "[t]he Court must accord deference to the government's predictions about the efficacy of its remedies . . . ." *SBC Commc'ns, Inc.*, 489 F.Supp.2d at 17. And as discussed, *supra*, the United

States has provided a reasonable basis for its predictions of LCC entry and expansion through receipt of the divested assets. The Court notes, as an additional matter, that none of the LCCs have objected to the settlement on the grounds that it is insufficient to remedy the anticompetitive effects of the merger.

Amici attempt to undermine the United States' predictions by pointing to evidence after the parties entered into the settlement. *See, e.g.,* AAI Amicus Brief at 5; Fjord Amicus Brief at 3-5. For example, in order to show that the United States' predictions are inaccurate, AAI points to statements by Southwest's Senior Vice President and CFO that Southwest "continue[s] to have a disciplined growth strategy, with flat year-over-year capacity in 2014." AAI Amicus Brief at 5. AAI argues that this statement shows that the United States is misguided in predicting that Southwest will use the opportunities provided by the divestitures to expand its network and reduce the anticompetitive harm of the merger. The Court disagrees. First, Southwest is only one of the LCCs receiving the divested assets. Moreover, the Court is skeptical that the brief statements cited by AAI, standing alone, significantly undercut the United States' predictions. In addition, the Court is not reviewing the reasonableness of the United States' decision in hindsight based on ex post facto statements. Rather, "the relevant inquiry is whether the United States' conclusion about the adequacy of the . . . divestiture was reasonable, not whether it was correct." *United States v. Abitibi-Consolidated, Inc.*, 584 F.Supp.2d 162, 166 (D.D.C. 2008) ("The United States has provided a factual basis for concluding that the . . . divestiture was reasonably adequate to eliminate the merged firm's incentive to close capacity strategically. Irrespective of whether that conclusion [was] correct, the United States has established an 'ample foundation for [its] judgment call' and thus shown 'its conclusion [was] reasonable.'") (quoting *Microsoft*, 56 F.3d at 1461).

As an additional matter, despite the objections of commenters and amici, perfect matching between remedies and alleged violations is not required for Tunney Act approval. "[I]t is improper for a court to require a proposed settlement to perfectly remedy antitrust violations when those violations have not yet been proven at trial, and when the government needs room to negotiate a settlement." *SBC Commc'ns, Inc.*, 489 F.Supp.2d at 16. In arguing that every aspect of the Complaint must be satisfied in the settlement, the commenters and amici presume that the United States would have succeeded at trial in obtaining all the relief it sought in the Complaint. Yet, when undertaking Tunney Act review, the Court must keep in mind that "[r]emedies which appear less than vigorous may well reflect an underlying weakness in the government's case, and for the district judge to assume that the allegations in the complaint have been formally made out is quite unwarranted." *Microsoft*, 56 F.3d at 1461.

### 2.  Loss of Specific Routes

Next, several commenters object to the loss of specific routes flown by Defendants, which they argue will cease under the merged airline. Specifically, Delta and several members of Congress argue that only legacy carriers provide service to small and medium-sized communities, and that the loss of an independent airline will place flights to these destinations in jeopardy. *See* Gov't Resp., Appendix, Att. 2 (Comments of Sen. John D. Rockefeller IV, Rep. Bill Shuster, Sen. John Thune, and Rep. Nick J. Rahall II); *Id.*, Att. 3 (Comments of Sen. John Thune); *Id.*, Att. 6. In addition, the Wayne County, Michigan Airport Authority ("WCAA"), which operates the Detroit Metropolitan Airport ("DTW"), expresses concern that the divestitures have forced American, as part of the merged airline, to cease its direct flights from Reagan National to DTW, leaving Delta as the only nonstop carrier on this route. *Id.*, Att. 4 (Comments of WCAA); *Id.*, Att. 5 (Suppl. Comments of WCAA). Yet, for the reasons discussed

below, the Court is not persuaded that these objections are sufficient to place the settlement outside the reaches of the public interest.

The United States argues that the settlement protects small and medium sized communities without increasing oligopoly or imposing cumbersome route-specific remedies. The Court agrees. As an initial matter, the United States has provided evidence that LCCs do serve small and medium sized communities, providing a reasonable basis for its prediction that LCCs may expand into other small and medium sized communities in response to the divestitures. Gov't Resp. at 24, 41. The United States also argues that permitting divestiture purchases by Delta in order to preserve service to small and medium sized communities would do more harm than good, as further concentration of slots and gates with legacy carriers would exacerbate the alleged shift to oligopoly in the airline market. *Id.* at 40-41. Finally, the Court notes that the Final Judgment does not divest any of the merged airline's "commuter" slots at Reagan National. *Id.* at 36. These commuter slots, which are limited to smaller-sized aircraft, are well-suited for service to small and medium sized communities. Indeed, the Department of Transportation agreement entered into by Defendants, although not part of the Final Judgment, requires that Defendants use all of the commuter slots at Reagan National to serve airports designated as medium, small, and non-hub airports for a period of at least five years. *Id.* at 8 & n. 11.

In addition, the United States has adequately responded to the comments of the WCAA by noting that the proposed Final Judgment does not mandate American's elimination of the Reagan National-DTW nonstop flight. The merged airline maintains a significant share of slots at Reagan National and has the flexibility to deploy these slots in the way it sees fit. *Id.* at 35-36. By ceasing direct service to DTW, American is making a business decision as to which routes it

will serve after the divestitures.  *Id.* at 37.  The United States further explains that amending the Final Judgment and mandating that the merged airline continue specific routes or requiring an LCC to undertake a specific route would represent a solution that is neither feasible nor desirable, as these "types of behavioral remedies would be exceedingly difficult to craft, entail a high degree of risk of unintended consequences, entangle the government and the Court in market operations, and raise practical problems such as the need for ongoing monitoring and enforcement."  *Id.* at 30 n. 52.  Indeed, "[e]ven a full-stop injunction of the merger would not have guaranteed continued competition between the merging airlines on specific routes . . . ."  *Id.* Moreover, the Court notes that should prices increase on the Reagan National-DTW route as WCAA predicts, LCCs will have the incentive to enter this route and compete on price with Delta.  As the United States points out, by providing LCCs with substantial assets at Reagan National, the settlement creates opportunities for this sort of competition.  *Id.* at 39.

### 3.  Failure to Comply with Tunney Act

Several commenters and amici contend that the settlement should be rejected because the United States and Defendants have failed to comply with the procedural requirements of the Tunney Act.  The Court finds all of these objections unavailing.

First, both amici argue that Defendants closing of their merger on December 9, 2013, prior to this Court's entry of Final Judgment, was in contravention of the Tunney Act.  AAI Amicus Brief at 19-21; Fjord Amicus Brief at 16-20.  However, as the United States points out, the text of the Tunney Act does not require a district court's approval of a settlement prior to closing a merger.  Gov't Resp. at 50-51.  Indeed, courts have previously acknowledged and accepted such action.  *See SBC Commc'ns*, 489 F.Supp.2d 1, 8 (D.D.C. 2007) (noting that the transaction at issue closed prior to entry of the Final Judgment "in keeping with [the United

States'] standard practice that neither stipulations nor pending proposed final judgments prohibit the closing of the mergers.").  As the United States points out, by choosing to close their merger prior to entry of the Final Judgment, Defendants have accepted the risk of undoing the merger should it prove necessary.  Gov't Resp. at 51.  Moreover, the Court notes that although not charged with enforcing the Tunney Act, the Bankruptcy Court gave its approval to the settlement and thus allowed Defendants' merger to close well before this Court's consideration of the Final Judgment.

Second, one commenter argues that the United States has failed to meet its obligations to explain the proposed consent judgment under 15 U.S.C. § 16(b)(3), because the CIS does not include substantive economic analysis and cost-benefit analysis of the sort required by Executive Orders 13563 and 12866.  Gov't Resp., Appendix, Att. 13 (Comments of Relpromax Antitrust, Inc.).  Yet such analysis, while potentially helpful in establishing that a settlement is "within the reaches of the public interest", *Microsoft*, 56 F.3d at 1461, is nowhere required by the Tunney Act.  Moreover, in the Court's view, the United States' CIS contains a sufficient explanation of the settlement to allow the public to understand the provisions of the decree and submit meaningful comments.  Accordingly, the alleged failure to comply with 15 U.S.C. § 16(b)(3) is without merit.

Similarly, the Court rejects this same commenter's argument that the United States was required to consider more than one alternative to settlement because the Tunney Act requires the United States' CIS to describe "alternatives to such proposal actually considered."  15 U.S.C. § 16(b)(6).  Here, the United States has presented the only alternative to this settlement that it *actually considered*, and thus there is no violation of the Tunney Act simply because the United States did not consider other alternatives.

Finally, the Fjord amici and several commenters argue that the settlement was the product of improper political pressure by the airlines and should thus be rejected. Gov't Resp. at 49-50; Fjord Amicus Brief at 20-23. Yet the objecting parties provide no evidence for this contention other than bare speculation. They similarly provide no reason to doubt the sufficiency of Defendants' compliance with the disclosure requirements of the Tunney Act. 15 U.S.C. § 16(g). Accordingly, the Court will not reject the settlement on these grounds.

### 4. Ambiguity in Final Judgment

Next, commenter Allegiant Air, LLC argues that the Final Judgment is ambiguous regarding Defendants' ability to reacquire divested assets at LAX. Gov't Resp., Appendix, Att. 14 (Comments of Allegiant Air, LLC) at 2. Allegiant expresses concern that even after American, as part of the merged airline, relinquishes claims to "preferential use" of the divested gates at LAX, as required by the settlement, it may still attempt to operate out of these gates on a "common use" basis, and thus limit LCC access to LAX. *Id.* Airport gates leased to a particular carrier on a "preferential use" basis allow the leasing carrier to use the gate subject to the airport authority's ability to provide access to another airline if the gate is not being used by the lessor. *Id.* "Common use" gates involve a situation where multiple carriers share use of the gate, with priority among the users determined according to protocols set by the Los Angeles World Airports Authority, the owner and operator of LAX. *Id.* Allegiant is apparently concerned that the merged airline may regain rights to the LAX gates if they are designated as "common use." However, the United States argues, and the Court agrees, that the existing language in the Final Judgment prohibiting Defendants from reacquiring "any interest" in the divested assets is sufficient to prevent the merged airline from using LAX procedures to block LCC access at this airport. Gov't Resp. 46-47. Accordingly, modification of the Final Judgment is unnecessary.

### 5. Objections Outside the Scope of Tunney Act Review

In addition to the foregoing objections, several commenters and amici raise objections that fall outside the scope of review applicable under the Tunney Act.

First, Delta argues that the Complaint was unjustified and unnecessary because there is no threat of coordinated pricing among the remaining legacy airlines. Gov't Resp., Appendix, Att. 6 at 9-20. The Court takes no position on this objection other than to note that it does not come within the purview of Tunney Act review. Essentially, Delta is challenging the United States' prosecutorial discretion in bringing its initial lawsuit against Defendants and the merits of this underlying lawsuit. Such an objection sheds no light on whether the settlement of this litigation is within the reaches of the public interest. A Tunney Act proceeding is not occasion for a "de novo determination of facts and issues." *United States v. Western Elec. Co.*, 993 F.2d 1572, 1577 (D.C. Cir. 1993) (citation omitted). Rather it merely represents an opportunity "to determine whether the Department of Justice's explanations [are] reasonable under the circumstances." *Id.* (citation omitted).

Next, the comments of the Consumer Travel Alliance, while recognizing that the settlement contains "some good first steps", argues that the Department of Transportation should take further action to ensure competition in the airline industry, such as disclosure of airfares, ancillary fees and code shares. Gov't Resp., Appendix, Att. 8 (Comments of Consumer Travel Alliance). Again, the Court takes no position as to the validity of these objections, except to note that they fall outside the scope of the United States' Complaint. As discussed, under the Tunney Act, "the court is only authorized to review the decree itself" and not to "effectively redraft the complaint" and inquire into matters that the United States did not pursue. *Microsoft*, 56 F.3d at 1459. The Court "cannot look beyond the complaint in making the public interest determination

unless the complaint is drafted so narrowly as to make a mockery of judicial power." *SBC Commc'ns*, 489 F.Supp.2d at 15. Here, there is no argument that the United States' Complaint is too narrowly drafted in excluding the Consumer Travel Alliance's concerns such that it has become a mockery of judicial power.

Finally, amici argue that the underlying merger between Defendants violates various principles of antitrust law. AAI Amicus Brief at 17-19 (alleging violation of the out-of-market benefits rule); Fjord Amicus Brief at 12-16 (alleging violation of *Brown Shoe Co. v. United States*, 370 U.S. 294 (1962)). Yet these objections misconceive Tunney Act review, as this Court is "not tasked with deciding whether . . . mergers as a whole run afoul of the antitrust laws," *SBC Commc'ns*, 489 F.Supp.2d at 3, but rather must only ensure that the proposed settlement is "within the reaches of the public interest," *Microsoft*, 56 F.3d at 1461. Here, for the reasons discussed, the Court is satisfied that this standard is met.

## IV. CONCLUSION

For the foregoing reasons, the Court concludes that the proposed Final Judgment is in the public interest. In an exercise of its discretion under the Tunney Act, the Court finds that a hearing on this issue is not necessary. The United States' [161] Motion for Entry of the Proposed Final Judgment is GRANTED, and the Final Judgment will be entered as proposed. A separate Order accompanies this Memorandum Opinion.

_____/s/_____
**COLLEEN KOLLAR-KOTELLY**
UNITED STATES DISTRICT JUDGE
